Diane P. Sullivan
WEIL, GOTSHAL & MANGES LLP
17 Hulfish Street, Suite 201
Princeton, NJ 08542
(609) 986-1120

Yehudah L. Buchweitz (*pro hac vice forthcoming*)
David Yolkut (*pro hac vice forthcoming*)
Matthew R. Friedenberg
Josh Halpern (*pro hac vice forthcoming*)
Yonatan Shefa (*pro hac vice forthcoming*)
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL KURLANSKY, HELAINE KURLANSKY, MARTIN EPSTEIN, HERBERT ENNIS, JUDITH ENNIS, MORDECAI APPLETON, HENRY KATZ, LILA KATZ, JOAN KATZ, GLENN KATZ, and JUDITH SINGER,<br><br>Plaintiffs,<br><br>vs.<br><br>1530 OWNERS CORP.; MOE MARSHALL, ELLEN GERBER, KENNETH LIPKE, CAROL LICHTBRAUN, JUSTIN WIMPFHEIMER, PATRICIA DI CONSTANZO, and MARK O'NEILL, Individually and as Members of the Board of Directors of 1530 Owners Corp., and; FIRSTSERVICE RESIDENTIAL,<br><br>Defendants. | Civil Action No.<br><br><br>**COMPLAINT** |

Plaintiffs Paul Kurlansky, Helaine Kurlansky, Martin Epstein, Herbert Ennis, Judith

Ennis, Mordecai Appleton, Henry Katz, Lila Katz, Joan Katz, Glenn Katz, and Judith Singer

(collectively, "**Plaintiffs**"), all of whom reside at 1530 Palisade Avenue, Fort Lee, NJ 07024, by

and through their undersigned counsel, for their Complaint against Defendant 1530 Owners

Corp. (also referred to herein as the "**Colony**"), which has a principal place of business located at

1530 Palisade Ave, Fort Lee, NJ 07024, Moe Marshall, Ellen Gerber, Kenneth Lipke, Carol

Lichtbraun, Justin Wimpfheimer, Patricia Di Constanzo, and Mark O'Neill (collectively the

"**Board Defendants**," and together with the Colony, the "**Colony Defendants**), both individually and as members of the Board of Directors of 1530 Owners Corp. (the "**Board**"), all of whom reside at 1530 Palisade Ave, Fort Lee, NJ 07024, and FirstService Residential ("**FSR**", and collectively with the Colony Defendants, the "**Defendants**"), which has a principal place of business located at 21 Christopher Way, Eatontown, NJ 07724, hereby state as follows:

## I.        PRELIMINARY STATEMENT

1.        This is an action to redress, *inter alia*, religious discrimination under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("**FHA**") and the New Jersey Law Against Discrimination, N.J.S.A.10:5-1 *et seq.* ("**NJLAD**"), faced by observant Jewish residents of the Colony, including those who are elderly and/or physically handicapped.  In a direct assault on Plaintiffs' religious freedom and the rights of certain Plaintiffs to reasonable accommodation because of handicap, Defendants have taken a series of targeted actions that have effectively confined Plaintiffs to their apartments on the Sabbath and major Jewish holidays, for either the entirety or a large portion of the day.

2.        Plaintiffs are predominantly Sabbath observant Jewish residents of the Colony – a thirty-two floor full service cooperative apartment building in Fort Lee, NJ, divided into a North Tower and a South Tower.  As Sabbath observers, Plaintiffs are forbidden from using electronic and certain mechanical devices on the Sabbath and Jewish holidays.  As is relevant to this Complaint, this means that Plaintiffs are forbidden from pushing elevator buttons on the Sabbath and religious holidays without violating their sincerely held religious beliefs.  Plaintiffs make up but a fraction of the Sabbath observant residents of the Colony.  As of today, there are at least fifty-four Colony residents representing thirty-three households who observe the Sabbath (collectively with Plaintiffs, the "**Sabbath Observant Residents**").  Most of the Sabbath Observant Residents are over sixty years of age, and some are eighty years of age or more.

3.      Because the Sabbath Observant Residents reside as high as the thirty-second floor, and most are elderly and/or physically handicapped, they have only two possible means of leaving and returning to their apartments during the 25 hours that make up the Jewish Sabbath.[1] The first is to ask a building staff member to assist in pushing the elevator buttons for them. Staff members at the Colony routinely assist other building residents with any number of activities (for example by pushing elevator buttons if a resident is carrying a heavy package), and had been assisting the Sabbath Observant Residents with elevator use on the Sabbath since well before Mr. Epstein moved to the Colony over sixteen years ago.  The second option is to use a "Sabbath elevator."  Sabbath elevators are pre-programmed to stop at certain floors, obviating the need for any button pushing.  Such elevators are common in high-rise buildings like the Colony with high concentrations of Sabbath observant residents – including in three buildings adjacent to the Colony – as they allow Sabbath observers to attend religious services (as they are religiously obligated to do), visit neighbors, attend communal meals, celebrations and other life-cycle events, or just go down to the lobby to take a walk with dignity, and without being dependent on others for assistance.

4.      For many years, the Sabbath Observant Residents had to rely on the first option (staff assistance), as the Colony's management and the Board insisted that the Colony's older elevators did not possess the functionality to be placed into Sabbath elevator mode.  While it did not provide for the same level of independence and flexibility as a Sabbath elevator, building staff were courteous and always willing to assist, and the Sabbath Observant Residents never heard nor experienced any objections from building staff nor Defendants.  The Sabbath Observant Residents paid for staff assistance in the same way that everyone else in the building

---

[1] For the purposes of this Complaint, the laws and restrictions of the Sabbath are equivalent to those of the major Jewish Holidays.

did: through tips.  While these tips were not required, they were consistent with building practice, and the Sabbath Observant Residents were appreciative of the staff and wished to compensate them accordingly.

5.     When in 2018 the Colony announced its plans to install high-speed electronic state-of-the-art elevators that came with a Sabbath mode already built-in, the Sabbath Observant Residents formed a Sabbath elevator committee (the "**Committee**") and approached the Board to request that the Board approve a Sabbath elevator program.  Each of the Colony's North and South towers has three elevators (two passenger elevators and one service elevator in each tower, for a total of six elevators).  The Committee asked that only the service elevators in each tower be programmed for Sabbath elevator use, because residents rarely use the service elevators in the ordinary course.  Residents who wished to use the service elevators during the times they were programmed to Sabbath mode would still be able to do so, and would be able to select the floor of their choosing, even if it was not one of the preprogrammed floors.  The Board agreed to put the issue to a shareholder vote, but what followed was a salvo of calculated and discriminatory actions by Defendants to negatively influence the forthcoming Sabbath elevator vote, target the Sabbath Observant Residents, and ultimately make it untenable for them to observe their faith as residents of the Colony.

6.     Plaintiffs first saw the writing on the wall when Ms. Lichtbraun joined the Board in 2018.  Prior to her joining, Ms. Joan Katz and Mr. Glenn Katz heard Ms. Lichtbraun remark that she did not want **"too many of those types of Jews moving into the building"** – referring to Sabbath observant Jews.  The Board itself evinced its discriminatory intentions when it took the unprecedented step of converting the shareholder vote regarding the Sabbath elevators to a "non-binding" vote, an act clearly designed to allow it to dismantle the Sabbath elevator program

-4-

even if passed by the shareholders.  Indeed, though the Sabbath elevator was instituted after receiving the support of a majority of the shares voted, the Colony abruptly terminated the program less than a year later by sending a memorandum to all Colony residents **on the eve of the Sabbath**, offering only flimsy and pretextual excuses to support its decision (the "**Termination Memo**").  The Board's animus towards the Sabbath Observant Residents was palpable, as the Termination Memo threatened to assess extensive elevator repair fees against all shareholders, as well as legal fees if the Sabbath Observant Residents sought legal action against the Colony in an "**unjustified lawsuit**."  This was unquestionably an attempt to pit the Sabbath Observant Residents against their neighbors.  Moreover, just weeks later, **on the eve of the Jewish High Holidays and without notice to the Sabbath Observant Residents**, the Board doubled down on its animus by instructing Colony staff to cease pushing elevator buttons for the Sabbath Observant Residents on the Sabbath and Jewish holidays, uprooting the over 16-year practice of permitting such assistance.

7.     The Board has conceded this discriminatory act, attempting to justify its draconian policy change by claiming that the Colony never had a "written policy" allowing for such assistance.  But this is an absurdity: the Colony does not have **any written policy** available to its shareholders delineating the comparable services that its staff members perform daily for all residents, such as pushing elevator buttons for struggling residents, or helping residents with their groceries.  The only such policy that **does** exist is the policy that facially targets the Sabbath Observant Residents on account of their religion, and applies to the Sabbath Observant Residents and no one else.

8.     The resulting impact to the overall Sabbath experience within the building and without has been profound, isolating, and irreparable: many Sabbath Observant Residents are left

without the ability to pray communally, and thus fulfill numerous Jewish **commandments**,[2] or to spend time enjoying and observing the Sabbath with their friends, family, and community. Additionally, many of the Sabbath Observant Residents with young grandchildren have been unable to host them over the Sabbath and Jewish holidays, as the children especially cannot be confined to an apartment all day, and they too cannot ascend and descend many flights of steps, especially those in strollers.

9.      Seeking recourse, the Committee engaged an attorney and the Anti-Defamation League (the "**ADL**") to contact Defendants to insist that they cease their discriminatory actions. Certain other members of the Committee initiated an investigation with New Jersey's Division on Civil Rights (the "**DCR**").  The Colony Defendants, represented by Mr. Marshall, swiftly and harshly retaliated.  In a February 24, 2021 Board meeting conducted via Zoom and open to all shareholders, Mr. Marshall targeted the Committee by announcing that their actions were costing shareholders $10,000, as the Colony Defendants were forced to engage their own counsel.  Mr. Marshall explained that he was reporting this information in an effort to let shareholders "know where [their] money is going," and described the resulting costs as "a waste of money."  In a second shareholder meeting held on April 7, 2021, Mr. Marshall informed shareholders that the Sabbath elevator matter was now costing shareholders almost $20,000, and that the cost of the "**battle**" could grow as high as $300,000, which would result in an assessment against all shareholders.

10.      These abhorrent comments – designed to intimidate, incite a building-wide backlash, and create a hostile living environment – have unfortunately succeeded.  On one

---

[2] For example, the following strongly held traditional religious practices can only occur in the presence of a quorum of ten: reciting certain foundational communal prayers; reading the Torah, which is the foundational text of Judaism, which Jews have read on the Sabbath for over three millennia; and saying the "mourner's *kaddish*," the primary means of honoring and commemorating deceased relatives.

occasion, a shareholder publicly and verbally accosted Mr. Epstein in the building lobby for "costing shareholders more than $10,000," and demanded to know why the Sabbath Observant Residents are "entitled" to a Sabbath elevator.  On the heels of that confrontation, a shareholder sent Mr. Epstein and other Committee members anonymous, threatening, hate-filled letters and called them **"an embarrassment and disgrace to Jews."**  Separately, one attorney shareholder sent the same Committee members two letters threatening legal action if they would not withdraw their DCR claims.  Parroting Mr. Marshall's retaliatory remarks, the shareholder accused them of costing the Colony $20,000 in legal fees, which would "potentially result in a special assessment to shareholders."

11.     Despite Defendants' repeated instigations, Plaintiffs attempted to resolve their issues with Defendants on several occasions in an effort to amicably reach a compromise without needing to resort to litigation.  However, Defendants have remained obstinate in their refusal to consider Plaintiffs' religious and physical needs.  Plaintiffs therefore have no choice but to commence this action.

12.     To remedy Defendants' discriminatory actions, to be given the opportunity to peacefully practice their religion in their own homes and communally, and to obtain the accommodations to which certain of the Plaintiffs are lawfully entitled, Plaintiffs seek a declaration that the Colony Defendants' actions violate the FHA, the NJLAD, and the Planned Real Estate Development Full Disclosure Act ("**PREDFDA**").  Plaintiffs also allege that the Board Defendants breached their fiduciary duty, that the Colony breached its Proprietary Lease (the "**Lease**"), and that Defendant FSR aided and abetted these breaches as well as the Colony Defendants' NJLAD violations.  Plaintiffs request an order removing the Board Defendants and excluding them from further service.  Plaintiffs further seek preliminary and permanent orders

compelling Defendants to resume the Colony's practice of assisting Sabbath observant Jewish residents with the elevators on Sabbath and Jewish Holidays, to resume operation of the Sabbath elevator, and to cease their retaliations against Plaintiffs.  Plaintiffs also seek an award of actual and punitive damages, and costs and attorneys' fees.

## II.       PARTIES AND KEY PEOPLE AND ORGANIZATIONS

13.      Plaintiff Mr. Martin Epstein, age 80, is a Sabbath observant Jewish resident of the Colony who lives on the sixteenth floor of the Colony's North Tower in apartment 16F.  Mr. Epstein has been living at the Colony for over sixteen years with his wife Gloria Epstein.  When he moved to the Colony, he was concerned that the building did not have a Sabbath elevator, and he spoke with observant Jewish residents of the Colony who explained that Colony employees had always assisted observant Jewish residents with the elevators on the Sabbath and Jewish holidays by pushing buttons for them.  Mr. Epstein later helped form the Committee, and advocated for installation of the Sabbath elevator after the Colony's elevators were upgraded. Now that the Board terminated the Sabbath elevator and prohibited staff from assisting the Sabbath Observant Residents with the elevators, Mr. Epstein is forced to hire someone personally to assist with the elevators on the Sabbath, which he prearranges before the onset of the Sabbath for specific times.  Mr. Epstein arranges similar assistance for other Sabbath Observant Residents as well.

14.      Plaintiffs Herbert Ennis, age 89, and Judith Ennis are Sabbath observant Jewish residents of the Colony who reside on the fifth floor of the Colony's North Tower in apartment 5A.  The Ennises have been living at the Colony for six years.  Ms. Ennis is a member of the Committee.  Mr. Ennis suffers from advanced Parkinson's disease and requires a cane to ambulate, which he has difficulty doing.  Mr. Ennis is unable to ascend or descend stairs and is dependent on the Colony's elevators to get to and leave his apartment.  Mr. Ennis's condition has

continued to worsen, and he is now transitioning to a wheelchair.  Before the Sabbath elevator was instituted, staff at the Colony would accompany the Ennises to the elevator to push the buttons for them when they returned from the synagogue on Sabbath, without their even needing to ask.  In order to leave their apartment, they would arrange in advance of the Sabbath for building staff to come assist them with the elevators, and building staff were always accommodating.  Once the Sabbath elevator was instituted, the Ennises relied on it not only to go to synagogue, but to go out for walks on Sabbath afternoons and visit neighbors.  Now that Colony staff no longer assist the Sabbath Observant Residents, Mr. Ennis has not attended synagogue on the Sabbath in several months, and is entirely homebound each Sabbath.  Ms. Ennis also seldom goes to synagogue, because she spends much of her Saturday mornings taking care of Mr. Ennis, and has no proper means to get there.  While many of the Sabbath Observant Residents use the hired assistant Mr. Epstein organizes, the hours are too rigid for her caretaker responsibilities, and she too has difficulty using the stairs.  Mr. Ennis has a handicap under the FHA and a disability under the NJLAD.

15.     Plaintiff Mordecai Appleton, age 91, is a Sabbath observant Jewish resident of the Colony who resides on the twenty-first floor of the Colony's South Tower in apartment 21M.  Mr. Appleton has been living at the colony for six years with his wife Carole Appleton, age 83, who has personally lived at the Colony since 2012.  Mr. Appleton suffers from congestive heart failure and requires a motorized scooter or other assistive device to ambulate more than short distances.  Mr. Appleton is unable to ascend or descend stairs and is dependent on the Colony's elevators to get to and leave his apartment.  Ms. Appleton has chronic pain in her knees, and is similarly unable to ascend or descend many stairs.  Before the Sabbath elevator was instituted (and again once the Board terminated it), the Appletons would leave a note at the service desk

before the onset of the Sabbath indicating what time they needed a staff member to bring the elevator up to their floor.  When they returned to the building, a staff member would press the elevator buttons to allow them to return to their apartment.  This practice was never an issue, and allowed them to attend services at the local synagogue, as well as to invite Sabbath observant guests to their apartment to celebrate the Sabbath with them, knowing that a staff member would assist their guests with the elevator.  Now that the Board has restricted staff from assisting the Sabbath Observant Residents with the elevators, Mr. Appleton and his wife are forced to pay someone to assist them instead, along with Mr. Epstein.  Occasionally, the hired assistant fails to show up, and when that happens, the Appletons are forced to stay home.  Even when the hired assistant does come, he comes at limited specified times, and the Appletons are confined to their apartment for the remainder of the Sabbath, and cannot have guests.  Mr. Appleton has a handicap under the FHA and a disability under the NJLAD.

16.     Plaintiffs Mr. Henry Katz, age 81, and Ms. Lila Katz, age 80, are Sabbath observant Jewish residents of the Colony who reside on the third floor of the North Tower in apartment 3E.  Henry and Lila Katz have been living at the Colony since 2005.  Mr. Katz suffers from atrial fibrillation, and has had two heart attacks.  He has a stent and a defibrillator, and runs out of breath going up stairs.  His doctor has advised him to avoid strenuous activity.  Mr. Katz has also had several blood clots in his leg.  He is often unstable, and has fallen several times.  He was in the hospital recently, and his doctors think he likely has gout.  Ms. Lila Katz suffers from congestive heart failure, cirrhosis of the liver, and has a low plate count. She has alternatively been diagnosed with arthritis, bursitis, and tendinitis.  Starting five years ago when their health deteriorated, Henry and Lila Katz relied on building staff to help them push elevator buttons on the Sabbath.  Mr. Katz is able to descend the stairs but is unable to ascend.  Ms. Lila Katz can

neither ascend nor descend.  When Henry and Lila Katz would enter the Colony, staff nearby would offer to push buttons automatically without their having to ask.

17.    Once the Sabbath elevator was established, Henry and Lila Katz relied on it every Sabbath to leave their apartment and to return.  However, now that the Board has terminated the Sabbath elevator and restricted staff from assisting with the elevators, they are severely restricted.  They are no longer able to host or share Sabbath meals with their friends.  Because Mr. Katz is able to descend stairs, he is able to attend synagogue, but is forced to pay someone to help him push the elevator buttons when he returns, which he pre-arranges before the Sabbath for very specific times.  However, because Ms. Lila Katz is unable to descend stairs, she has not been to synagogue since Yom Kippur eight months ago, and is homebound each Sabbath, which she would not be with the help of a Sabbath elevator.

18.    Plaintiffs Dr. Paul Kurlansky, age 68, and Ms. Helaine Kurlansky, age 67, are Sabbath observant Jewish residents of the Colony who reside on the thirty-second floor of the Colony's South Tower in apartment PHC.  Because Dr. Kurlansky suffers from cardiomyopathy and an irregular heartbeat, extensive use of the stairs could be hazardous to his health.  The Kurlanskys purchased their apartment after shareholders had already voted to institute the Sabbath elevator, but before it went into effect.  When they came to see the building before purchasing their apartment, Mr. Marshall assured them that there would be a Sabbath elevator. The Kurlanskys also asked Mr. Marshall what Sabbath observers do in the absence of a Sabbath elevator, and Mr. Marshall explained that, as a matter of building practice, building staff assist Sabbath observers by pushing buttons for them.  Based on these representations, the Kurlanskys purchased their apartment at the Colony.  Moreover, the Kurlanskys purchased one of the Colony's more spacious apartments specifically so that they would be able to enjoy the company

of their children and grandchildren on the Sabbath and Jewish holidays.  However, because of

Defendants' actions, they are unable to do so, as their children and grandchildren are unable to

be confined to the apartment for the duration of the Sabbath or holiday.  Dr. Kurlansky has a

handicap under the FHA and a disability under the NJLAD.

19.     Plaintiffs Joan Katz, age 68, and Glenn Katz, age 69, are Jewish residents of the

Colony who live on the thirtieth floor of the Colony's North Tower in apartment 30B.  Joan and

Glenn Katz have been living at the Colony for six years.  Ms. Joan Katz is Sabbath observant and

is a member of the Committee.  Mr. Glenn Katz is not Sabbath observant, though he often uses

the stairs with his wife on the Sabbath.  Ms. Joan Katz suffers from an autonomic nervous

system dysfunction that affects her balance and causes tremors.  Ms. Joan Katz was forced into

early retirement because of her condition.  She is able to use the stairs, but excessive stair use

makes her very nervous, and she holds on strongly to the railing in fear of falling.  Ms. Joan Katz

has a handicap under the FHA and a disability under the NJLAD.

20.     The Sabbath elevator significantly enhanced the Sabbath experience for Ms. Joan

Katz, as it allowed her and her husband to easily attend synagogue, Sabbath meals, and social

events on the Sabbath.  Ms. Joan Katz is co-president of her synagogue's Sisterhood, and the

Sabbath elevator allowed her to celebrate the Sabbath with her fellow congregants on Saturday

afternoons.  Since the Board terminated the Sabbath elevator and instructed staff not to assist the

Sabbath Observant Residents, Joan and Glenn Katz still attend synagogue, but must walk down

thirty flights of stairs to do so.  To return to the thirtieth floor, they will either arrange for

assistance in advance with Mr. Epstein's hired assistant or try to get in an elevator with another

resident.  On occasion, they have had no choice but to walk up thirty flights of stairs.  Recently,

when Ms. Joan Katz returned from synagogue, she, Ms. Ennis, and another Sabbath Observant

Resident waited by the elevator, hoping someone would assist with the elevators.  A staff member, who knows all of them and their apartment numbers, and who used to assist them regularly on the Sabbath, got onto the elevator but did not push the buttons for them because of the Colony's new policy restricting assistance to Sabbath observers.  This act of discrimination was deeply degrading and demeaning to Ms. Joan Katz and Ms. Ennis, who were shocked by the lack of decency exhibited by the staff member, who used to be more than happy to assist.

21.     Plaintiff Judith Singer, age 92, is a Sabbath observant Jewish resident of the Colony who lives on the ninth floor of the Colony's North Tower in apartment 9B.  Ms. Singer moved to the Colony with her late husband in 2004.  Starting in 2004, Ms. Singer and her husband would arrange for building staff to assist them with the elevators on the Sabbath and Jewish holidays by pushing buttons for them when they needed to leave their apartment.  Upon returning from synagogue, building staff at the entrance would automatically know to push the elevator buttons for them, or alert another staff member to assist.  Ms. Singer followed this practice without interruption or objection until September 2020 when the Board ordered staff members to stop assisting Sabbath observers with pushing elevator buttons.  Ms. Singer regularly used the Sabbath elevator when it was functioning.  Now that there is no Sabbath elevator and staff are prohibited from assisting with the elevators, Ms. Singer hires an assistant that she prearranges in advance for specific times with the help of Mr. Epstein.

22.     The Colony is a co-operative residential apartment building located at 1530 Palisade Avenue, Fort Lee, NJ 07024.

23.     Defendant 1530 Owners Corp. is a domestic profit corporation of the State of New Jersey, and is the entity in which residents of the Colony purchase proprietary shares to become shareholders of the Colony.  Those who own apartments at the Colony are shareholders

of 1530 Owners Corp.  Plaintiffs are all either shareholders, or live with a spouse who is a shareholder.

24.     1530 Owners Corp. (the Colony) is managed by a seven-member Board of Directors, with each director serving a three-year term.  The Board meets with shareholders several times per year to keep shareholders informed on developments with the building.

25.     Defendant Moe Marshall has been President of the Board since 2014, and was a member of the Board for several years before becoming President.  Mr. Marshall also operates his contractor business out of an office at the Colony, for which he pays below-market rent.[3]  He often uses his Board status to solicit business from tenants in the building.  For example, when the Kurlanskys came to see the Colony, Mr. Marshall introduced himself as the Board President, and offered to conduct their renovations, explaining that he would easily be able to get approval from the Colony and from the city.  On information and belief, Mr. Marshall has taken retribution against residents for refusing his professional services, or speaking out against him.  Mr. Marshall also has a history of discriminatory behavior.[4]

26.     Defendant Ellen Gerber served on the Board from 2015 until May 2021, and was Vice President of the Board from 2017 until the end of her term.  Ms. Gerber has been strongly opposed to the Sabbath elevator.

27.     Defendant Kenneth Lipke is the Treasurer of the Board, and has been a member of the Board since 2014.  Mr. Lipke has been strongly opposed to the Sabbath elevator.

---

[3] On information and belief, Mr. Marshall pays only $400 per month for his commercial office space, and his rent has not increased in the five years he has been in the space.

[4] In a separate lawsuit filed in 2016 against the Colony and Mr. Marshall for age discrimination, plaintiff, a 59-year-old man, disclosed that Mr. Marshall threatened "that he should watch himself or he would be replaced by someone cheaper and younger."  Mr. Marshall also told plaintiff that he could replace plaintiff with someone without a family in order to save on insurance premiums.  Upon information and belief, Mr. Marshall never went out of his way to advise shareholders about the costs of defending this lawsuit, or how the costs could impact Colony finances.

28.     Defendant Carol Lichtbraun is the Secretary of the Board.  Ms. Lichtbraun was elected to the Board in 2018, and was just reelected for a new three-year term.  Ms. Lichtbraun has been strongly opposed to the Sabbath elevator.

29.     Defendant Justin Wimpfheimer has been a member of the Board since at least 2017.  Mr. Wimpfheimer has been strongly opposed to the Sabbath elevator.

30.     Defendant Patricia Di Constanzo has been a member of the Board since May 2019.

31.     Defendant Mark O'Neill has been a member of the Board since May 2020.

32.     Defendant FSR has its regional corporate headquarters in Eatontown, NJ, and its national headquarters in Dania Beach, FL.  FSR works with over 8,500 cooperatives, HOAs, community associations, condominiums, and strata corporations across the United States and Canada.[5]  As a leading provider of building management services, FSR is well acquainted with both federal and state laws prohibiting housing discrimination, as well as board director responsibilities.[6]  Pursuant to a contract with the Colony, which contract is executed by the Board, FSR serves as the Colony's managing agent, authorized by the Board in this capacity to lead the building staff in discharging their employment duties at the Colony.  Mr. Jude Odenthal, an FSR employee, serves as Community Manager, working closely with the Board, and Mr. Marshall in particular, to oversee Colony staff.  Mr. Odenthal works out of an office at the Colony, and is assisted by an administrative staff that included Ms. Jenifer Garcia as Assistant Property Manager until April 2021.

---

[5] *See* https://www.fsresidential.com/new-jersey/.
[6] *See, e.g.*, *The Four Myths of Reasonable Accommodation and Reasonable Modification*, Articles (Jan. 7, 2015), https://www.fsresidential.com/corporate/news-and-articles/articles/the-four-myths-of-reasonable-accommodation-and-rea/; *What to Know about Service Dogs, Comfort Animals and Your New Jersey High-Rise*, Articles (Feb. 15, 2018), https://www.fsresidential.com/new-jersey/news-events/articles/what-to-know-about-service-dogs-comfort-animals-an/; *5 Reasons Board Members Go Back to School*, Article (Jan. 8, 2020), https://www.fsresidential.com/corporate/news-and-articles/articles/5-reasons-board-members-go-back-to-school/.

### III.    JURISDICTION AND VENUE

33.    Subject matter jurisdiction over this action is conferred upon this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) & (4), and 42 U.S.C. § 3613.

34.    This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

35.    Personal jurisdiction over this action is conferred upon this Court because the Defendants are located in this District and because the acts complained of occurred in this District.

36.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all of the Defendants are located in this District and because the events giving rise to the claim occurred in this District.

### IV.    FACTUAL BACKGROUND

**A. The Colony is a Full-Service "White-glove" Building**

37.    The Colony is a luxury, full-service high-rise apartment building with just under 500 apartments, divided between its North and South towers.  The Colony touts the many services it offers its residents, including 24/7 concierge, in-house maintenance, and valet services, as well as delivery services and on-site dry cleaning, among others.[7]  The Colony also offers an extensive list of amenities, which include indoor and outdoor pools, massage rooms, and a fully equipped fitness and health club, featuring exercise equipment, saunas, and professionally led exercise classes.[8]

38.    Shareholders pay for these services and amenities through monthly Maintenance Fees.  With the exception of parking, laundry and dry cleaning, and storage, most of the services

---

[7] *The Colony at 1530*, https://www.thecolonyat1530.com/lifestyle-and-amenities.
[8] *See id*.

and amenities are offered to residents at no additional fee.  While the Colony charges for certain classes, others are free to residents.  Exercise classes are typically capped at around twelve people, and residents who do not sign up in time are unable to join.  When certain classes are offered, whether at the pool, the spa, or another room, the facility in which the class is taking place is off limits to other residents.  Residents pay Maintenance Fees irrespective of whether they use the building's services and amenities.

39.     In order to carry out its many services, the Colony employs approximately 28 building staff, not counting staff in the garage and management office.  These concierges, porters, door attendants, maintenance staff, and other staff members routinely assist residents with a wide array of daily activities around the building.  For example, staff members deliver packages and other parcels to residents' apartments, and assist residents with their luggage.  If a resident is sick, staff will often help the resident take out the garbage, or go upstairs to bring the resident a prescription.  The door attendants and concierges in the main lobby routinely leave the front desk to go to the storage/valet room where packages are held for pick-up if the storage room is closed.  Similarly, in the lower-level service entry, the door attendants regularly leave their desk to go outside to help residents unload their car trunks and place their groceries or packages into shopping carts kept outside of the service entry, to be brought to their apartments by staff.  If a larger cart is needed and is not available in the service room, the door attendant will walk a distance to retrieve a larger cart.  The maintenance staff circulate throughout the building and regularly go to residents' apartments to deliver packages and address maintenance concerns.  Also, it is common to see a staff member escort a resident who is vision impaired, frail, or who otherwise has difficulty walking.  Notably, door attendants and other staff members routinely assist residents in the lobby or lower level who are carrying packages or groceries by carrying

the items for the residents, or accompanying the residents to the elevator bank to press the

elevator buttons for them. These services, which are covered by all shareholders' Maintenance

Fees, are offered every day of the week, including Saturday—the Jewish Sabbath.

**B. The Colony's Longstanding Practice of Assisting Observant Jewish Residents on the Sabbath and Jewish Holidays**

40.     Just as staff members regularly assist residents with carrying packages and

groceries, including by pushing elevator buttons for struggling residents, staff at the Colony have

long assisted observant Jewish residents who are forbidden from pushing elevator buttons on the

Sabbath and Jewish holidays.  For over sixteen years, on Friday nights and Saturdays, the

Sabbath Observant Residents returning from religious services in the nearby synagogue would

enter the service entry or main lobby and the door attendant on duty would ask an available

porter to accompany them to the nearby elevator and push the button for them – a courtesy that

takes only a few moments and is akin to the many other services that the Colony offers its

residents.  When the Sabbath Observant Residents needed assistance to go downstairs from their

apartments on the Sabbath, they would arrange for it beforehand by leaving a request at the front

desk or service desk asking a staff member to call the elevator to their floor or pick them up at a

prescribed time.  This practice of allowing building staff to assist Sabbath observers with

elevator operation was consistent with that of the three high-rise buildings adjacent to the

Colony, which all allow their staff members to assist Sabbath observers with calling elevators on

the Sabbath and Jewish holidays to supplement their Sabbath elevator programs when necessary.

41.     As noted above, this practice had been in place for over sixteen years, since

before Mr. Epstein and Ms. Singer moved to the Colony.  Before closing on their apartment, Mr.

Epstein approached a Sabbath observant couple to inquire how they managed getting up and

down from their apartment on the Sabbath and Jewish holidays.  The couple explained that staff

members would pick them up from their apartment, as well as push elevator buttons on the lower level to allow them to return to their apartment.  Indeed, in an effort to sell the Kurlanskys on the Colony, Mr. Marshall confirmed this practice to the Kurlanskys when they were deciding whether to purchase an apartment at the Colony.  Plaintiffs, including Mr. Epstein and Ms. Singer, and the other Sabbath Observant Residents had been following this practice without interruption or objection until September 2020 – mere days before the Jewish High Holidays – when the Board, suddenly, shockingly, and without notice, ordered staff members to stop assisting Sabbath observers with pushing elevator buttons, as discussed further below.

### C.  Observant Jewish Residents Advocate for a Sabbath Elevator to Supplement Staff Assistance

42.     While staff elevator assistance effectively allowed the Sabbath Observant Residents to return to their apartments when returning to the building on the Sabbath, it did not provide flexibility for them to leave their apartments to visit other floors or leave the building as fully needed.  Because Sabbath observers are unable to call for assistance on the Sabbath, they were required to arrange with building staff to pick them up in their apartments at pre-scheduled times, and were limited to those pre-planned activities and hours.  This was especially true for those like Mr. Ennis, Mr. Appleton, and Ms. Lila Katz, for whom taking the stairs even one floor is an impossibility.  In order to allow for greater mobility, the Committee requested that the building adopt a Sabbath mode for its elevator service, as is typical in buildings like the Colony.  Indeed, three other full service buildings adjacent to the Colony[9] (the Atrium, the Century, and River Ridge) feature Sabbath elevators, some of which have been functioning for a decade or more without controversy, rancor, or incident.  The Committee only requested that the service

---

[9] Like the Colony, these three buildings are all in walking distance to the local Orthodox synagogue. Because Orthodox Jews do not drive on the Sabbath and are required to walk to synagogue on the Sabbath, many Orthodox Jews live in these buildings in particular.

elevators be programmed for Sabbath mode, leaving the Colony's four remaining passenger elevators functioning on a regular basis.

43.    Mr. Epstein had been advocating for the institution of a Sabbath elevator since at least 2007.  At that time, though, the Board told Mr. Epstein and the other Sabbath observant residents that the building's old elevators did not have the functionality to be programmed in Sabbath mode.  Yet starting in October 2017, the Colony began upgrading to high-speed electronic state-of-the-art elevators (pictured below), which were completed in 2019.  The new, automated elevators came with Sabbath mode built-in; they could thus easily be pre-programmed for use as a Sabbath elevator without the need for any additional equipment, resources, or manpower.



44.     Mr. Epstein and his wife discussed the idea for a Sabbath elevator with Mr. Marshall in 2016, and Mr. Marshall indicated that a Sabbath elevator would become a reality after the upgrades were completed.  Based on the assurances, and with plans for the renovation already underway, Mr. Epstein, Ms. Ennis, Ms. Joan Katz, and other residents – both Sabbath observant and non-Sabbath observant – formed the Committee.

45.     To ensure the new elevators would support their needs, the Committee contacted a representative from Liberty Elevator Corporation ("**Liberty**") – the elevator company performing the renovations – to confirm the new elevators were properly equipped for Sabbath mode.  The representative explained that it was easy to program the elevators for Sabbath mode, and sent the Committee materials outlining the programming options.

46.     The Committee also invited Mr. Marshall to several meetings to discuss the benefits of having a Sabbath elevator.  Mr. Marshall purported to support the idea, but said he would need to speak to the other Board members.  Unfortunately, the other Board Members had other plans entirely.

47.     The Board responded that it would put the question to a shareholder vote at the 2019 annual meeting.  It was not merely unusual – but ***unprecedented*** – to place such a decision up for a shareholder vote, since decisions relating to building operations are usually decided directly by the Board.  For example, the Board previously issued a rule allowing emotional support dogs in the building, and another rule limiting how long residents could sit in the lobby, without consulting shareholders or bringing the matters to a vote.  Generally, only issues that necessitate a change to the Lease or the building's bylaws are brought to a shareholder vote.  For example, at the 2019 annual meeting, shareholders voted on a proposal to prohibit smoking in the Colony, because such a proposal required an amendment to the Lease.

48.     Mr. Marshall himself told the Committee that it was within the Board's power to make the decision itself, but that the Board wanted shareholder approval in order to foster goodwill.  But as is now readily apparent, the Board in fact did not want a Sabbath elevator in the building for discriminatory reasons, and was hoping the shareholders would vote down the Sabbath elevator without their having to do so.  Towards that end, the Board purposely misrepresented the facts of the elevator on the shareholder ballot (as described below).  This was not the first time that members of the Board had displayed animus towards Sabbath observant Jewish residents.  In the summer of 2017, Ms. Joan Katz and Mr. Glenn Katz overheard Ms. Lichtbraun (who was not yet on the Board) speaking to other residents by the pool about the changing population at the Colony.  Ms. Lichtbraun remarked that she did not want **"too many of those types of Jews"** – referring to religious Jews – "**moving into the building**."  Ms. Joan Katz confronted Ms. Lichtbraun asking if she had a problem with her as a Sabbath observer, but Ms. Lichtbraun did not respond.  On a different occasion, Ms. Joan Katz attended a meeting of the Colony's social committee in early 2019, at which the social committee discussed its plans for the building's upcoming events.  Mr. Wimpfheimer also attended the meeting as a liaison between the social committee and the Board.  When one committee member suggested a particular entertainer for one of the events, Mr. Wimpheimer immediately responded: "**no - he's too Jewish**."  Ms. Joan Katz asked if he was being serious, and he responded affirmatively.

49.     Prior to the 2019 vote, the Committee worked tirelessly with the Board and the Colony's FSR management staff to design a Sabbath elevator program that would not inconvenience non-users.  For example, the Committee suggested that the Sabbath elevator doors open in the compactor room, rather than the hallway, so that residents would not enter the service elevator only to discover that it was in Sabbath mode.  Yet inexplicably, and indeed for reasons

that can only be explained by the Board's desire to sabotage the program, the Board denied this request.

50.     The Committee also agreed that the elevator would only enter Sabbath mode at certain specified hours over the Sabbath when the Sabbath Observant Residents needed it most (*e.g.*, before and after Synagogue hours), and that the Sabbath elevator would stop only on designated floors requested by the Sabbath Observant Residents.

51.     The Committee also educated non-Sabbath observant residents about the benefits of having a Sabbath elevator through a series of communications and in-person meetings in which they noted, for example, that the Sabbath elevator would make the Colony more competitive with the three nearby buildings that already provided the amenity.  Local realtors confirmed that the Sabbath elevator would raise the value of apartments in the building.  Unfortunately, not all residents were receptive.  At one such meeting in or around early 2019, Ms. Appleton heard a resident remark: "**we don't need that kind . . .  Let them go someplace else**."

52.     Board members tried to sabotage these meetings as well.  At one such meeting in March 2019, Ms. Ennis was designated to speak about the importance of a Sabbath elevator for the Sabbath Observant Residents, especially for those like Mr. Ennis who are non-ambulatory or have difficulty with steps.  Mr. Marshall asked to provide a "brief" welcome to the residents after which he would allow the Committee to give their presentation.  Mr. Marshall instead proceeded to speak for forty minutes, providing inaccurate information about the Sabbath elevator.  Only after certain residents requested that Mr. Marshall yield the floor to the Committee did Mr. Marshall finally relent.  Ms. Ennis gave her presentation, but by the time she began residents were tired and losing patience.  Another Committee member opened the floor to questions, but

the meeting quickly became unruly and negative.  Mr. Marshall made no effort to control the group as he generally does during meetings, and Ms. Lichtbraun egged on the unruly residents.

53.    On April 27, 2019, shortly before the May 2019 annual shareholder meeting, management distributed an absentee ballot to all the shareholders.  To the shock of the Committee and the other proponents of the Sabbath elevator, the Board inexplicably and unilaterally changed the wording on the ballot from a "vote" to a "**non-binding** vote."  *See* Ex. A.  Neither Mr. Epstein nor Henry and Lila Katz, all long-time residents of the Colony, nor any other Committee member, could recall the Colony ever having a "non-binding" vote on **any other matter**.  Other long-time shareholders and a former Board member have likewise confirmed that the Colony has never held a non-binding shareholder vote until the Sabbath elevator vote.  The Colony's bylaws do not provide for a "non-binding" vote of shareholders.

54.    The Board claimed to be holding the vote "in order to be informed of shareholders' preferences prior to the Board making a decision."  *See id.*  However, a former Board member[10] told Plaintiffs that Board members – in particular, Defendants Lichtbraun, Gerber, Lipke, and Wimpfheimer – were vehemently opposed to the Sabbath elevator because it would attract too many of "those types" to the Colony, but thought it would reflect poorly on them if they unilaterally disapproved of the Sabbath elevator.  In reality, the Board was creating a "heads I win, tails you lose" scenario in which either the shareholders would vote down the Sabbath elevator (which they hoped for and tried to cause), or the Board would retain its rights to cancel the program.

55.    Not only was the promised vote downgraded to "non-binding" status, but the substantive terms were also changed.  Despite months of planning during which the Committee

---

[10] This former Board member has asked not to be named out of fear of retribution by the Board.  Other residents and building workers have made the same request, also out of fear.

had intentionally agreed to have the Sabbath mode operate at specified hours, the wording on the ballot described the Sabbath elevator as operating "from sunset each Friday to sunset each Saturday" – a description that was likely to dissuade shareholders by portraying the hours as more extensive than agreed to.  *See id.*  The ballot also failed to mention that only the service elevator would run in Sabbath mode.

56.     The Committee brought these inaccuracies to Mr. Marshall's attention and asked that the ballots be corrected.  Mr. Marshall refused, and the Committee insisted that he discuss the issue with the Board.  On April 29, 2019, Mr. Marshall informed Ms. Joan Katz that the Board unanimously voted against rectifying the error.  No explanation was given for why the Board refused to correct these errors, but clearly this was just another step in its multi-pronged discrimination campaign.

57.     Undeterred, the Committee sent shareholders a letter informing them that the Board's ballot contained "incorrect and missing information," and explained that only the service elevator would run in Sabbath mode, that it would run for a fraction of total Sabbath hours, and that it would stop at designated floors only.  *See* Ex. B.  The Committee also explained that residents would still be able to utilize the service elevator while the Sabbath elevator was operating.  *See id.*  The Committee also held two separate meetings with Colony residents on April 30 to provide further information about the benefits of a Sabbath elevator, and to again correct the Board's misstatements.  *See* Ex. C.

58.     Despite the Board's best efforts to paint an unfavorable picture of the Sabbath elevator, the proposal won a majority of the voting shares at the May 15, 2019 annual meeting. Although the elevator renovations were completed in July 2019, by which time the shareholders had already expressed their collective wishes for the Sabbath elevator program, the Sabbath

elevator did not begin operating until September 2019, and only after the Committee implored the Board to allow the Sabbath elevator to begin functioning before the High Holidays.

**D.  The Board Carries Out its Plan to Sabotage the Sabbath Elevator**

59.     In an effort to streamline the process, Mr. Epstein served as the liaison between the Board and FSR, and the Sabbath Observant Residents.  In an email sent to the Sabbath Observant Residents on September 27, 2019 announcing the upcoming Sabbath elevator schedule, Mr. Epstein requested that residents direct their comments to him, and expressed his desire to cause a minimum impact to all shareholders.

60.     Mr. Epstein worked tirelessly with Mr. Marshall and Mr. Odenthal to arrange the times of operation and schedule of stops, and to address shareholder comments.  Mr. Epstein was committed to addressing shareholder comments, and did so by responding directly to shareholders, as well as by notifying the Sabbath Observant Residents of any such comments. Only a handful of shareholder comments were registered in the initial three months of operation, the majority of which came around December 7, 2019 when one of the non-service elevators was out of order.

61.     As the Committee agreed, the Sabbath elevator operated in the service elevator for limited times on Friday evenings and Saturdays, totaling about nine hours in a twenty-five hour period – far fewer hours than the Sabbath modes operated in the adjacent high-rise buildings.  Although some Sabbath elevators in the adjacent buildings stop on every floor or every other floor, the Colony Sabbath elevator stopped only on floors that shareholders requested, so as to minimize any possible disruption to non-users (which was already minimized since the service elevators were lightly used on evenings and weekends).  At all times, the Sabbath Observant Residents were acutely aware of and were particularly considerate to the other residents in the building.  Although they bent over backwards to limit the Sabbath elevator

parameters, the Sabbath Observant Residents were grateful to have this valuable amenity, which allowed them to observe their faith with dignity and without having to rely on the building staff.

62.     Despite these concessions, and barely three months after the Sabbath elevators started functioning, Mr. Marshall told Mr. Epstein that the Sabbath elevator program was "in trouble," and the Board unanimously wanted to terminate it.  Although Sabbath observers asked for a written explanation of the reasons, the Board did not provide one.

63.     On December 3, 2019, Mr. Epstein asked Mr. Marshall to schedule a meeting to discuss any issues with the Sabbath elevator.  Mr. Marshall asked Mr. Epstein to first meet with Mr. Odenthal.  On December 12, 2019, after meeting with Mr. Odenthal, Mr. Epstein renewed his request to Mr. Marshall to schedule a meeting.  Mr. Marshall ignored Mr. Epstein's request, and two days later, Mr. Epstein sent Mr. Marshall an email again asking to meet to discuss any purported issues.

64.     By December 15, 2019, Mr. Marshall still had not responded, and Mr. Epstein thus sent a detailed letter to Mr. Marshall explaining why the Sabbath elevator was not burdensome to the Colony, and assured Mr. Marshall that he and the Sabbath Observant Residents, who represented over thirty apartments, were committed to working with the Board and building management to make the Sabbath elevator a success for all shareholders.  *See* Ex. Ex. D at 1-3.  Mr. Epstein also explained that several recent buyers at the Colony purchased their apartments expressly because they were told that there would be a Sabbath elevator in the building, and pointed out that other buildings adjacent to the Colony have had Sabbath elevators for many years without issue.  *See id.* at 2-3.

65.     Similarly, on December 16, 2019, Dr. Kurlansky sent an email to Mr. Marshall explaining that the benefits the Sabbath elevator provides to all shareholders because of

increased property value certainly outweigh any minor issues regarding the Sabbath elevator, which represents less than two percent of overall elevator service in the building.  Dr. Kurlansky also expressed his desire to do whatever he could to address any issues.

66.     At a meeting in January 2020 with Plaintiffs and other affected shareholders, Mr. Marshall and Mr. Odenthal claimed that use of the service elevators for limited hours on Friday night and Saturday was somehow causing excessive "wear and tear" on the elevator doors and would accelerate the need for all of the elevator doors to be replaced sooner than planned.  On information and belief, this excuse had no basis in fact.  To the contrary, according to the Colony's 2019 audited financial statement, the building spent less than a quarter of its allocated budget for elevator repairs, even though the Sabbath elevator was running for nearly one-third of the year.  *See* the relevant excerpt of the Colony's Financial Statements attached as Ex. E.

67.     Fearing the loss of this critical service, the Committee agreed to one concession after another.  In a letter sent to Mr. Marshall and Mr. Odenthal on January 31, 2020, the Committee expressed its desire "to do everything [it] can to allay operational concerns."  *See* Ex. F at 3.  The Committee, for example, agreed to reduce the number of stops, to temporarily delete floors when residents were away, and to have the elevator run "express" from the lower level to the highest floor needed, and then make stops on the programed floors on the way down only. *See id.*  Additionally, the Committee agreed to shorten the total hours of operation from nine hours over the course of the Sabbath to just seven, even though it would "pose a hardship to the Sabbath observing shareholders."  *See id.*  However, the Committee informed the Board that reducing the total number of hours to less than seven "**would not be feasible for proper Sabbath observance, and would cause severe hardship to many of the users of the Sabbath elevator – especially the elderly, the infirm and physically challenged**" (emphasis added).

*See id.* at 4.  The Committee also stressed that a further reduction in hours "would also render all Sabbath observers who must use the elevator at risk of violating the Sabbath, since proper observance entails not only morning, afternoon and evening services, but also Torah study, rabbi lectures and similar activities in the spirit of the Sabbath."  *See id.*

68.     Additionally, the Committee offered to pay for a report from the elevator company to assess whether the Sabbath elevator was causing the "wear and tear," and to evaluate how the Sabbath mode could operate most efficiently. The Committee also renewed its earlier request that the doors open in the trash room rather than the hallways to make the Sabbath mode less noticeable to non-users.  The Board inexplicably denied each and every request.

69.     Despite the Committee's insistence that decreasing the hours to less than seven total hours would be untenable for the Sabbath Observant Residents, the Board insisted on drastically cutting the hours from nine total hours to **a mere five hours** (two on Friday evenings, and three on Saturdays – divided into three one hour increments), and threatened to terminate the Sabbath elevator altogether if the Committee did not consent.  Faced with this ultimatum, the Committee "accepted" the terms, even though it meant being stuck in their apartments for a majority of the Sabbath.

70.     With all the agreed-upon limitations now in place, the Sabbath elevator operated for the next few months.  At the height of the COVID-19 pandemic in the Spring of 2020, building rules reduced elevator usage to two people per elevator, and houses of worship were closed.  The Board announced a temporary suspension of the Sabbath elevator and the users did not object, even though it meant staying inside their apartments each Sabbath.  One of the non-Sabbath observant residents sent a message to the Board asking that service be restored on a limited basis, but the Board ignored the message.

71.     At an April 29, 2020 Zoom meeting held for shareholders to have an opportunity to "Meet the Candidates" for an upcoming Board election, two incumbent Board members used the platform to further smear the Sabbath elevator.  Mr. Marshall and Mr. Lipke again alleged without basis or support that the Sabbath elevator was causing excessive "wear and tear" to the elevator doors.  Mr. Marshall threatened to assess costs of elevator repairs against all shareholders.  Mr. Lipke used the opportunity to remind shareholders that the Sabbath elevator vote was "non-binding," and claimed that the Sabbath elevator was only intended to run for a short-term trial, even though the shareholder ballot said nothing about the Sabbath elevator operating for a "trial period" only.

72.     In June 2020, as the COVID spread began to abate and houses of worship re-opened with reduced hours and at reduced capacities, the Sabbath elevator likewise resumed on a very limited basis and the affected residents repeatedly expressed their appreciation.

73.     Indeed, through July 2020, the Committee heard no further complaints from the Board or building management.  It was therefore a total shock to Plaintiffs and the other Sabbath Observant Residents when **on Friday evening**, July 24, FSR sent the Termination Memo on behalf of the Board to all Colony residents announcing the "Termination of Sabbath Elevator Service."  *See* Ex. G. Despite the ongoing cooperation of the Sabbath Observant Residents, the open line of communication with Mr. Odenthal, and the fact that the Sabbath elevator had been approved by a majority shareholder vote, the Board gave no advance warning of its unilateral decision.

74.     As if the Board's inflammatory decision to distribute the Termination Memo on the eve of the Sabbath was not enough to demonstrate its discriminatory intentions, the Board offered several dubious reasons for its decision, which were belied by inaccuracies and

contradictions contained in the letter itself.  Most egregiously, although the Sabbath elevator operated in **only two of the building's six elevators** (one elevator in each of the North and South towers), the Termination Memo concluded that Sabbath elevator use caused extra stress on the elevator doors that would necessitate the replacement of **all the doors on all six elevators**. *See id.* at 3.

75.     The Termination Memo acknowledged that in 2017, when the Board decided to replace the aging elevators, they chose not to replace the elevator doors, which were "evaluated to be in fair condition with a potential life span of ten years." *See id.* at 2.  Yet in an attempt to engender ill will against the Sabbath elevator, the Board inexplicably asserted that a mere **five hours** of use a week for less than one year now necessitated one million dollars in repairs, which would be assessed against all shareholders. *See id.* at 3.  At the same time, the Board blamed the Sabbath elevator for impacting deliveries and cleaning, indicating that the service elevators would undergo "wear and tear" regardless. *See id.*  When the Committee asked to see documentation supporting the Board's claims, they were ignored.

76.     Just recently, on March 22, 2021, one Sabbath Observant Resident approached a Liberty repair technician who was on site to inquire about the elevator doors.  The technician explained that the doors were original doors and would need to be replaced soon regardless.  The resident asked the technician if he had noted increased service calls during the period the Sabbath elevator was in operation, and the technician responded in the negative.  Similarly, on May 5, 2021 when the same resident noticed several elevator technicians near the service entrance, he asked a staff member at the service entry why so many technicians were on site, and the staff member explained that they were performing emergency repairs on the service elevator.  When the resident asked the staff member whether it was true that Sabbath mode had caused

damage to the elevator doors, the staff member responded: "no way - that's bullshit."  None of these facts are surprising, as the Board's justifications were obviously pretext.

77.     The Board also claimed that residents complained of longer elevator wait times caused by the Sabbath elevator.  *See id.*  But this too is simply not credible.  While building management reported the handful of comments registered in the first three months of the Sabbath elevator's operation, building management did not report any further comments to the Committee after that initial three-month period, even though the Committee had been in close contact with both Mr. Marshall and Mr. Odenthal.  Additionally, residents still had access to the same two additional elevators that they were accustomed to using, as residents primarily use the non-service elevator banks, and are regularly restricted from service elevator use.  In fact, in November 2020, after the Board terminated the Sabbath elevator program, a notice was posted next to the service elevator, advising: "We suggest residents not use the service elevator from 9 A.M. to 6 P.M. Monday through Friday.  Elevator will be in use by Colony Staff, Emergency Staff and Contractors during these hours."  *See* Ex. H.

78.     The Board's true discriminatory motives were most evident in the threatening tone the Board took in the Termination Memo's concluding paragraph.  There, the Board stated: "[w]e ask that you respect the decision of those representing the best interests of the Colony residents.  In the past, a small group of shareholders has mentioned potential lawsuits against the Board and Management when the option of discontinuing the Shabbos elevator was mentioned. **We hope residents would not want to be a party to an unjustified lawsuit which would lead to legal fees that would be assessed against all shareholders**."  *See* Ex. G at 3-4.

79.     This was a blatant attempt to threaten the Sabbath Observant Residents and turn other shareholders against them and the Sabbath elevator program, as Defendants have no history

-32-

of assessing legal fees against shareholders.  In fact, the Colony's 2019 financial statement

reveals that it spent three times more in legal fees than budgeted for, yet the Board did not assess

those fees against shareholders.  *See* Ex. E at 7.

### E.  The Colony Doubles Down by Ordering Building Staff to Cease Assisting Sabbath Observers by Pressing Elevator Buttons

80.    Having dismantled the Sabbath elevator program, the Board intensified its animus

towards the Sabbath Observant Residents.  On September 16, 2020—***just days before the Jewish***

***high holiday of Rosh Hashanah***—a Colony employee notified certain Sabbath observant

residents that staff had been ***directed not to assist observant Jewish residents with the elevators***

***on the Sabbath and other Jewish holidays***.  On information and belief, the Board instructed

staff members that if they were caught offering such assistance, they would be fired.  One staff

member was near tears as he explained that he wanted to continue helping but was afraid he

would lose his job.

81.    Worse, the Board did not give residents any notice of its decision.  If concerned

staff members had not on their own notified a few of the Sabbath Observant Residents of this

new edict beforehand, the Sabbath Observant Residents would have returned from religious

services on the evening of Rosh Hashanah to find they had no way to get back to their

apartments – a situation that would have been humiliating and potentially dangerous to their

health, especially to those with disabilities such as Mr. Ennis, Mr. Appleton, Mr. Henry Katz,

Ms. Lila Katz, Ms. Joan Katz, and Dr. Kurlansky (collectively, the "**Handicapped Sabbath**

**Observant Residents**").

82.    When asked why this sudden change was occurring, one staff member said he was

warned that pushing the elevator button for Sabbath observers was not in the union contract.

This excuse is a complete pretext.  The staff has been unionized for years, but this issue had

never been mentioned before.  Since this change in policy, a number of building staff members have been demoted or pushed to resign or retire.

83.     Affected Jewish shareholders were deeply shaken by this latest turn of events. Mr. Epstein and other Committee members contacted Mr. Marshall and FSR building management to ask if it was really true that the Board ordered staff to stop assisting Sabbath Observant Residents with the elevator on the Sabbath and holidays.   Mr. Epstein also expressed his concern to Ms. Garcia from management that the new policy would cause severe hardship to the Sabbath Observant Residents.  Both Mr. Marshall and Ms. Garcia confirmed that the report was true, and that the decision was made by the Board.  In light of the regular, routine assistance provided by building staff to other residents in any number of secular activities – *including help with the elevators* – this decision can only be seen as abuse and discrimination targeting the Sabbath Observant Residents.

84.     On September 17, 2020, Mr. Epstein sent two emails to Mr. Marshall reminding him that the Sabbath Observant Residents are religiously prohibited from pushing elevator buttons on the Sabbath and Jewish holidays, and explaining that if the Board would not rescind its decision, he and the Sabbath Observant Residents would not be able to attend synagogue on the holiest days of the year.  *See* Ex. I.  Mr. Epstein noted that he and his wife had been living at the Colony for 16 years, and had never had an issue with staff helping them out on the Sabbath. *See id.*  He also noted the disparate treatment the Sabbath Observant Residents were facing, considering that there would be no issue if they needed staff to make deliveries to their apartments rather than push buttons.  Mr. Epstein also warned that the Board's decision would subject the Colony to potential liability, as Sabbath observers might fall on the steps trying to

attend services.  *See id.*  In a meeting with Mr. Marshall to discuss the issue, Mr. Marshall told Mr. Epstein to "go pay a Shabbos goy to push a button."

85.     Separately, on September 18, 2020, another Committee member emailed Mr. Odenthal, Mr. O'Neill, the Colony's counsel, and Mr. Marshall, asking them to share her message with the entire Board.  *See* Ex. J.  The Committee member implored them to reverse the decision, and explained that she and the other Sabbath Observant Residents would not otherwise be able to attend services on the holiest days of the Jewish calendar year, nor the Sabbath.  *See id.*  She expressed that the new policy was "targeted directly at religiously observant Jewish shareholders, and ***especially, those who are physically disabled due to age and/or illness who cannot climb the stairs***" (emphasis added).  *See id.*  She also communicated that the Board's decision was part of "a pattern of conduct that disadvantages religiously observant Jewish shareholders."  *See id.*

86.     Mr. Marshall refused to change his position, even for the Jewish High Holidays. On Thursday evening, September 17, 2020, Rabbi Zev Goldberg, rabbi of the Young Israel of Fort Lee, contacted Fort Lee Mayor Mark Sokolich to inform him about the Colony's new policy, and explained that the policy would effectively "lock the Orthodox residents in their apartments for the duration of Rosh Hashanah."  Mayor Sokolich tried to intervene, but Mr. Marshall still refused to relent.  It was only after Congressman Bill Pascrell's office interceded by contacting the Mayor, who in turn reached out to Mr. Marshall a second time to implore him to reconsider, that Mr. Marshall finally and begrudgingly agreed to delay the new policy until after the High Holidays.

87.     Mr. Marshall otherwise remained obstinate.  Indeed, he informed one of the Sabbath Observant Residents that he would lift the order only on Rosh Hashanah and Yom

Kippur, ***but would reinstate and implement it on the intermittent Sabbath and every subsequent Sabbath and holiday after Yom Kippur*** (including throughout the holiday of Sukkot that follows a week after Yom Kippur).  Mr. Marshall also instructed that the group would have to hire someone with their own funds to assist them.

88.     On September 23, 2020, Mr. Ennis sent a letter to Mr. Marshall sharing his concerns about the Board's decision.  A copy of the letter is attached as Ex. K.  Mr. Ennis questioned the Board's position that the Sabbath elevator was causing wear and tear on the building's elevators.  *See id.*  He also pointed out that the Board was treating the Sabbath Observant Residents differently because workers assist residents with activities such as carrying packages to their apartments, and called the Board's decision "unconscionable."  *See id.*  Mr. Ennis and other residents who communicated their disappointment to the Board and to management received no response.

89.     After terminating both the Sabbath elevator program and the longstanding practice of allowing staff to assist with elevator use, the Board offered no alternatives that would enable the Sabbath Observant Residents to observe their faith with dignity at the Colony.  Ms. Lila Katz and Mr. Ennis are confined to their apartments each Sabbath.  On Passover, Mr. Epstein, whose wife is in the hospital, was unable to celebrate with his friends and neighbors because he had no way to return to his apartment.  Instead, Mr. Epstein spent much of the holiday isolated in his apartment.  Many of the Sabbath Observant Residents are likewise unable to visit with friends and attend synagogue functions on the Sabbath, because both staff assistance and the Sabbath elevator are no longer available.  This is the very opposite of the communal comradery and goodwill that the Sabbath and Jewish Holidays are meant to imbue.

90.     Mr. Marshall and the rest of the Board now insist there was never a "policy" to assist religious Jewish shareholders on the Sabbath.  Yet Mr. Marshall *himself* told the Kurlanskys before purchasing their apartment that this was the longtime practice in the building.  Similarly, shortly after two of the Sabbath Observant Residents moved to the Colony in 2019, they asked the building assistant superintendent how to arrange to have a staff member escort their guests downstairs after a Sabbath lunch, and the assistant superintendent instructed them to arrange for it directly with one of the staff members.

91.     Moreover, the reason there was no "policy" is that the assistance provided by staff to Sabbath observant Jewish residents was ***no different than the assistance provided to residents on a regular basis for non-religious reasons***.  Elevator service is part and parcel of high-rise apartment living, in the Colony as elsewhere.  As described in detail above, Colony staff help residents on a daily basis with carrying packages to their apartments, unloading their groceries from their cars, and pressing elevator buttons when (for example) residents' hands are full.  Staff do all of these things even though there is also no "policy."  The ***only*** policy the Colony does now have is the overtly discriminatory one that the Board enacted to prohibit its staff from assisting Sabbath observers alone.

92.     Further exposing the specious nature of the Board's justifications, Mr. Lipke has offered contradicting reasons for the Board's actions.  When a resident asked Mr. Lipke why the Board would not work out a solution with the Sabbath Observant Residents, Mr. Lipke, using an oft-used discriminatory trope, commented that the Sabbath Observant Residents "will never pay" for staff assistance, and that the Sabbath Observant Residents "want it for free."  Similarly, on a separate occasion in September 2020, Mr. Lipke remarked to a Colony resident that "those Jews" refused to pay an assessment in order for the staff to assist them with the elevators on the

Sabbath (which is, of course, already a courtesy the Colony performs for every other Colony resident).

**F. Plaintiffs Respond to the Board's Discriminatory Conduct by Seeking Legal Recourse, and the Board Retaliates**

93.     On October 30, 2020, Plaintiffs' then-attorney sent a letter to the Board and its counsel (the "**October 30 Letter**"), highlighting the many flaws in the Termination Memo, and contending that the memo was merely a cover-up for the Board's religious discrimination, which is prohibited under the FHA and the NJLAD.  *See* Ex. L. The letter further advised that the Board's unilateral decision to terminate the Sabbath elevator conflicted directly with its "approv[al] by a majority of voting shareholders after years of discussion," and explained that the Board's abuse of power constituted bad faith, a breach of the Board's fiduciary duty to its shareholders, and a breach of the Lease's "No Discrimination" clause, giving rise to additional liability.  *See id.* at 1, 6.  The letter also referred to the Board's decision to bar staff from assisting Sabbath Observant Residents with the elevators as "astonishing," "clear evidence of religious discrimination," and "surgically targeted at religious observance, leaving observant Jews, especially the many elderly residents of the Colony, unable to attend religious services and making them virtual prisoners in their apartments."  *See id.* at 5.

94.     Plaintiffs' counsel informed the Board that he was authorized to pursue legal relief for these violations, and demanded that the building: resume the long-standing practice of allowing Colony employees to assist the Sabbath Observant Residents with elevators on the Sabbath and other Jewish holidays; reinstitute the Sabbath elevator program absent a valid justification not to do so; and agree not to retaliate against the Sabbath Observant Residents.  *See id.* at 6-7.  However, Plaintiffs' counsel made it clear that Plaintiffs wished to avoid putting the Colony through the "the expense and risk of litigation," and "subject[ing] themselves and their

fellow tenants to the process of discovery . . . and a public trial," which "could affect property values at the Colony." *See id.* at 6.

95.     The Board did not respond directly to Plaintiffs.  Instead, on November 10, 2020, FSR sent a letter to the entire shareholder body on behalf of the Board, alleging that the Committee shared a copy of the October 30 Letter with members of a building social group.  *See* Ex. M.  The Board stated that it did "not intend to repudiate each and every misstatement or innuendo" in the letter, and that its decision to terminate the Sabbath elevator "was based upon the board's careful deliberation" and in the best interest of the Colony and its residents.  *See id.* This was clearly yet another attempt by the Board to pit shareholders against the Sabbath Observant Residents.

96.     On November 24, 2020, Plaintiffs' former counsel forwarded the October 30 Letter to FSR, and inquired if it was true that FSR was involved in the instruction to staff not to push buttons for the Sabbath Observant Residents, and whether the reason for the change in policy was related to the employees' collective bargaining agreement.  *See* Ex. N.  FSR did not respond.

97.     When the Colony Defendants did not directly respond to the October 30 Letter, the Committee contacted the ADL[11] who sent a letter to the Board and FSR (the "**ADL Letter**") condemning the discriminatory nature of the Board's actions.  *See* Ex. O.  In regards to the Board's instruction to staff not to assist the Sabbath Observant Residents with the elevators, the ADL noted the disparate treatment that the Sabbath Observant Residents were facing, as "staff

---

[11] The ADL is an anti-hate organization that was founded in 1913. *See* https://www.adl.org/who-we-are/our-mission. The ADL's mission is to "stop the defamation of the Jewish people, and to secure justice and fair treatment to all." *See id.* To that effect, the ADL has filed countless *amicus briefs* at the U.S. Supreme Court and other courts, and has advocated in Congress and state legislatures to prevent religious discrimination. *See* https://www.adl.org/what-we-do/discrimination/religious-freedom.

are still permitted to assist residents with the elevators for secular reasons." *See id.* at 1.  The ADL added that "such a policy would be discriminatory on its face, and likely violate both federal and state fair housing laws. At best, it denies observant Jewish residents a basic courtesy given to others, preventing them from attending synagogue (shul) on Shabbat in accordance with their faith." *See id.* at 2.

98.     The ADL also expressed its concerns about the termination of the Sabbath Elevator, considering that a majority of the building supported the idea, the Sabbath Observant Residents "made every effort to limit disruptions," and the Board was not "able to produce any documentation (or allow an independent consultant to be hired) to verify any harm" from the Sabbath elevator.  *See id.*  The ADL closed by adding that "any prospective residents who may be interested in the building are being sent a clear message that observant Jews are unwelcome," and offered to work with the Board towards a resolution.  *See id.*

99.     Counsel for the Colony Defendants responded to the ADL Letter and requested that the ADL rescind the letter.  *See* Ex. P at 3.  The Colony Defendants admitted that "staff were told not to leave their posts" to assist the Sabbath Observant Residents with operation of the elevators on the Sabbath, and justified their actions by claiming that "[t]he Colony does not employ sufficient staff to assist roughly 12 families out of the 484 families in the building."  *See id.* at 2.  The Colony Defendants also denied "that such a policy or practice existed at the Colony for 16 years," and instead falsely alleged that "a former Board member who happens to be an observant Jewish man [Mr. Epstein], made private arrangements with staff to help him with pushing buttons and operating the elevator on Shabbat."  *See id.* at 3.  They added that "[h]e may or may not have 'tipped' the staff a few dollars to provide him with this accommodation."  *See id.*  The Colony Defendants denied any wrongdoing, and instead maligned the Committee for

trying to "impose their will on everyone else," and for "thinking only of themselves," despite the fact that they "chose to live in a building with 484 families."  *See id.*

100.    In November 2020, Mr. Epstein and the Kurlanskys attempted unsuccessfully to negotiate a resolution with the Colony Defendants.

101.    With the discrimination faced by the Sabbath Observant Residents continuing unabated, two of the Sabbath Observant Residents who are not parties to this action filed a complaint against the Colony with the DCR on December 16, 2020.[12]

102.    Staying true to the threats contained in the Termination Memo, Mr. Marshall and the Board quickly and harshly retaliated against the Committee.  At a February 24, 2021 Board of Directors meeting conducted via Zoom and open to all shareholders, Mr. Marshall, while answering a question about the status of any litigation the building was facing, spoke extensively about how "the Shabbos Committee started with a seven page complaint" – the October 30 Letter -  "and after that went to the ADL . . .  and [the Board] had to use a law firm who are specialized **to defend us, defend the Board, defend the Colony**."  *See* Ex. Q at :41 (emphasis added).  Mr. Marshall also targeted the two Sabbath Observant Residents who initiated a DCR investigation, calling them out **by name and apartment number**.  *See* Ex. Q at 1:07.  The remainder of Mr. Marshall's noxious remarks speak for themselves:

> **So it's unfortunate that, you know, these things happening to Colony. It's our home. It's all of us. This is a place we live with our neighbors and this and that.** When things like this happen, in order to protect the Colony and we have no choice but turn to our attorneys and law firm and believe it or not, **so far it's costing us a lot of money. I just want you to know that it's getting close to 10,000 so far. $10,000 dollars and it's going to grow. They continue, we will continue. We'll defend the Colony**. We did everything by the book and I just—very unfortunate that this is happening but we have an obligation as a Board member to let you know where your money is going. And sometimes you see signs on

---

[12] The DCR complaint is currently being investigated by the DCR.

> the highway that says "Your money is at work, your tax money is
> at work." **So I'm telling you where your money is going**. In one
> hand we're saving $400,000 coming from the government. We're
> doing in-house job the work. A lot of work, a lot of work we're
> doing in-house that I'm trying to save money. We're trying not
> waste money, save money . . . **[W]hen things like this happen it's
> just a waste of money**. So we have an obligation to let you know
> what's going on and we will keep you up-to-date.

(emphasis added).  *Id.* at 1:22.  Strikingly, Mr. Marshall did not say anything

about any other litigation the building was facing, including an appeal currently

being pursued by the Colony Defendants.

103.     Further, when Mr. Epstein asked Mr. Marshall when the building, which holds

itself out as a "white-glove" building, would stop disallowing staff from pushing buttons for the

Sabbath Observant Residents, Mr. Marshall claimed that the building never had a policy of

allowing staff to push buttons, and accused Mr. Epstein of creating a "backdoor" program for

"him and his wife."  *See* Ex. R.  Mr. Marshall also claimed that pushing buttons for the Sabbath

Observant Residents was "completely out of line" because it is not related to services provided

for 100% of the building's shareholders.  *See id.*  Yet as noted above, before the Kurlanskys

moved to the Colony, Mr. Marshall himself told them that it was the building's practice to have

staff assist Sabbath observers with the elevators.   In reality, Mr. Marshall was attempting to

tarnish Mr. Epstein's name publicly, and to single out the Sabbath Observant Residents for

retaliation.

104.     Mr. Marshall's retaliatory campaign has since continued.  On April 7, 2021, at

another Board meeting open to all shareholders, Mr. Marshall responded to a shareholder

question about the status of the building's legal matters by stating that it was "unfortunate" that

Sabbath elevator related legal fees were now costing shareholders almost $20,000, and that the

cost of the "**battle**" could grow as high as $300,000, which would be assessed against all

shareholders.  *See* Ex. S.  Notably, Mr. Marshall again glossed over other legal fees the building

was facing in connection with other lawsuits, and did not threaten to assess those fees against

shareholders.  *See id.*  Indeed, several long-time shareholders and a former Board member

confirmed to Plaintiffs that there has ***never*** been a shareholder assessment for legal fees.

105.    Mr. Marshall's comments have had their desired effect of creating a toxic

environment for the Sabbath Observant Residents.  For example, Mr. Epstein has already

suffered two discriminatory attacks and general animosity from certain other Colony residents,

and other Sabbath Observant Residents have received hateful and threatening letters from fellow

residents.  In each instance, the perpetrators have specifically echoed Mr. Marshall's

pronouncements regarding how much the Colony had spent on legal fees surrounding the

Sabbath elevator, and some have expressed a fear of being assessed for such fees, as Mr.

Marshall threatened.

106.    On April 7, 2021, immediately after the open Board meeting described above, a

shareholder verbally accosted Mr. Epstein in the building lobby as Mr. Epstein returned from the

hospital to visit his sick wife, for "costing shareholders more than $10,000," and demanded to

know why the Sabbath Observant Residents are "entitled" to a Sabbath elevator.

107.    On April 19, 2021, Mr. Epstein again returned from the hospital to find an

anonymous hate letter in his mailbox (pictured in full below).  The author refers to Mr. Epstein

as "Mr. White Gloves" (presumably a reference to Mr. Epstein's comments at the prior

shareholder meeting) and calls him ***"an embarrassment and disgrace to Jews."***  *See* Ex. T.  The

author also instructs Mr. Epstein and the Sabbath Observant Residents to "hire a Shabbos goy" to

assist them, blames them for costing the Colony over $20,000 in legal fees, and derides Mr.

Epstein "as a supposedly observant Jew" for focusing on "petty things like having people push

elevator buttons" amidst the pandemic.  *See id*.

> Mr. Epstein aka Mr. White Gloves
>
> With all due respect, you are an embarrassment and disgrace to Jews.
>
> You have no right whatsoever to believe you are entitled to utilize the
> Colony staff for your own personal use to push the elevator buttons.  If
> feel the need to do so, simple for you and the other 11 families in the
> Colony needing to do so, hire a Shabbos goy at a cost of $10 per week
> per family. If you and the other families feel so strongly about the need
> to have elevator button pressers, shell out the $520 per annum and go
> for it.
>
> In the meantime, I urge you and the other families to drop the claims
> vs. the Colony as it is costing so far over $20k in legal fees as I am sure it
> is costing you and the other 11 families legal fees as well. Put the
> money to good use and hire the Shabbos goy for a fraction of the cost.
>
> If you were so concerned about the observance of Shabbos, why did
> you move into the Colony in the first place knowing full well that no
> Shabbos elevators existed. If were truly sincere about observing the
> Shabbos rituals, you should have moved into your own house and not
> in a bldg. with 400 apartments.
>
> Lastly, with all going on in the world today, including the 556,000
> deaths to date due to Coronavirus in the U.S. and worldwide deaths at
> almost 3M, as a supposedly observant Jew, don't you think your time
> can be better spent on helping people as opposed to petty things like
> having people push elevator buttons. As I said earlier, you are an
> embarrassment to Jews. YOU NEED TO GET A LIFE!
>
> A DISGRUNTLED SHAREHOLDER OF THE COLONY.

108.    On May 13, 2021, two other Sabbath observant residents also received an

anonymous hate letter from the same "disgruntled shareholder."  *See* Ex. U.  The author repeated

the hateful comments made in the letter to Mr. Epstein, called them "an embarrassment and

disgrace to Jews," and blamed the Sabbath Observant Residents for costing the Colony over

$20,000 in legal fees.  *See id.*  The author also threatened to initiate a frivolous class action

lawsuit on behalf of the Colony shareholders.  *See id.*

109.    On May 20, 2021, these same Sabbath observant residents received another letter from an attorney shareholder, on the shareholder's law firm letterhead, threatening to bring a lawsuit against them if they did not withdraw their DCR complaint.  *See* Ex. V.  The shareholder accused them of costing shareholders $20,000, which "could potentially result in a special assessment to shareholders."  *See id.*  On June 3, 2021, the same attorney shareholder sent a follow-up letter threatening again to commence a lawsuit because the DCR complaint was still pending.  *See* Ex. W.

110.    On May 17, 2021, Mr. Epstein filed a complaint with the DCR (which he later withdrew), which alleged, *inter alia*, that Mr. Marshall's remarks during the February 24 and April 7 meetings had created a hostile environment for the Sabbath Observant Residents, and made note of the harassment he faced following those remarks.

111.    Despite the fact that Mr. Marshall was made aware of the repercussions of his public remarks, he continued to fan the flames of hostility.  On June 2, 2021, the Colony held a shareholder meeting to conclude a vote for Board elections, after the Colony failed to achieve a quorum at an earlier shareholder meeting.  The notice to shareholders announcing the special meeting specifically stated that those who voted already did not need to attend the meeting, and that voting aside, "[n]o other business [would] be conducted at the meeting."  *See* Ex. X. Nonetheless, Mr. Marshall announced yet again that the Sabbath elevator matter had already cost the Colony $20,000, that the costs would grow, and that the Colony was forced to participate in two unsuccessful five-hour mediation sessions with the Committee involving the Colony's lawyer.

112.    The Colony and its management have also taken reprisals against Joan and Glenn Katz.  In December 2020 they sustained a leak in their apartment, which resulted in water

damage.  While several years earlier the building remedied a similar issue in a matter of weeks, it took over five months for the building to finish fixing the damage, despite the fact that Joan and Glenn Katz notified Mr. Odenthal and the building superintendent about the issue on numerous occasions.  In April, Joan and Glenn Katz followed up with Mr. Odenthal yet again about finishing the repairs, and Mr. Odenthal claimed the assistant superintendent contacted them to finish the work, but they refused because it was on Passover.  However, Mr. Katz spoke to the assistant superintendent who said he was not even aware of the issue.  Mr. Odenthal later told Joan and Glenn Katz to do the repairs themselves through homeowners insurance, and claimed that staff were too busy with hallway renovations.

113.    Other Sabbath Observant Residents have also been singled out for their support of the Sabbath elevator.  Ms. Ennis heads a social group with Ms. Joan Katz called the "Newbies" for new residents of the Colony.  Following Mr. Marshall's Board meeting remarks in February and April, Colony residents have repeatedly insinuated that Ms. Ennis uses the social group to further the Sabbath elevator, even though the Newbies is simply a social group that bears no connection to the Sabbath elevator.  Another Sabbath Observant Resident received hostile looks from Mr. Marshall while passing him in the hallway, and has been ostracized by a longtime friend because of her support of the Sabbath elevator.

114.    The Board has even taken steps to dissuade other Sabbath observant residents from moving to the Colony.  Two Sabbath observant residents who met with the admissions committee after the Board dismantled the Sabbath elevator program were explicitly told that the Colony does not offer a Sabbath elevator, even though neither of these prospective residents asked about a Sabbath elevator.

115.    Because of the Defendants' ongoing efforts to make it difficult for Plaintiffs to live at the Colony as observant Jews, and the hostile and toxic environment the Defendants have engendered, Plaintiffs have been made to feel stigmatized, extremely insecure, and vulnerable in their own homes.  Many of the Plaintiffs do not sleep well at night, and constantly fear what the Board will do next to target them.

## V.    CLAIMS AGAINST THE DEFENDANTS

### COUNT I

**Fair Housing Act - 42 U.S.C. § 3604(b)**

**Against the Colony Defendants**

116.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1–115 of this Complaint as if fully set forth herein.

117.    The Colony Defendants' actions are in direct violation of the FHA.  *See* 42 U.S.C. § 3604(b).

118.    Section 3604(b) of the FHA makes it an unlawful housing practice to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services or facilities therewith*, because of race, color, *religion*, sex, familial status, or national origin." 42 U.S.C. § 3604(b) (emphasis added).

119.    Plaintiffs are all Jewish, predominantly Orthodox Sabbath observant Jews.

120.    The Colony's elevators are a "service[] or facilit[y]" of the building within the meaning of the FHA, and the Colony employs staff who provide a host of services to residents.

121.    The Colony Defendants have discriminated against Plaintiffs on the basis of their religion including by: (i) canceling the Sabbath elevator program, and (ii) instituting a policy that specifically prohibits building staff from assisting Plaintiffs and the Sabbath Observant Residents with elevator use on the Sabbath and Jewish holidays, but allows building staff to assist residents

-47-

for a host of other analogous secular purposes, including elevator use.  In making both of these decisions, the Colony Defendants' intent to discriminate against Plaintiffs' because of religion is clear.  Among other things:

- The Colony Defendants have disparaged the Sabbath Observant Residents;

- The Colony Defendants' actions have targeted the Sabbath Observant Residents alone among all of the building's residents;

- The Colony Defendants held an unprecedented "non-binding" vote regarding the Sabbath elevator and spread mistruths about the Sabbath elevator;

- The Colony Defendants canceled the Sabbath elevator program despite a majority shareholder vote in support;

- Without notifying the Sabbath Observant Residents, the Colony Defendants instituted a new policy on the eve of the Jewish High Holidays forbidding staff from assisting the Sabbath Observant Residents, upon threat of termination, after over sixteen years to the contrary; and

- The Colony Defendants have manufactured a hostile and toxic living climate for Plaintiffs.

122.    The Colony Defendants' actions have also had a disparate effect on Plaintiffs and the Sabbath Observant Residents, as the cancelation of the Sabbath elevator program only affects the Sabbath Observant Residents, and the policy restricting elevator assistance only applies to the Sabbath Observant Residents.

123.    Therefore, the Colony Defendants have directly discriminated against Plaintiffs on account of their religion in the terms, conditions, and privileges of the Colony, and in the provision of services and facilities therein, in violation of the FHA.  *See* 42 U.S.C. § 3604(b).

124.     Plaintiffs have been damaged and continue to be damaged by the Colony
Defendants' discriminatory actions.

**COUNT II**

**Fair Housing Act - 42 U.S.C. § 3604(f)**

**Against the Colony Defendants**

125.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-124 of this
Complaint as if fully set forth herein.

126.     The Colony Defendants' actions are in direct violation of the FHA.  *See* 42 U.S.C.
§ 3604(f).

127.     Section 3604(f) of the FHA makes it an unlawful housing practice to
"discriminate against any person in the terms, conditions, or privileges of sale or rental of a
dwelling, or in the provision of services or facilities in connection with such dwelling, because of
a handicap."  *See* 42 U.S.C. § 3604(f)(2).

128.     The Colony's elevators are a "service[] or facilit[y]"of the building, and the
Colony employs staff who provide a host of services to residents, including elevator assistance.

129.     Section 3604(f)(3) further provides that "[f]or purposes of this subsection,
discrimination includes a -- refusal to make ***reasonable accommodations*** in rules, policies,
practices, or services, when such accommodations may be necessary to afford such person equal
opportunity to use and enjoy a dwelling."  *See* 42 U.S.C. § 3604(f)(3)(B) (emphasis added).

130.     The Handicapped Sabbath Observant Residents (*i.e.*, Plaintiffs Mr. Ennis, Mr.
Appleton, Mr. Henry Katz, Ms. Lila Katz, Ms. Joan Katz, and Dr. Kurlansky, as well as at least
ten other Sabbath observant residents of the Colony) are handicapped as defined by the FHA.
*See* 42 U.S.C. § 3602(h).

131.     The Colony Defendants were aware that many of the Sabbath Observant Residents – including the Handicapped Sabbath Observant Residents – are elderly, infirm, and physically challenged.

132.     The Handicapped Sabbath Observant Residents have particular difficulty with or are unable to use the stairs.  The Sabbath elevator program and the ability to ask for assistance with elevators on the Sabbath are necessary to afford the Handicapped Sabbath Observant Residents the opportunity to travel throughout the building.

133.     The Colony Defendants have refused to reasonably accommodate the Handicapped Sabbath Observant Residents' by canceling the Sabbath elevator program and by instituting a policy that prohibits building staff from assisting Sabbath Observant Residents with elevator use on the Sabbath and Jewish holidays.

134.     Moreover, such "accommodations" are entirely reasonable, as building staff already assist residents with a host of daily tasks – including elevator assistance specifically – and the Colony's elevators are already equipped with Sabbath mode.  At present, the Colony Defendants accommodate all other residents of the building with elevator assistance, but refuse to make the same accommodation for the Handicapped Sabbath Observant Residents.

135.     The Colony Defendants' actions have also had a disparate effect on the Handicapped Sabbath Observant Residents, as the cancelation of the Sabbath elevator program and the policy restricting elevator assistance makes it impossible in some cases, or almost impossible in others, for them to access the elevator on the Sabbath and Jewish holidays without violating their sincerely held religious beliefs.

136.     Because of the Colony Defendants' actions, the Handicapped Sabbath Observant Residents have difficulty moving throughout the Colony, and are often confined to their apartments.

137.     The Handicapped Sabbath Observant Residents have been damaged and continue to be damaged by the Colony Defendants' refusal to reasonably accommodate their handicaps.

## COUNT III

### Fair Housing Act - 42 U.S.C. § 3617

### Against the Colony Defendants

138.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-137 of this Complaint as if fully set forth herein.

139.     The Colony Defendants' actions are in direct violation of the FHA.  *See* 42 U.S.C. § 3617.

140.     Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [42 U.S.C. §§ 3603–3606]." *Id*.

141.     Plaintiffs exercised their right to seek relief from the Colony Defendants' discriminatory actions so that they could freely exercise their religion without being discriminated against.

142.     The Colony Defendants coerced, intimidated, threatened, and interfered with Plaintiffs' FHA rights, including by holding a shareholder vote for the Sabbath elevator and then attempting to sabotage it; cutting Sabbath elevator hours by threat of termination and eventually terminating the Sabbath elevator for pretextual reasons; sending the Termination Memo to all shareholders threatening Plaintiffs for contemplating legal action and threatening to assess fees

against all shareholders; further targeting Plaintiffs by ordering staff to stop assisting the Sabbath

Observant Residents and doing so on the eve of the High Holidays; failing to entertain Plaintiffs'

accommodation requests; openly denigrating the Committee for contacting an attorney and the

ADL and for costing shareholders money by forcing the building to pay legal fees defending the

Board and the Colony; falsely accusing Mr. Epstein of fabricating the building's over sixteen

year policy; threatening to assess fees against all shareholders on account of the Sabbath elevator

and Plaintiffs' defending their rights under the FHA and other applicable law; and generally

creating a hostile environment for Plaintiffs.

143.    The Colony Defendants have created a hostile living environment for Plaintiffs,

which has already resulted in, among other things, two verbal attacks against Mr. Epstein,

anonymous hate-filled letters sent to Mr. Epstein and other Sabbath Observant Residents, and

general animosity from shareholders and the Board, all of which have interfered with Plaintiffs'

abilities to use and enjoy their living space, and to be free from discrimination.

144.    Plaintiffs have been damaged and continue to be damaged by the Colony

Defendants' unlawful interference.

## COUNT IV

### New Jersey Law Against Discrimination - N.J. Stat. Ann. § 10:5-12

### Against the Colony Defendants

145.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-144 of this

Complaint as if fully set forth herein.

146.    The Colony Defendants' actions are in direct violation of the NJLAD.  *See* N.J.

Stat. Ann. § 10:5-4, N.J. Stat. Ann. § 10:5-12.

147.    Section 10:5-12 of the NJLAD makes it unlawful housing practice to

"discriminate against any person or group of persons because of race, *creed*, color, national

origin . . . in the terms, conditions or privileges of the sale, rental or lease of any real property or part or portion thereof *or in the furnishing of facilities or services in connection therewith*."  N.J. Stat. Ann. § 10:5-12(g)(2) (emphasis added); *see also* N.J. Stat. Ann. § 10:5-12(h)(2).

148.     Plaintiffs are all Jewish, predominantly Orthodox Sabbath observant Jews.

149.     The Colony's elevators are a "facilit[y] or service[]" of the building within the meaning of the NJLAD, and the Colony employs staff who provide a host of services to residents.

150.     The Colony Defendants have discriminated against Plaintiffs on the basis of their religion including by: (i) canceling the Sabbath elevator program, and (ii) instituting a policy that specifically prohibits building staff from assisting Plaintiffs and the Sabbath Observant Residents with elevator use on the Sabbath and Jewish holidays, but allows building staff to assist residents for a host of other analogous secular purposes, including elevator use.  In making both of these decisions, the Colony Defendants' intent to discriminate against Plaintiffs' because of religion is clear.  Among other things:

- The Colony Defendants have disparaged the Sabbath Observant Residents;

- The Colony Defendants' actions have targeted the Sabbath Observant Residents alone among all of the building's residents;

- The Colony Defendants held an unprecedented "non-binding" vote regarding the Sabbath elevator and spread mistruths about the Sabbath elevator;

- The Colony Defendants canceled the Sabbath elevator program despite a majority shareholder vote in support;

- The Colony Defendants instituted a new policy on the eve of the Jewish High Holidays forbidding staff from assisting the Sabbath Observant Residents, upon threat of termination, after over sixteen years to the contrary; and

- The Colony Defendants have manufactured a hostile living climate for Plaintiffs.

151.    The Colony Defendants' actions have also had a disparate effect on Plaintiffs and the Sabbath Observant Residents, as the cancelation of the Sabbath elevator program only affects the Sabbath Observant Residents, and the policy restricting elevator assistance only applies to the Sabbath Observant Residents.

152.    Therefore, the Colony Defendants have directly discriminated against Plaintiffs on account of their religion in the terms, conditions, and privileges of the Colony, and in the provision of services and facilities therein, in violation of the NJLAD.  *See* N.J. Stat. Ann. §§ 10:5-4, 10:5-12.

153.    Plaintiffs have been damaged and continue to be damaged by the Colony Defendants' discriminatory actions.

## COUNT V

### New Jersey Law Against Discrimination - N.J. Stat. Ann. § 10:5-12

### Against the Colony Defendants

154.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-153 of this Complaint as if fully set forth herein.

155.    The Colony Defendants' actions are in direct violation of the NJLAD.  *See* N.J. Stat. Ann. §§ 10:5-4, 10:5-12.

156.    Section 10:5-12 of the NJLAD makes it unlawful housing practice to "discriminate against any person or group of persons because of . . . disability . . . in the terms, conditions or privileges of the sale, rental or lease of any real property or part or portion thereof

*or in the furnishing of facilities or services in connection therewith*."  *See* N.J. Stat. Ann. § 10:5-12(g)(2) (emphasis added); *see also* N.J. Stat. Ann. § 10:5-12(h)(2).

157.    The Colony's elevators are a "facilit[y] or service[]" of the building within the meaning of the NJLAD, and the Colony employs staff who provide a host of services to residents, including elevator assistance.

158.    The New Jersey Administrative Code further provides that "[i]t is unlawful for any person to . . .  Refuse to make reasonable accommodations in rules, policies, practices or services, or reasonable structural modifications, when such accommodations or modifications may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, including public and common areas."  *See* N.J. Admin. Code § 13:13-3.4(f)(2).

159.    The Handicapped Sabbath Observant Residents are disabled as defined by the NJLAD.  *See* N.J. Stat. Ann. § 10:5-5(q).

160.    The Colony Defendants were aware that many of the Sabbath Observant Residents – including the Handicapped Sabbath Observant Residents – are elderly, infirm, and physically challenged.

161.    The Handicapped Sabbath Observant Residents have particular difficulty with or are unable to use the stairs.  The Sabbath elevator program and the ability to ask for assistance with elevators on the Sabbath are necessary to afford the Handicapped Sabbath Observant Residents the opportunity to use the elevators, and to travel throughout the building.

162.    The Colony Defendants have refused to reasonably accommodate the Handicapped Sabbath Observant Residents' handicaps by canceling the Sabbath elevator program and by instituting a policy that prohibits building staff from assisting the Sabbath Observant Residents with elevator use on the Sabbath and Jewish holidays.

163.    Moreover, such "accommodations" are entirely reasonable, as building staff already assist residents with a host of daily tasks – including elevator assistance specifically – and the Colony's elevators are already equipped with the ability to be programmed to Sabbath mode.  At present, the Colony Defendants accommodate all other residents of the building with elevator assistance, but refuse to make the same accommodation for the Handicapped Sabbath Observant Residents.  To the extent the Sabbath elevators impose any costs on the Colony, those costs are reasonable as well.

164.    The Colony Defendants' actions have also had a disparate effect on the Handicapped Sabbath Observant Residents, as the cancelation of the Sabbath elevator program and the policy restricting elevator assistance makes it impossible in some cases, or almost impossible in others, for them to access the elevator on the Sabbath and Jewish holidays without violating their sincerely held religious beliefs.

165.    Because of the Colony Defendants' actions, the Handicapped Sabbath Observant Residents have difficulty moving throughout the Colony, and are often confined to their apartments.

166.    The Handicapped Sabbath Observant Residents have been damaged and continue to be damaged by the Colony Defendants' refusal to reasonably accommodate their handicaps.

## COUNT VI

### New Jersey Law Against Discrimination - N.J. Stat. Ann. § 10:5-12(d)

### Against the Colony Defendants

167.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-166 of this Complaint as if fully set forth herein.

168.    The Colony Defendants' actions are in direct violation of the NJLAD.  *See* N.J. Stat. Ann. § 10:5-12(d).

169.     Section 10:5-12(d) makes it unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has sought legal advice regarding rights under this act, shared relevant information with legal counsel, shared information with a governmental entity, or filed a complaint . . . or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act." *Id.*

170.     Plaintiffs exercised their right to seek relief from the Colony Defendants' discriminatory actions so that they could freely exercise their religion without being discriminated against in accordance with their rights under the NJLAD, including by engaging an attorney and contacting the ADL.

171.     The Colony Defendants took reprisals against, and coerced, intimidated, threatened, and interfered with Plaintiffs' NJLAD rights, including by holding a shareholder vote for the Sabbath elevator and then attempting to sabotage it; cutting Sabbath elevator hours by threat of termination and eventually terminating the Sabbath elevator for pretextual reasons; sending the Termination Memo to all shareholders threatening Plaintiffs for contemplating legal action and threatening to assess fees against all shareholders; further targeting Plaintiffs by ordering staff to stop assisting the Sabbath Observant Residents and doing so on the eve of the High Holidays; failing to entertain Plaintiffs' accommodation requests; openly denigrating the Committee for contacting an attorney and the ADL and for costing shareholders money by forcing the building to pay legal fees defending the Board and the Colony; falsely accusing Mr. Epstein of fabricating the building's over sixteen year policy; threatening to assess fees against

all shareholders on account of the Sabbath elevator and Plaintiffs' defending their rights under the NJLAD and other applicable law; and generally creating a hostile environment for Plaintiffs.

172.    The Colony Defendants have created a hostile living environment for Plaintiffs, which has already resulted in, among other things, two verbal attacks against Mr. Epstein, anonymous hate-filled letters sent to Mr. Epstein and other Sabbath Observant Residents, and general animosity from shareholders and the Board, all of which have interfered with Plaintiffs' abilities to use and enjoy their living space.

173.    Plaintiffs have been damaged and continue to be damaged by the Colony Defendants' unlawful interference.

<u>COUNT VII</u>

**Aiding and Abetting Violations of the NJLAD**

**Against Defendant FSR and the Board Defendants**

174.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-173 of this Complaint as if fully set forth herein.

175.    The Board Defendants' and Defendant FSR's actions are in direct violation of the NJLAD.  *See* N.J. Stat. Ann. § 10:5-12(e).

176.    Section 10:5-12(e) makes it unlawful "to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under" the NJLAD.  *Id*.

177.    Defendant FSR works closely with the Board to oversee the Colony staff.

178.    Defendant FSR was aware, including through the October 30 Letter, the ADL Letter, and a letter from a Committee member, that the Board's decisions to terminate the Sabbath elevator and to prohibit staff from assisting the Sabbath Observant Residents were acts of discrimination, and failures to grant reasonable accommodations.  By nonetheless refusing to instruct Colony staff to resume the Sabbath elevator program and assist the Sabbath Observant

Residents with pushing buttons on the Sabbath, Defendant FSR actively and purposely aided and/or abetted the Colony Defendants' violations of the NJLAD that are set forth in Counts IV-V, and which are incorporated herein by reference.  Furthermore, FSR distributed the November 10, 2020 letter and the Termination Memo to all shareholders, both of which were clearly intended to create hostility against the Sabbath Observant Residents.

179.    Additionally, each Board Defendant was aware, including from countless communications with Plaintiffs and the Committee, the October 30 Letter, and the ADL Letter, that the Board's decisions to terminate the Sabbath elevator and to prohibit staff from assisting the Sabbath Observant Residents were acts of discrimination, and failures to grant reasonable accommodations.  By nonetheless voting to terminate the Sabbath elevator program and to prohibit Colony staff from assisting the Sabbath Observant Residents with pushing buttons on the Sabbath, and by continuing to support these votes, each Board Defendant actively and purposely aided and/or abetted the Colony Defendants' violations of the NJLAD that are set forth in Counts IV-V, and which are incorporated herein by reference.

180.    Each Board Defendant and Defendant FSR knowingly and substantially assisted the Colony Defendants' violations of the NJLAD with knowledge that the Colony Defendants were violating the NJLAD in the manner set forth above.

181.    Plaintiffs have been damaged and continue to be damaged by the Board Defendants' and Defendant FSR's unlawful aiding and abetting.

## COUNT VIII

### PREDFDA - N.J. Stat. Ann. § 45:22A-21, *et seq*.

#### Against the Board Defendants

182.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-181 of this Complaint as if fully set forth herein.

183.     The Board Defendants' actions are in direct violation of the PREDFDA.  *See* N.J. Stat. Ann. § 45:22A-21, *et seq.*

184.     Section 45:22A-44(b) provides: "The association shall exercise its powers and discharge its functions in a manner that protects and furthers the health, safety and general welfare of the residents of the community."

185.     The PREDFDA applies to cooperatives such as the Colony.  *See* N.J.S.A. 45:22A-23(h).

186.     The Board Defendants have exercised their power in a manner that has impaired Plaintiffs' health, safety and general welfare, including by (i) canceling the Sabbath elevator program, and (ii) instituting a policy that specifically prohibits building staff from assisting Plaintiffs and the Sabbath Observant Residents with elevator use on the Sabbath and Jewish holidays.  These actions have made it difficult for Plaintiffs to properly observe their religion, have confined Plaintiffs (including the Handicapped Sabbath Observant Residents) to their homes, and have endangered their health and safety by forcing Plaintiffs and other Sabbath Observant Residents to use the stairs on the Sabbath, even though it is either impossible to do so or they have difficulty doing so, and in all events could be injured in the process.

187.     The Board Defendants have also created a hostile living environment for Plaintiffs, which has already resulted in a verbal attack against and a hate-letter directed to Mr. Epstein, and have interfered with Plaintiffs' abilities to use and enjoy their living space.  This, too, has endangered Plaintiffs' health, safety and general welfare as residents of the Colony.

188.     The Board Defendants also interfered with Plaintiffs' efforts to educate shareholders regarding the Sabbath elevator, and overturned the shareholder vote in favor of the

Sabbath elevator, and thereby sabotaged the Colony's democratic process and relevant building policies and practices.

189.     Plaintiffs have been damaged and continue to be damaged by the Board Defendants' violations of the PREDFDA.

## COUNT IX

### Breach of Proprietary Leases

### Against Defendant 1530 Owners Corp.

190.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-189 of this Complaint as if fully set forth herein.

191.     Prior to taking up residence in the Colony, each Plaintiff (indeed each Sabbath Observant Resident) executed a proprietary lease, as Lessee, with Defendant 1530 Owners Corp., as Lessor, pursuant to which Plaintiffs hold the proprietary shares appurtenant to their apartment units.  These proprietary leases are valid and binding contracts with which the Plaintiffs have fully complied to date.

192.     Section 48 of the propriety leases state: "The Lessor will not discriminate against any person because of his race, creed, *religion*, color, national origin, ancestry, sex, marital status or other ground proscribed by law when exercising any right reserved to it in this Lease" (emphasis added).  *See* Ex. Y for the relevant excerpted provision.

193.     Through the Board Defendants' actions discussed above, Defendant 1530 Owners Corp. has materially breached Section 48 of the Lease, including by: (i) canceling the Sabbath elevator program, and (ii) instituting a policy that specifically prohibits building staff from assisting Plaintiffs and the Sabbath Observant Residents with elevator use on the Sabbath and Jewish holidays, but allows building staff to assist residents for a host of other analogous secular

purposes, including elevator use.  In making both of these decisions, the Colony Defendants'
intent to discriminate against Plaintiffs because of religion is clear.  Among other things:

- The Colony Defendants have disparaged the Sabbath Observant Residents;

- The Colony Defendants' actions have targeted the Sabbath Observant Residents
  alone among all of the building's residents;

- The Colony Defendants held an unprecedented "non-binding" vote regarding the
  Sabbath elevator and spread mistruths about the Sabbath elevator;

- The Colony Defendants canceled the Sabbath elevator program after a
  shareholder vote in support;

- The Colony Defendants instituted a new policy on the eve of the Jewish High
  Holidays forbidding staff from assisting the Sabbath Observant Residents, upon
  threat of termination, after over sixteen years to the contrary; and

- The Colony Defendants have manufactured a hostile living climate for Plaintiffs.

194.    Plaintiff's former counsel specifically informed the Board of the breach.

195.    Plaintiffs have been damaged and continue to be damaged as a direct and
proximate cause of Defendant 1530 Owners Corp.'s material breach.

## COUNT X

### Aiding and Abetting Breach of Proprietary Leases

### Against Defendant FSR

196.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-195 of this
Complaint as if fully set forth herein.

197.    As alleged above, the Colony breached its Leases with Plaintiffs by
discriminating against Plaintiffs because of their religion.

198.    As the Colony's managing agent, FSR has knowledge of the contents of the Leases, including its non-discrimination provision. FSR is also tasked with providing instructions to the Colony's staff.

199.    Plaintiffs informed FSR that they were being discriminated against on multiple occasions, including through letters sent by Plaintiffs' former counsel, the ADL and one of the Committee members.  Additionally, Plaintiffs' former counsel forwarded the October 30 Letter to FSR, in which he specifically mentions that the Board breached the Leases.

200.    Defendant FSR provided substantial assistance to the Colony's breaches of the Leases by nonetheless refusing to instruct the Colony's staff to reprogram the Sabbath elevator and to continue assisting Plaintiffs and the Sabbath Observant Residents with elevator use. Furthermore, FSR distributed the November 10, 2020 letter and the Termination Memo to all shareholders, both of which were clearly intended to create hostility against the Sabbath Observant Residents.

201.    FSR thus aided and abetted the breaches.

202.    Plaintiffs have been damaged and continue to be damaged by Defendant FSR's aiding and abetting the Colony's breach.

## COUNT XI

### Derivative Claim – Breach of Fiduciary Duty

### Against the Board Defendants

203.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-202 of this Complaint as if fully set forth herein.

204.    Under New Jersey law, as directors of a corporation, the Board Defendants owe fiduciary duties to the Colony and its shareholders.  This includes discharging their authority and

position on the Board with the highest obligation of good faith, fair dealing, loyalty, and due care.

205.     The Board Defendants breached their fiduciary duties to the Colony and its shareholders by, among other things, unilaterally cancelling the Sabbath elevator program in July 2020 in direct contravention of the majority shareholder vote taken at the 2019 annual meeting.

206.     The Board Defendants have attempted to conceal these breaches of fiduciary duties through the ruse that the majority shareholder vote was "non-binding."  This is utter nonsense: the Colony's bylaws do not provide for a "non-binding" vote, and even if one were possible, none has been called in nearly two decades since Plaintiffs have resided in the building. Rather, the fact remains that the Board Defendants knowingly placed their own personal prejudices above the expressed wishes of the shareholders who elected them.

207.     The Board Defendants also breached their fiduciary duties to the Colony and its shareholders by instituting an overtly discriminatory policy that specifically prohibits building staff from assisting Plaintiffs and the Sabbath Observant Residents with elevator use on the Sabbath and Jewish holidays, causing the Colony to breach its Leases and violate applicable federal and state laws.

208.     By their own admission, the Board Defendants' breach of fiduciary duties through these actions – which Plaintiffs now must correct on behalf of the Colony through this action – has exposed the Colony to significant and needless legal liability.  Indeed, as recently as April 2021, the Board Defendants indicated that their decisions to restrict staff from assisting the Sabbath Observant Residents and to ignore the majority shareholder vote and cancel the Sabbath elevator program have cost the Colony $20,000, which figure continues to grow.

209.    The Board Defendants have also breached their fiduciary duties to the Colony and its shareholders by subjecting them to increased liability in the event one of the elderly or infirm Sabbath Observant Residents were injured trying to traverse the stairs in an attempt to attend religious services.

210.    On October 30, 2020, through their former counsel, Plaintiffs made due demand that the Board Defendants correct their misconduct by reinstituting the Sabbath elevator program and instructing Colony staff to resume assisting the Sabbath Observant Residents.  In that demand letter, Plaintiffs' counsel explicitly noted that the Board Defendants' actions contravened the majority shareholder vote taken in May 2019, violated their fiduciary duties, and violated additional federal and state laws.  The Board Defendants have refused to comply with the demand letter and refused to discharge their fiduciary obligations to the Colony and its shareholders.

211.    The Board Defendants' actions are not a good faith exercise of prudent business judgment, nor do they protect and promote the Colony's interests.  Indeed, they place personal prejudice against the Colony's explicit wishes.

212.    As a direct and proximate result of the Board Defendants' breach of their fiduciary obligations, the Colony has and will continue to sustain significant damages, including (without limitation) legal fees defending a course of action that, from the outset, contravenes the majority shareholder vote and clearly violates applicable federal and state law.

## COUNT XII

### Aiding and Abetting Breach of Fiduciary Duty

### Against Defendant FSR

213.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-212 of this Complaint as if fully set forth herein.

214. As alleged above, the Board Defendants breached their fiduciary duties to the Colony and its shareholders.

215. As the Colony's managing agent, and a leading provider of building management services, FSR has knowledge of the FHA and NJLAD, as well as the non-discrimination provision of the Leases. FSR works closely with the Board, and is aware that the Board owes fiduciary duties to the Colony and its shareholders.

216. Plaintiffs informed FSR that they were being discriminated against as a result of the Board's actions on multiple occasions, including through letters sent by Plaintiffs' former counsel, the ADL, and a Committee member. Additionally, Plaintiffs' former counsel forwarded the October 30 Letter to FSR, in which he specifically mentions that the Board breached their fiduciary duties.

217. Defendant FSR provided substantial assistance to the Board Defendants' breaches of fiduciary duty by nonetheless refusing to instruct the Colony's staff to reprogram the Sabbath elevator and to continue assisting Plaintiffs and the Sabbath Observant Residents with elevator use. FSR thus aided and abetted the Board's breaches of fiduciary duty.

218. Plaintiffs have been damaged and continue to be damaged by Defendant FSR's aiding and abetting of the Board Defendants' breaches of fiduciary duty.

## VI.    RELIEF REQUESTED

WHEREFORE, THE PLAINTIFFS respectfully request that this Court grant the following relief:

1. A declaration that the Colony Defendants' actions in canceling the Sabbath elevator program, in ordering building staff to cease assisting the Sabbath Observant Residents with elevator usage on the Sabbath, and in threatening and intimidating Plaintiffs for taking legal action, constitute discrimination and an interference with Plaintiffs' rights under the FHA, 42

U.S.C. §§ 3604(b) and (f), and 3617; the NJLAD, N.J. Stat. Ann. § 10:5-4, 10:5-12(d), (g) and (h); and the PREDFDA, N.J. Stat. Ann. § 45:22A-44;

2.      A declaration that the Colony Defendants are required to provide a reasonable accommodation (in the form of the preliminary and permanent injunctive relief set forth below) to the Handicapped Sabbath Observant Residents under 42 U.S.C. §§ 3604(f), and N.J. Stat. Ann. § 10:5-12 and N.J. Admin. Code. § 13:13-3.4(f)(2);

3.      Preliminary and permanent orders compelling Defendants to:

      a.      Resume the Colony's practice of assisting the Sabbath Observant Residents with the elevators on Sabbath and Jewish Holidays, and memorialize this practice in a formal, written policy;

      b.      Resume operation of the Sabbath elevator; and

      c.      Cease their discriminatory treatment of and retaliations against Plaintiffs;

4.      Pursuant to this Court's broad equitable powers, an order removing the Board Defendants and excluding them from further service, and ordering the Colony to hold a special vote of shareholders to elect a new Board of Directors at a time and manner consistent with the Colony's bylaws;

5.      Judgments that the Colony breached the Leases and that the Board Defendants breached their fiduciary duties to the Colony's shareholders;

6.      Judgments that Defendant FSR aided and abetted the Colony Defendants' violations of the NJLAD, Counts IV-V, and their breaches of the Leases and their fiduciary duties.

7.      An award of actual and punitive damages;

8.      An award to Plaintiffs of full costs, disbursements and attorneys' fees arising out of Defendants' action in connection with this action, as available under, *inter alia*, 42 U.S.C. §3613(c)(2) and N.J. Stat. Ann. § 10:5-27.1;

9.      Such other and further relief as this Court may deem just and appropriate.

Dated:     New York, New York
           June 21, 2021

*/s/  Diane P. Sullivan*
Diane P. Sullivan
WEIL, GOTSHAL & MANGES LLP
17 Hulfish Street, Suite 201
Princeton, NJ 08542
(609) 986-1120
diane.sullivan@weil.com

Yehudah L. Buchweitz (*pro hac vice forthcoming*)
David Yolkut (*pro hac vice forthcoming* )
Matthew R. Friedenberg
Josh Halpern (*pro hac vice forthcoming*)
Yonatan Shefa (*pro hac vice forthcoming*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
yehudah.buchweitz@weil.com
david.yolkut@weil.com
matthew.friedenberg@weil.com
josh.halpern@weil.com
yonatan.shefa@weil.com

*Attorneys for Plaintiffs*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, other than a complaint filed by non-parties Susan and Samuel Joffe against 1530 Owners Corp. with the New Jersey Department of Law & Public Safety Division on Civil Rights on December 16, 2020, amended  April 23, 2021, Docket No. H2020-001497.  Mr. Epstein also filed a complaint against 1530 Owners Corp. with the DCR on May 17, 2021, Docket No. H2021-001610, but later withdrew the complaint in compliance with N.J. Admin. Code. § 13:4-8.1.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on June 21, 2021
New York, NY

*/s/ Diane P. Sullivan*
Diane P. Sullivan