Diane P. Sullivan
Weil, Gotshal & Manges LLP
17 Hulfish Street, Suite 201
Princeton, NJ 08542
(609) 986-1120

Josh Halpern (*pro hac vice* pending)
Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600
Washington DC 20036
(202) 682-7000

Yehudah Buchweitz (*pro hac vice* pending)
David Yolkut (*pro hac vice* pending)
Matthew R. Friedenberg
Yonatan Shefa (*pro hac vice* pending)
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL KURLANSKY, HELAINE KURLANSKY, MARTIN EPSTEIN, HERBERT ENNIS, JUDITH ENNIS, MORDECAI APPLETON, HENRY KATZ, LILA KATZ, JOAN KATZ, GLENN KATZ, and JUDITH SINGER<br><br>                              Plaintiffs,<br><br>-against-<br><br>1530 OWNERS CORP.; MOE MARSHALL, ELLEN GERBER, KENNETH LIPKE, CAROL LICHTBRAUN, JUSTIN WIMPFHEIMER, PATRICIA DI CONSTANZO, and MARK O'NEILL, Individually and as Members of the Board of Directors of 1530 Owners Corp.; and FIRSTSERVICE RESIDENTIAL,<br><br>                              Defendants. | Civ. A. No. 2:21-cv-12770<br><br><br><br>MOTION DATE:<br>July 19, 2021<br><br>ORAL ARGUMENT REQUESTED |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..............................................................................1

STATEMENT OF FACTS ...................................................................................5

    A.   The Colony's Elevator Assistance Policy ..............................6

    B.   The Colony Votes to Implement a Sabbath Elevator System, Despite the Board's Best Efforts at Sabotage ......................7

    C.   The Board Terminates the Sabbath Elevator Service .........10

    D.   The Board Orders Building Staff Not to Assist Sabbath Observant Jewish Residents with the Elevators ..................12

    E.   Sabbath Observant Residents File Complaints Against the Board for Discrimination, and Face Immediate Retaliation ..............14

ARGUMENT .....................................................................................................17

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...............18

    A.   The Board Discriminates Against Plaintiffs in Violation of the FHA and NJLAD...................................................18

    B.   The Board Failed to Accommodate Plaintiffs' Disabilities in Violation of the FHA and NJLAD ....................................23

    C.   The Board Retaliated and Interfered with Plaintiffs' Exercise of Rights under the FHA and NJLAD ....................................26

II.   PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION..........30

III.  THE BALANCE OF HARDSHIPS FAVORS PLAINTIFFS ....................36

IV.  THE PUBLIC INTEREST FAVORS AN INJUNCTION............................38

CONCLUSION .................................................................................................39

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*,
   996 F. Supp. 409 (D.N.J. 1998) ...........................................................................30

*Austin v. Town of Farmington*,
   826 F.3d 622 (2d Cir. 2016) ................................................................................23

*Baratta v. N.H. Ave. Invs., L.L.C.*,
   No. 09-5195 (AET), 2010 WL 11695152 (D.N.J. May 27, 2010) ....................23

*Bloch v. Frischholz*,
   587 F.3d 771 (7th Cir. 2009) ..............................................................................29

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ......................................................................................19, 20

*City of L.A., Dep't of Water & Power v. Manhart*,
   435 U.S. 702 (1978) ............................................................................................24

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
   421 F.3d 170 (3d Cir. 2005) ...............................................................................22

*Curto v. A Country Place Condo. Ass'n, Inc.*,
   921 F.3d 405 (3d Cir. 2019) ...............................................................18, 19, 20

*Davis v. Echo Valley Condo. Ass'n*,
   945 F.3d 483, 491 (6th Cir. 2019) .......................................................................26

*Doe v. City of Butler*,
   892 F.2d 315 (3d Cir. 1989) ...............................................................18, 22, 24

*El v. People's Emergency Ctr.*,
   315 F. Supp. 3d 837 (E.D. Pa. 2018) ...................................................................21

*Fulton v. City of Philadelphia*,
   --- U.S. --- , Slip Op. (June 17, 2021) .................................................................20

*Heckler v. Mathews*,
    465 U.S. 728 (1984)............................................................................31

*Hovsons, Inc. v. Twp. of Brick*,
    89 F.3d 1096 (3d Cir. 1996) ............................................................24

*Lefkowitz v. Westlake Master Ass'n, Inc.*,
    2019 WL 669806, No. 18-14862 (D.N.J. Feb. 19, 2019)......................25, 26, 29

*Marks v. BLDG Mgmt. Co.*,
    No. 99 CIV. 5733, 2002 WL 764473 (S.D.N.Y. Apr. 26, 2002) ......................30

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018)......................................................................22

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016) .............................................................22

*Montanye v. Wissahickon Sch. Dist.*,
    218 F. App'x 126 (3d Cir. 2007) ......................................................27

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
    658 F.3d 375 (3d Cir. 2011) ............................................................22

*Newell v. Heritage Senior Living, LLC*,
    673 F. App'x 227 (3d Cir. 2016) ......................................................27

*Nieves v. Individualized Shirts*,
    961 F. Supp. 782 (D.N.J. 1997)........................................................24

*Oxford House-Evergreen v. City of Plainfield*,
    769 F. Supp. 1329 (D.N.J. 1991)......................................................30

*Raab Family P'ship v. Borough of Magnolia*,
    No. 08-5050 (JBS), 2009 WL 361135 (D.N.J. Feb. 13, 2009).........................30

*Revock v. Cowpet Bay W. Condo. Ass'n*,
    853 F.3d 96 (3d Cir. 2017) .............................................................24, 28

*Roa v. Roa*,
    200 N.J. 555 (2010) ........................................................................18

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) .......................................................................*passim*

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
  938 F.3d 1259 (11th Cir. 2019) ........................................................26

*Shapiro v. Cadman Towers, Inc.*,
  51 F.3d 328 (2d Cir. 1995) ..........................................................26, 37

*Stewart v. Cnty. of Salem*,
  274 F. Supp. 3d 254 (D.N.J. 2017) ...................................................24

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) .............................................................26

*Trostenetsky v. Keys Condo. Owners Ass'n*,
  No. 17-CV-04167-RS, 2018 WL 2234599 (N.D. Cal. May 16, 2018) .............29

*Weber v. Don Longo, Inc.*,
  No. 15-2406, 2018 WL 1135333 (D.N.J. Mar. 2, 2018). ..................................24

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) .............................................................................17

*Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*,
  98 F. Supp. 2d 347 (S.D.N.Y. 2000) ...............................................22

**Statutes & Regulations**

24 C.F.R. § 100.201 .............................................................................23

24 C.F.R. § 100.600 .............................................................................29

42 U.S.C. § 3602 ..........................................................................17, 23

42 U.S.C. § 3604 ....................................................................*passim*

42 U.S.C. § 3613 ...............................................................................17

42 U.S.C. § 3617 ...............................................................................26

N.J. Admin. Code § 13:13-3.4 .............................................................23

3

N.J. Stat. Ann. § 10:5-5................................................................................24

N.J. Stat. Ann. § 10:5-12....................................................4, 17, 18, 27

N.J. Stat. Ann. § 45:22A-21.........................................................................1

Plaintiffs respectfully submit this Memorandum of Law in Support of their Motion for a Preliminary Injunction. Plaintiffs are observant Jews—all elderly and many medically handicapped—who live in the Colony, a 32-story high-rise building in Fort Lee, New Jersey. Plaintiffs seek an order compelling Defendants—the corporation that owns their building, its management company, and its Board of Directors ("the Board")—to (1) reverse their facially discriminatory policy of forbidding staff from pressing elevator buttons for Sabbath observant Jews on the Sabbath and Jewish holidays; (2) restore the Sabbath elevator services ratified by the Colony's shareholders; and (3) cease and desist from their ongoing efforts to retaliate against and interfere with Plaintiffs in the exercise of their statutory rights under federal and state fair housing law.[1]

## PRELIMINARY STATEMENT

Plaintiffs hold the sincere religious belief that they cannot operate electrical machinery or press elevator buttons on the Sabbath and certain Jewish holidays. For over sixteen consecutive years, the Colony addressed their needs just as it would any other: through the assistance of building staff. When a Jewish resident needed to ride the elevator on the Sabbath, staff would press the buttons for them,

---

[1] Plaintiffs' complaint also alleges violations of the Real Estate Development Full Disclosure Act, N.J. Stat. Ann. § 45:22A-21, *et seq*., a breach of proprietary leases, and a breach of fiduciary duty. Plaintiffs do not seek preliminary injunctive relief with respect to these additional claims.

as they do all the time for residents holding groceries or toting luggage. That elevator assistance made life workable for Sabbath observers at the Colony, enabling them to attend communal services, recite the mourner's *Kaddish*, and observe the Sabbath together with friends and family.

But even with elevator assistance, residents still faced substantial constraints on their freedom of movement and a corresponding lack of dignity in observing the Sabbath. Elderly and handicapped Sabbath observers were essentially homebound, except during the limited windows of time in which staff would facilitate elevator service between the lobby and their residence. In May 2019, the Colony shareholders took an important step toward addressing that problem by voting to place the building's least-utilized service elevators in "Sabbath mode," causing them to automatically stop at select floors during designated time periods. This simple adjustment to the default elevator settings – a featured part of the elevators the Colony purchased – offered Sabbath observant residents greater freedom on the Sabbath because it obviated the need to coordinate with building staff.

Unfortunately, the Board of Directors did not share this spirit of cooperation. Several Board members felt that "too many of *those types of Jews*" – *i.e.*, religious Jews – were "moving into the building," and that building events might become

2

"too Jewish" for their taste. J. Katz Decl. at ¶ 8.[2] So they called the shareholder vote approving the Sabbath elevator "non-binding"—the first and only such vote in the building's history—leaving to the Board the ultimate and unfettered discretion to set aside the results. On a Friday evening in July 2020, the Board weaponized that discretion with a "Termination Memo" shutting down the Sabbath elevator program for good. The Termination Memo aimed to isolate and intimidate Sabbath observers, warning that "unjustified lawsuit[s] … would lead to legal fees … against *all shareholders*." Epstein Decl. at ¶¶ 25-27, 45, Ex. F at 2-3.

What the Board did next beggars belief. Several weeks after terminating the Sabbath elevator service, the Board secretly reversed its sixteen-year practice of providing neutral elevator assistance to all residents and specifically prohibited Colony staff from pushing elevator buttons for Sabbath observant residents on the Sabbath or Jewish holidays. The prohibition was strict and surgical: staff could continue to press the elevator buttons for any resident who happened to be in the elevator on Saturday, so long as that resident wasn't observing the Sabbath. Lifting even a finger in support of a Sabbath observer could get a staff member *fired*.

Three Sabbath observant residents, Samuel and Susan Joffe and Martin Epstein, stood up to this rank discrimination and filed complaints with New

---

[2] This memorandum adds emphasis to exhibit citations unless otherwise specified.

Jersey's Division on Civil Rights ("DCR"). Reprisals were swift. Moe Marshall, the Board's President, announced at the next shareholder meeting that "Mr. and Mrs. Joffe, **_Apartment 8H_**, [have] taken it upon them[]selves [to] go ahead to the DCR" and file a complaint that was "costing us a lot of money." Epstein Decl. at ¶¶ 34, 52, Ex. L. The Joffes later received an anonymous note calling them a "disgrace to Jews" and threating a class-action lawsuit if they persisted at the DCR. Susan Joffe Decl. at ¶ 19, Ex. A.  Martin Epstein received a similar letter, calling him an "embarrassment," demeaning his faith as "petty," and directing him to "GET A LIFE!" Epstein Decl. at ¶¶, 35, 54, Ex. N (caps in original).  Yet, even after these disturbing incidents, the Board continues to incite other residents against the Sabbath observers.

Things have gotten entirely out of hand at the Colony, and this Court's intervention is desperately needed. The requested injunctions would put a stop to the ongoing discrimination against Sabbath observers and make good on the promises of equality and accommodation enshrined in the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12. Until then, Plaintiffs will continue to live under a regime of discrimination that denies them basic access to friends, family, and synagogue services on the Sabbath.

4

## STATEMENT OF FACTS[3]

The Colony is a co-operative in Fort Lee, managed by a seven-member Board of Directors. The 32-floor, full-service, high-rise building has approximately 28 staff members—concierges, porters, door attendants, and maintenance staff—who routinely assist with daily activities around the building. Epstein Decl. at ¶ 5. They ride the elevators to deliver packages, bring up groceries, and assist with luggage. Epstein Decl. at ¶ 5.

Plaintiffs are Sabbath observant Jews who live at the Colony. Several are elderly, with handicaps that prevent them from climbing the stairs on the Sabbath. For example, Herbert Ennis is an 89-year-old with advanced Parkinson's disease—he alternates between a cane and a wheelchair and cannot venture down from his 5th floor home without the elevator. H. Ennis Decl. at ¶ 4. Mordecai Appleton is a 91-year-old with congestive heart failure who lives on the 21st floor—he relies on a special Sabbath-compliant motorized scooter and similarly requires the elevator to leave his home. Appleton Decl. at ¶ 4. And Henry Katz is an 81-year-old with a life-threatening heart condition—his doctor has instructed that strenuous activity poses an undue risk to his health, and he requires the elevator to access his 3rd floor apartment. H. Katz Decl. at ¶ 4.

---

[3] A fuller statement of relevant facts is set forth in Plaintiffs' Complaint and accompanying declarations.

### A.    The Colony's Elevator Assistance Policy

For over sixteen years, Sabbath observant residents like Plaintiffs relied on staff to assist them with the elevators on the Sabbath. On Friday nights and Saturdays, when Sabbath observant residents returned from religious services, staff would help them with the elevators as a matter of course, enabling them to go up to their units. The effort involved was miniscule: Staff could simply step inside the elevator press the button, and then step out. For the small subset of Sabbath observant residents who needed assistance to go downstairs from their apartments on the Sabbath, as well as up, staff would call the elevator to their floor or pick them up at a preset time. This elevator assistance practice was a basic courtesy, extended equally to all residents: when hands were tied—whether by groceries, young children, or religious observance—building staff would always step into the elevator to assist. P. Kurlansky Decl. at ¶ 6. Sabbath observant residents paid for that service just as any other resident would: with an appropriate tip, consistent with building policy and basic etiquette. P. Kurlansky Decl. at ¶ 6.

The Colony is one of several buildings within walking distance of the local Orthodox synagogue, and it repeatedly pointed to its elevator assistance policy to compete for the many Sabbath observant homebuyers on the market. H. Kurlansky Decl. at ¶ 6. One Plaintiff, Dr. Paul Kurlansky, is a 68-year-old with cardiomyopathy who lives on the 32nd floor of the Colony. P. Kurlansky Decl. at

¶ 5. When his wife Helaine toured the building, Marshall stressed that they would have no difficulty observing the Sabbath because the staff had long pressed elevator buttons for residents. H. Kurlansky Decl. at ¶ 6. He also represented that the Colony would soon begin operating a Sabbath elevator, just like the neighboring buildings that already offered that service. H. Kurlansky Decl. at ¶ 6.

**B.      The Colony Votes to Implement a Sabbath Elevator System, Despite the Board's Best Efforts at Sabotage**

Staff assistance made life workable for Sabbath observant residents, but it was still an incomplete solution. Epstein Decl. at ¶ 6. Though Sabbath observant residents could go up to their apartments whenever they wished, those who are unable to walk down could only leave at preset times and in careful coordination with building staff. Epstein Decl. at ¶ 6. That is why Plaintiff Martin Epstein had begun advocating for a "Sabbath elevator" at the Colony as early as 2007. Epstein Decl. at ¶ 7. According to the Board, the building's old elevators could not be programmed for Sabbath mode. Epstein Decl. at ¶ 7.

In 2019, the Colony upgraded to high-speed electronic elevators with a built-in Sabbath mode option. So Sabbath observant residents formed a committee ("the Committee") to advocate once more for Sabbath mode.  Epstein Decl. at ¶ 7. The Committee made proposals designed to maximize the Sabbath elevator's utility, while minimizing any conceivable inconvenience. Epstein Decl. at ¶¶ 9, 10. For

example, the Committee agreed to restrict Sabbath elevator operations to specified hours (*e.g.*, before and after Synagogue hours), and to limit the number of floors on which the elevator would stop. Epstein Decl. at ¶ 12.

The notion of a Sabbath elevator rankled several Board members. In 2017, Carol Lichtbraun, now the Board's Secretary, told other residents that she did not want **"too many of those types of Jews"**—religious Jews—"**moving into the building**." J. Katz Decl. at ¶ 8. And in 2019, one of the Board's Directors, Justin Wimpfheimer, strenuously opposed hiring a certain entertainer for a building event because he was simply "**too Jewish**" for Wimpfheimer's taste.  J. Katz Decl. at ¶ 8. One of the Plaintiffs challenged Wimpfheimer and asked if he was "serious," but he refused to back down. J. Katz Decl. at ¶ 8. Wimpfheimer and Lichtbraun were among the most vociferous opponents of the Sabbath elevator. J. Katz Decl. at ¶ 8.

Still, the Board knew it could not dismiss the Sabbath elevator out of hand. Epstein Decl. at ¶¶ 9, 10. The proposal offered clear benefits to the building's elderly, handicapped residents, and it included substantial compromises designed to preempt any perceived costs. Epstein Decl. at ¶ 9. Indeed, three of the high-rise buildings adjacent to the Colony had already implemented Sabbath elevator programs, some of which operate for the entirety or vast majority of the 25-hour Sabbath and stop at every (or every other) floor. Epstein Decl. at ¶ 19.

But the Board had a plan. It would submit the Sabbath elevator proposal to a

8

"non-binding" vote at the 2019 annual shareholder meeting. Epstein Decl. at ¶ 10. This "heads we win, tails you lose" gambit worked as follows: Prior to the vote, the Board would stack the deck against the Sabbath elevator. If that effort succeeded, and shareholders voted down the proposal, the Board could then cloak its animus in public opinion. Epstein Decl. at ¶ 11.  And if the vote were to pass, the Board could manufacture a *post hoc* explanation for why the system was unworkable. Epstein Decl. at ¶ 11. Either way, the Sabbath elevator was doomed.

The Board's approach was unprecedented in several respects. *First*, as a matter of building practice, shareholders at the Colony vote only on issues that necessitate a change to the lease or the building's bylaws—the Sabbath elevator implicated neither. Epstein Decl. at ¶ 11. *Second*, the Colony's bylaws say nothing about "non-binding" voting, Susan Joffe Decl. at ¶ 22, Ex. D, and long-time residents cannot recall a single such vote on *any matter ever*.  Epstein Decl. at ¶ 11; H. Katz Decl. at ¶ 7. The purpose was clear: keeping "too many of *those types of Jews*" from "moving into the building." J. Katz Decl. at ¶ 8.

In the lead up to the vote, Board members tried repeatedly to undermine the Committee's efforts to educate residents about the program's benefits—both to Sabbath observers in the form of greater freedom, and to all residents in the form of higher property values. Epstein Decl. at ¶ 6. In March 2019, at one of the Committee's informational meetings, Marshall prevented the Committee from

9

making its presentation with a forty-minute filibuster. Epstein Decl. at ¶ 10; J. Ennis Decl. ¶ 6. In addition, the Board tampered with the text of the resolution. In late April 2019, shortly before the May shareholder meeting, the Board released absentee ballots that (1) described the Sabbath elevator as operating "from sunset each Friday to sunset each Saturday," rather than during the agreed-upon windows; and (2) failed to mention that *only the service elevator* would run in Sabbath mode. Epstein Decl. at ¶¶ 12, 42 Ex. B. The Committee petitioned to set the record straight, but the Board refused. Epstein Decl. at ¶ 12.

In the end, despite the Board's best efforts at sabotage, common decency prevailed: the Sabbath elevator proposal won a majority of the voting shares at the May 15, 2019 annual meeting. Epstein Decl. at ¶ 13. Elevator renovations were completed in July 2019, and Sabbath elevator services commenced that September. Epstein Decl. at ¶ 13. Life for the Sabbath observers' improved exponentially as a result. *See, e.g.*, Appleton Decl. at ¶ 5; Epstein Decl. at ¶ 14.

### C.    The Board Terminates the Sabbath Elevator Service

In December 2019, barely three months after the Sabbath elevator program began, Marshall informed Martin Epstein—the liaison between the Board and the Sabbath observant residents—that the program was "in trouble." Epstein Decl. at ¶ 17. According to Marshall, Sabbath mode setting was causing excessive "wear and tear" on the elevator doors and that, as a result, *all* of the elevator doors in the

*entire* building would need to be replaced sooner than planned. Epstein Decl. at ¶ 20. But the Committee knew better: only the service elevators operate in Sabbath mode; they operate for limited hours on Friday night and Saturday; and they stop on a limited subset of floors. Epstein Decl. at ¶ 20.

Still, the Sabbath observant residents needed the elevator and were prepared to make substantial concessions to keep the program alive. Epstein Decl. at ¶ 21. In late January 2020, after the Board demanded further limits on the Sabbath elevator service, the Committee proposed not only to reduce the number of stops and skip floors when residents were away, but also to substantially shrink the total hours of operation—from nine hours over the course of the 25-hour Sabbath to a mere seven. Epstein Decl. at ¶ 21. The Committee explained that fewer than seven hours "would not be feasible for proper Sabbath observance, and would cause severe hardship to many of the users of the Sabbath elevator – especially the elderly, the infirm and physically challenged." Epstein Decl. at ¶¶ 21, 45, Ex. E. The Board countered with an ultimatum: the Sabbath elevator would run for just five hours or none at all. Epstein Decl. at ¶ 22. The Committee had no choice but to accept those terms, even if it meant consigning the elderly, handicapped, and observant Jews to their apartments for a great majority of the Sabbath. Epstein Decl. at ¶ 22.

Trying another tact, the Committee offered to sponsor an expert report from an elevator company to assess once and for all the supposed "wear and tear" and

11

propose ways to minimize the costs of the service. Epstein Decl. at ¶¶ 20, 21. The Board not only refused that offer, but rebuffed requests to disclose the documented basis for their supposed "wear and tear" concerns. Epstein Decl. at ¶ 21.

A few months later, in July 2020, the Board issued a Friday evening memo—"Termination of [the] Sabbath Elevator Service." Epstein Decl. at ¶¶ 25, 46, Ex. F. This Termination Memo claimed shareholders had voted for just a "Shabbos elevator *trial*." Epstein Decl. at ¶ 46, Ex. F. But the actual ballot never mentioned a trial. Epstein Decl. at ¶ 42, Ex. B. The Memo also claimed that Sabbath elevator use would necessitate the replacement of all the doors on all six building elevators—at a supposed cost of "over one million dollars"—even though only the service elevators enter Sabbath mode and stop on only a subset of floors. Epstein Decl. at ¶ 46, Ex. F at 2. Finally, the Memo closed with a warning shot: "We hope residents would not want to be a party to an *unjustified lawsuit* which would lead to legal fees that would be assessed against *all shareholders*." Epstein Decl. at ¶ 46, Ex. F at 2-3.

### D.   The Board Orders Building Staff Not to Assist Sabbath Observant Jewish Residents with the Elevators

The Board didn't stop there. On September 16, 2020—just days before the Jewish High Holiday of Rosh Hashanah—observant Jewish residents learned that the Board flatly prohibited all building personnel from assisting Sabbath observers

with the elevators on the Sabbath and coming holidays. Epstein Decl. at ¶ 28.  This time, there was no "termination memo"—indeed, there was no formal notification whatsoever. If building staff had not personally confided in several of the observant Jewish residents, those residents would have been left stranded on one of the holiest days of the year without the ability to access their own apartments. Epstein Decl. at ¶ 28. After sixteen years of neutral assistance, the elderly and handicapped Sabbath observers were now left to fend for themselves. Epstein Decl. at ¶ 29. Staff who violated this discriminatory policy faced a threat of termination. Epstein Decl. at ¶ 28.

The Board's discrimination was so egregious that Fort Lee's political and religious leadership felt compelled to intercede. After the local Rabbi failed to move the Board, Congressman Bill Pascrell's office coordinated with the mayor, Mark Sokolich, to implore Marshall and the Board to reverse themselves. Epstein Decl. at ¶ 31. The Board refused. They reaffirmed their discriminatory policy, which remains in place to this day, offering only a brief reprieve for the three days of Rosh Hashanah and Yom Kippur. On every other Sabbath and Jewish holiday, including even the Sabbath that falls between that Rosh Hashanah and Yom Kippur, staff were flatly prohibited from assisting the Sabbath observers. Epstein Decl. at ¶ 31.

**E.**   **Sabbath Observant Residents File Complaints Against the Board for Discrimination, and Face Immediate Retaliation**

On October 30, 2020, Plaintiffs' prior counsel sent a letter to the Board demanding that they restore the equal elevator policies and cease retaliating against Sabbath observant residents. Epstein Decl. at ¶¶ 33, 49, Ex. I at 6-7. When the Board refused to even acknowledge the letter, the Sabbath observant residents turned to "a leading anti-hate organization," the Anti-Defamation League ("ADL"). Epstein Decl. at ¶¶ 33, 50, Ex. J. The ADL issued a letter to the Colony in November 2020, condemning the Board's conduct as "discriminatory on its face, and likely violat[ive of] both federal and state fair housing laws." Epstein Decl. at ¶ 50, Ex. J. The Board responded with incredulity, chiding the ADL for making "a big issue about how staff working at the Colony have been told not to assist those residents needing help with operating the elevators on Shabbat." Epstein Decl. at ¶ 51, Ex. K. The Board claimed it "**NEVER** had a policy of allowing its staff to assist" with elevators on the Sabbath, that Plaintiffs were "thinking only of themselves," and that Sabbath observers were trying to "impose their will on everyone else." Epstein Decl. at ¶ 51, Ex. K at 3.

In December 2020, as the discrimination continued, the Joffes filed a formal complaint with the DCR. Susan Joffe Decl. at ¶ 11. In response, the Board conceded that it terminated the Sabbath elevator service and instructed staff not to

assist Sabbath observers. Then, Marshall targeted the Joffes by name and apartment number at the very next shareholder meeting: "Mr. and Mrs. Joffe, **_Apartment 8H_**, [have] taken it upon them[]selves [to] go ahead to the DCR" and file a complaint that was "costing us a lot of money." Susan Joffe Decl. at ¶ 12; Epstein Decl. at ¶ 52, Ex. L. Marshall described the investigation as a complete "waste of money." Epstein Decl. at ¶ 52, Ex. L at 1:07. At a subsequent Board meeting in April 2021, Marshall again offered a tally of the "unfortunate" legal fees (almost $20,000), and warned the cost of the "battle" could grow as high as $300,000, with the costs assessed against all shareholders. Epstein Decl. at ¶¶ 34, 53, Ex. M.

Marshall's comments incited retaliation against the Sabbath observers. Epstein Decl. at ¶ 35; Susan Joffe Decl. at ¶ 13; J. Katz Decl. at ¶11. In mid-May 2021, the Joffes received an anonymous letter from a "disgruntled shareholder," branding them "an embarrassment and disgrace to Jews." Susan Joffe Decl. ¶¶ 13, 19, Ex. A. The author berated them for filing a DCR claim and threatened to initiate a class action lawsuit against them on behalf of the Colony shareholders. Susan Joffe Decl. ¶ 19, Ex. A. Roughly a week later, the Joffes received another shareholder letter—this time, on law firm letterhead—threatening to bring a baseless lawsuit against the Joffes if they did not withdraw their DCR complaint. Susan Joffe Decl. ¶¶ 13, 20, Ex. B. Parroting the Board, the resident-lawyer

15

complained the Joffes were costing everyone else $20,000, which could "result in a special assessment to shareholders." Susan Joffe Decl. ¶ 20, Ex. B. Earlier this month, on June 3, the Joffes received yet another letter threatening legal action against them. Susan Joffe Decl. ¶¶ 13, 21, Ex. C.

Mr. Epstein faced similar intimidation. On April 7, 2021, as Epstein returned from the hospital where he was visiting his sick wife, a shareholder accosted him for "costing shareholders more than $10,000" and demanded to know why Sabbath observers were "entitled" to a Sabbath elevator. Epstein Decl. at ¶ 35. Less than two weeks later, Mr. Epstein found an anonymous letter in his mailbox, calling him a "supposedly observant Jew" and "an embarrassment and disgrace to Jews" at large. Epstein Decl. at ¶¶ 35, 54, Ex. N. The author accused him of quibbling over "*petty things* like having people push elevator buttons" and directed him to "GET A LIFE!" Epstein Decl. at ¶ 54, Ex. N (caps in original).

Yet even after these disturbing incidents, the Board continued to stoke tensions and incite retaliation against the Sabbath observers. On June 2, 2021, Marshall hijacked another shareholder meeting to announce that the Sabbath observers had now cost the Colony $20,000. Epstein Decl. at ¶ 36. He claimed the costs would continue to grow and that the Colony had already been forced to pay a lawyer for mediation.  Epstein Decl. at ¶ 36.

## ARGUMENT

The FHA and NJLAD authorize preliminary injunctions, 42 U.S.C. §§ 3613(c), 3602(f), and all of the traditional injunction factors cut decisively in Plaintiffs' favor. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

On the merits, the Board's elevator policies violate fair housing law in at least five discrete ways: first, the policies *facially discriminate* against Sabbath observant Jews; second*,* they are *animated by animus* towards observant Jews; third, they have a *disparate impact* on the handicapped, as well as observant, Jewish residents; fourth*,* they *fail to accommodate* Plaintiffs' handicaps; fifth, they *interfere with and retaliate against* Plaintiffs in their good-faith efforts to secure accommodation and equal treatment. 42 U.S.C. §§ 3604, 3617; N.J. Stat. Ann. § 10:5-12(a), (d).

The resulting harm is ongoing and irreparable. Each and every Sabbath, Plaintiffs endure the humiliation of unequal treatment, as staff provide elevator assistance to all but those who require it for their religious observance. That stigmatic harm will never be fully washed away. In addition, the Board's policies leave several Plaintiffs trapped in their homes for substantial periods of time, unable to pray communally (as Orthodox Jewish tradition demands) or celebrate the Sabbath with friends and family. And, finally, an injunction would put an end to ongoing hostilities and a steady stream of abuse and retaliation that Plaintiffs

17

face from the Board and those it has egged on.

The final two factors—balance of the equities and the public interest—are beyond serious dispute: Plaintiffs' civil rights dwarf Defendants' trumped-up arguments about costs and delays.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    The Board Discriminates Against Plaintiffs in Violation of the FHA and NJLAD

The FHA and NJLAD prohibit "discriminat[ion] against any person in … the provision of services or facilities" because of "religion." 42 U.S.C. § 3604(b); N.J. Stat. Ann. § 10:5-12(g)(2) ("creed"); N.J. Stat. Ann. § 10:5-12(h)(2).[4]  These provisions are violated when the challenged conduct was "(i) motivated by intentional discrimination or (ii) resulted in a discriminatory effect, even absent evidence of a discriminatory motive." *Doe v. City of Butler*, 892 F.2d 315, 323 (3d Cir. 1989).

#### *1.    The Board's elevator policies intentionally discriminate against Sabbath Observant Jews.*

Intentional discrimination can be proven through "direct" evidence of "facial discrimination" or through "indirect" evidence of anti-religious animus. *Curto v. A*

---

[4] New Jersey courts construe NJLAD *in pari materia* with the FHA. *Roa v. Roa*, 200 N.J. 555, 568 (2010).

*Country Place Condo. Ass'n, Inc.*, 921 F.3d 405, 410 & n.3 (3d Cir. 2019). Here, we have both in spades.

*Direct evidence*. The Board engaged in "explicit facial discrimination" in adopting its anti-observant elevator policies. *Curto*, 921 F.3d at 410 & n.3. First, the Board conceded in its letters to the DCR and ADL that staff were told "not to assist [Sabbath observant] residents needing help with operating the elevators on Shabbat." Epstein Decl. at ¶¶ 33, 51, Ex. K. For everyone else, the Board permits staff to collect luggage, deliver packages, and press elevator buttons as needed. Epstein Decl. at ¶ 51, Ex. K; P. Kurlansky Decl. at ¶ 6. That express policy of "impos[ing] burdens *only* on conduct motivated by religious belief" is a *per se* violation of the FHA. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993) (emphasis added); *Curto*, 921 F.3d at 410 & n.3.

In addition, the procedures the Board used to rescind the Sabbath Elevator service were facially discriminatory. As explained above, the Board deploys two sets of procedural rules in crafting Colony policy—one for Sabbath observance and one for all other business. For all non-Sabbath business, votes are required only when they necessitate a change to the lease or the building bylaws; and those votes are always binding on the Board. But a different set of rules applies to Sabbath observance: when religious freedom hangs in the balance, the Board can call for a shareholder vote whenever it wishes; and it can set aside the results whenever they

19

favor the faithful. The Board engaged in non-neutral, facial discrimination when it applied these special, "made-for-[the-Sabbath]" procedures to punish the Plaintiffs. *Fulton v. City of Philadelphia*, --- U.S. ---, slip op. at 10 (June 17, 2021).

Just imagine the Board announced the following policy: "All shareholder referenda will pass with a majority of the votes—except religious accommodations, which require a supermajority to pass." That is manifestly discriminatory, *id.*, and it is essentially what happened here. The Board should never have put the Sabbath Elevator to a shareholder vote in the first place. But once the shareholders were given a say, the Board was required to respect the outcome, just as it would for *any other secular matter* put to a vote. That clear "departure from neutrality" constitutes impermissible facial discrimination. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546; *Curto*, 921 F.3d at 410 n.3.

*Indirect evidence.* Even if the Court conceptualizes the elevator policies and procedures as facially neutral, the indirect evidence of discriminatory intent easily satisfies Plaintiffs' "prima facie" burden. *Curto*, 921 F.3d at 410 n.3. Consider the irregularities: first, the Board called for an unprecedented shareholder vote on the Sabbath elevator; then, it rendered the vote "nonbinding" (also unprecedented); and then, it published a false ballot, which it refused to correct. Epstein Decl. at ¶ 12. Finally, *on a Friday evening*, the Board terminated the service because of supposed "wear and tear." Epstein Decl. at ¶ Ex. 20. But it refused to disclose the

20

documented basis for that belief, if any, and it flatly denied Plaintiffs' offer to pay for an independent assessment of the elevator doors.  Epstein Decl. at ¶ 21. All of this smacks of anti-religious animus.

And that isn't even the worst of it. For sixteen consecutive years, Sabbath observant residents relied upon staff assistance to attend religious service and observe the Sabbath with friends and family. Epstein Decl. at ¶ 30. The Board silently withdrew that longstanding assistance, and singled out Sabbath observant residents for disfavored treatment. Epstein Decl. at ¶¶ 28, 29. And it made sure Sabbath observers would feel the full sting of that discrimination by threatening to terminate staff who disobeyed. Epstein Decl. at ¶ 28.

That vindictive conduct has just one plausible explanation: the Board's hatred for traditional religion. Carol Lichtbraun schemed about how to prevent "*too many of those types of Jews*" from "moving into the building," J. Katz Decl. at ¶ 8, and Justin Wimpfheimer opposed anyone "too Jewish" for his taste. J. Katz Decl. at ¶ 8; *see, e.g.*, *El v. People's Emergency Ctr.*, 315 F. Supp. 3d 837, 342 (E.D. Pa. 2018) (FHA claim where landlord did "not care to have folks of Islamic religion"). Meanwhile, the Board's minions demeaned Plaintiffs as "supposedly observant Jews," with a "petty" fixation on button pushing, who "think[] only of themselves." Epstein Decl. at ¶¶ 35, 54, Ex. N. Calling Plaintiffs' faith selfish, "insubstantial[,] and even insincere" reflects a clear "hostility to [their] religious

21

viewpoint." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1729, 1731 (2018).

At the very least, all of this proves that the Board's discriminatory purpose was "a '*motivating factor*' behind the challenged" elevator policies in that it "played a role in [those] decision[s]." *Community Services, Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) (emphasis added); *Mhany Mgmt. v. County of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016).

### 2. *The Board's elevator policies disparately impact Sabbath Observant Jews.*

The Board's elevator policies also produce an impermissible disparate impact on handicapped Sabbath observers. *See Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly*, 658 F.3d 375, 381–84 (3d Cir. 2011); *Doe*, 892 F.2d at 323. The Board knew their policies would impose disparate burdens on the Sabbath observant Jews—that was the whole point. *See, e.g.*, *Yeshiva Chofetz Chaim Radin v. Village of New Hempstead*, 98 F. Supp. 2d 347, 354-55 (S.D.N.Y. 2000) (holding that a seemingly neutral requirement that homeowners secure a permit before installing a second kitchen could violate the FHA if it had a disparate impact on Orthodox Jews who observe strict kosher standards).

**B.    The Board Failed to Accommodate Plaintiffs' Disabilities in Violation of the FHA and NJLAD**

The FHA and NJLAD protect handicapped residents by requiring buildings to "make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3); N.J. Admin. Code § 13:13-3.4(f)(2). Failure to accommodate a handicap is unlawful even when it isn't "the result of a discriminatory animus." *Austin v. Town of Farmington*, 826 F.3d 622, 627 (2d Cir. 2016).

A plaintiff alleging a failure to accommodate must prove "1) that he is disabled; 2) that the Defendants knew or reasonably should have been expected to know of the disability; 3) that reasonable accommodation … is necessary to afford him an equal opportunity to use and enjoy the dwelling; and 4) that Defendants refused to make a reasonable accommodation." *Baratta v. N.H. Ave. Invs., L.L.C.*, No. 09-5195 (AET), 2010 WL 11695152, at *3 (D.N.J. May 27, 2010). Defendants have long known that several Plaintiffs have handicaps that prevent them from going up and down the stairs,[5] yet they still refuse to restore the elevator

---

[5] Under the FHA, a "handicap" is a "physical … impairment which substantially limits one or more … major life activities." 42 U.S.C. § 3602(h). HUD regulations broadly define "physical impairment" to include "[a]ny physiological disorder or condition … affecting … the musculoskeletal, respiratory, or cardiovascular system." 24 C.F.R. § 100.201(a)(1-2). The NJLAD's

assistance policy and the Sabbath elevator program. That takes elements 1, 2, and 4 off the table.

The only remaining question is "whether the requested accommodation[s] [are] '(1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing.'" *Revock v. Cowpet Bay West Condo. Ass'n*, 853 F.3d 96, 110 (3d Cir. 2017). Defendants bear the burden to prove accommodations are unreasonable. *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1103 (3d Cir. 1996). Reasonableness and necessity "depend on the circumstances" of each Plaintiff. *Revock*, 853 F.3d at 110. The FHA zeroes in the *particular individual* and asks whether "accommodations may be necessary to afford *such person* equal opportunity to use and enjoy the dwelling." 42 U.S.C. § 3604(f)(3) (emphasis added); *cf. City of L.A., Dep't of Water & Power v.*

definition is similarly expansive. N.J. Stat. Ann. § 10:5-5(q); *Weber v. Don Longo, Inc.*, No. 15-2406, 2018 WL 1135333 at *14 (D.N.J. Mar. 2, 2018) ("NJLAD does not require that a disability restrict any major life activities to any degree."). Plaintiffs easily satisfy these definitions because they suffer from physical challenges inhibiting their ability to walk long distances and climb or descend stairs. *Supra* at 5-7; *see, e.g., Stewart v. Cnty. of Salem*, 274 F. Supp. 3d 254, 260 (D.N.J. 2017); *Nieves v. Individualized Shirts*, 961 F. Supp. 782, 786–87, 796 (D.N.J. 1997). And Defendants had ample notice of these handicaps: Mrs. Ennis described her husband's condition to the Board in advocating for the Sabbath elevator, J. Ennis Decl. ¶ 6, and the Committee warned the Board that its policies harmed "the elderly, the infirm and physically challenged." Epstein Dec. at ¶ 45, Ex. E at 3.

*Manhart*, 435 U.S. 702, 709 (1978) (Title VII's analogous "focus on the individual is unambiguous.").

Here, the proposed accommodations are clearly "necessary" to afford these particular Plaintiffs "an equal opportunity" to freely travel to and from their homes on the Sabbath. 42 U.S.C. § 3604(f)(3). Without elevator assistance, Plaintiffs' disabilities—which prevent them from descending and certainly climbing stairs— consign them to their homes for much of the Sabbath.

The fix is easy and, thus, eminently reasonable. All the Board needs to do is to stop discriminating against Sabbath observers, honor the outcome of the shareholder vote (as it would any other referendum), and restore the non-discriminatory status quo. In *Lefkowitz v. Westlake Master Ass'n*, No. 18-14862, 2019 WL 669806, at *4 (D.N.J. Feb. 19, 2019), a Court in this district recognized that it could be reasonable for a planned real estate development to accommodate a handicapped Sabbath observant resident with a key that would better facilitate travel on the Sabbath. Plaintiffs here request even less: a simple return to the status quo, in which (a) the elevator's built-in Sabbath mode is reactivated and (b) staff lift their fingers and press buttons for Sabbath observers, just as they do for all other residents. Indeed, when the Sabbath elevator is operational, that finger lifting is entirely unnecessary.

25

Defendants will likely complain their prior policies supposedly imposed costs on the building. But the defendants in *Lefkowitz* could have said the same. The simple legal reality is that "reasonable accommodation … can and often will involve some costs," *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 334–35 (2d Cir. 1995), and reasonableness involves a "balancing of costs and benefits." *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 491 (6th Cir. 2019); *Schaw v. Habitat for Humanity of Citrus Cnty.*, 938 F.3d 1259, 1265, 1267 (11th Cir. 2019). Here, because "the plaintiffs' free exercise of religion will be impaired," that "balance easily tips in the plaintiffs' favor." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002). The prior policies—which involved no more than lifting a finger or flipping an elevator switch—enabled Plaintiffs to leave their homes, worship communally, observe the Sabbath with friends and family, and fully exercise core First Amendment rights. Those basic freedoms dwarf the Board's unsupported claims of expense, especially since (1) the Colony offered elevator assistance *for at least sixteen consecutive years* and (2) all three adjacent high-rises provide Sabbath elevators without controversy.

## C.   The Board Retaliated and Interfered with Plaintiffs' Exercise of Rights under the FHA and NJLAD

The FHA and NJLAD make it "unlawful to coerce, intimidate, threaten, or interfere with any" resident in the "exercise" of fair housing rights. 42 U.S.C.

§ 3617; N.J. Stat. Ann. § 10:5-12(d). Both statutes also prohibit retaliation or "reprisals against any person because that person has opposed" a statutory violation or otherwise "filed a complaint." N.J. Stat. Ann. § 10:5-12(a). The Board has violated each of these provisions—brazenly and repeatedly.

*Retaliation*. To prove retaliation under the FHA and NJLAD, a plaintiff must show that (1) he "engaged in a protected … activity"; (2) the defendant "took an adverse … action"; and (3) "a causal link exists between" the two. *Newell v. Heritage Senior Living, LLC*, 673 F. App'x 227, 231 (3d Cir. 2016). Protected conduct includes not only litigation, but also "making complaints to management" and "protesting against discrimination." *Montanye v. Wissahickon School Dist.*, 218 F. App'x 126, 131 (3d Cir. 2007).

The Board retaliated against Plaintiffs in at least two key ways. First, after protracted conflict with the Plaintiffs over the Sabbath elevator, the Board punished Sabbath observant residents by denying them the elevator assistance that it offers to every other resident in the building. That startling discrimination and the Board's continued unwillingness to reverse itself constitute retaliation against Plaintiffs for the complaints and letters they drafted in connection with the Sabbath elevator. *See, e.g.*, Epstein Decl. at ¶ 33; Susan Joffe Decl. at ¶ 13.

Second, the Board retaliated against Plaintiffs by inciting aggression from other residents. Following the DCR complaints, Marshall called out certain

27

Committee members *by name and apartment number* at a building-wide meeting and declared that their effort to secure religious equality and accommodation was costing everyone else money. Susan Joffe Decl. at ¶ 12. On top of that, the Board lied repeatedly—to the ADL, the New Jersey Division on Civil Rights, and the shareholders—claiming it never had a neutral practice of elevator assistance. Epstein Decl. at ¶ 51, Ex. K. The predictable result: targeted attacks branding Committee members an "embarrassment" and directing them to "GET A LIFE!" Epstein Decl. at ¶¶, 35, 54, Ex. N. Undeterred, the Board President continues to single out and demonize the Sabbath observers in front of all the shareholders—their fellow neighbors. This is a textbook example of retaliation. *See supra* at 14-16.

*Interference.* The prohibition on intimidation and interference is "broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *Revock*, 853 F.3d at 113. Interference "may consist of harassment, provided that it is 'sufficiently severe or pervasive' as to create a hostile environment." *Id.* "Harassment that intrudes upon the 'well-being, tranquility, and privacy of the home' is considered particularly invasive." *Id.* The Board violated, and continues to violate, these provisions in multiple ways.

First, the Board has launched a campaign to intimidate Plaintiffs into

dropping their DCR complaints and abandoning their efforts to secure Sabbath accommodations. That campaign began with the Termination Memo, which warned that "unjustified lawsuit[s] … would lead to legal fees … assessed against *all shareholders*." Epstein Decl. at ¶¶ 25-27, Ex. F. Since then, the Board has worked tirelessly "to isolate [Plaintiffs] from [the] community." *Trostenetsky v. Keys Condo. Owners Ass'n*, No. 17-CV-04167-RS, 2018 WL 2234599, at *3 (N.D. Cal. May 16, 2018). At every opportunity, Marshall tells the shareholders they are subsidizing what he derides as Plaintiffs' costly complaints and burdensome observance. Epstein Decl. at ¶¶ 36, 52, Ex. L, 53, Ex. M; Susan Joffe Decl. at ¶ 12. Shareholders have followed Marshall's lead, sending threatening notes to Committee members and accosting another in the Colony lobby. *See supra* at 15-16. As a result, Plaintiffs do not sleep well at night, fearful of what the Board will do next to target them. P. Kurlansky Decl. at ¶ 7. This campaign of intimidation is thus "sufficiently … pervasive as to interfere with" Plaintiffs' "use [and] enjoyment of" their Colony apartments. 24 C.F.R. § 100.600(a)(2); *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009).

Second, the Board's refusal to restore the Sabbath elevator service and rescind its draconian button-pushing policy also "constitutes [unlawful] interference." *Lefkowitz*, 2019 WL 669806 at *4. The Board's punitive elevator policies are designed to browbeat Plaintiffs into abandoning their fair housing

29

claims. *Id.*; *see also Marks v. BLDG Mgmt. Co.*, No. 99 CIV. 5733 (THK), 2002 WL 764473, at *12 (S.D.N.Y. Apr. 26, 2002) ("the denial of … benefits might well discourage tenants from exercising their rights under the FHA, the very evil § 3617 is designed to prevent."), *aff'd*, 56 F. App'x 62 (2d Cir. 2003).

Plaintiffs are thus entitled to a preliminary injunction directing Defendants to cease and desist in their efforts to intimidate, interfere with, and retaliate against Plaintiffs, including by withholding elevator assistance. *See, e.g.*, *Raab Family Partnership v. Borough of Magnolia*, No. 08-5050 (JBS), 2009 WL 361135, at *5-10 (D.N.J. Feb. 13, 2009); *Oxford House-Evergreen v. City of Plainfield*, 769 F. Supp. 1329, 1341-45, 1346 (D.N.J. 1991).

## II.   PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION

In the FHA context, Plaintiffs are not required to independently prove irreparable harm to secure a preliminary injunction. Rather, a "strong likelihood of success on the merits" creates "a presumption of irreparable harm." *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp*., 996 F. Supp. 409, 439 (D.N.J. 1998). Given Plaintiffs' strong showing on the merits, the presumption should be the beginning and end of the matter for irreparable injury.

In any event, Plaintiffs don't need the presumption because they are suffering enduring and irreparable injuries in at least three critical respects:

*First*, "[d]iscrimination itself … cause[s] serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984). Plaintiff face that humiliation every Sabbath, when the building staff apply the discriminatory elevator policies against them solely because of their faith. One recent encounter is telling: When Susan Joffe, Judith Ennis, and Joan Katz were recently waiting outside the elevator bank for someone to press the button on the Sabbath, a staff member walked right past them and straight into the elevator without providing assistance. Although this staff member had provided such assistance several times in the past, that was before the Board had specifically prohibited him and his colleagues from pressing elevator buttons for Sabbath observant residents. J. Ennis Decl. at ¶ 8; J. Katz Decl. at ¶ 10; Susan Joffe Decl. at ¶ 14.  No *ex post* remedy will ever unwind that stigmatic harm, which Plaintiffs will continue to suffer for as long as the Colony discriminates against them.

*Second*, the Board's elevator policies prevent Plaintiffs from exercising core First Amendment rights. The Board has squarely blocked Plaintiffs' two most viable paths to communal worship on the Sabbath, and the resulting "loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (emphasis added).

31

But even in the face of this animus, Plaintiffs have refused to forgo their religious commitments. Some have taken to walking down the stairs, putting themselves unnecessarily at risk. Others have hired an individual from outside the Colony to assist them with the elevator. But this ad hoc arrangement is hardly a panacea. Plaintiffs have quickly learned that reliance on an outside aid subjects them to the whims of local traffic or the misfortune of a missed alarm clock. Appleton Decl. at ¶ 7; Epstein Decl. at ¶ 32; J. Ennis Decl. at ¶ 9. And the impracticalities do not end there: If and when that person fails to arrive on time to render assistance, residents have no way to contact him or secure a back-up coverage because they do not use phones or email on the Sabbath. Appleton Decl. at ¶ 3; Epstein Decl. at ¶ 32; J. Ennis Decl. at ¶ 10. As a result, 91-year-old Mordecai Appleton was unable to attend communal services.  Appleton Decl. at ¶ 7. If Plaintiffs are forced to continue relying upon this workaround, they will invariably continue to miss out on communal prayer, lifecycle events in their Synagogue, and other foundational parts of the Sabbath.

Restoring the practice of staff assistance would considerably diminish these problems. The Colony employs 28 building staff who can assist residents. And because there is *always* someone on duty, Sabbath observers have some assurance that they will never be entirely left in lurch. Even if those spiritual losses persist for

only "*minimal periods of time*," that would still "unquestionably constitute[] irreparable injury." *Roman Cath. Diocese*, 141 S. Ct. at 67.

Nor can an outside aid ever duplicate the freedoms promised by the automatic Sabbath elevator. A plaintiff like Herbert Ennis is not healthy enough to commit to a preset schedule, and requires the flexibility of the Sabbath elevator to have a realistic shot at attending services—a critical part of his faith and Sabbath experience. For every passing Sabbath in which the Colony refuses to reactivate the Sabbath elevator, Mr. Ennis is deprived of the spiritual opportunity to pray together with a quorum in his congregation, attend the Rabbi's sermon and religious lectures, and bask in the goodwill and comfort of his fellow congregants. And Mr. Ennis is not alone in these religious needs: only the Sabbath elevator provides Plaintiffs the freedom to deviate from a preset schedule, and to worship, celebrate, and congregate with any measure of dignity, independence, and spontaneity. H. Ennis Decl. at ¶ 7; J. Ennis Decl. at ¶ 9.

Sabbath observant residents have only recently begun to experience the *full sting* of the Board's constraints. Prior to Covid-19, residents relied on elevator assistance from staff to participate in large synagogue gatherings and enjoy meals with friends and family throughout the Sabbath and Jewish holidays. P. Kurlansky Decl. at ¶¶ 8, 9; Epstein Decl. at ¶ 39. For the past year, the pandemic placed those communal aspects of Plaintiffs' religious lives on hold. But now, with the warmer

33

weather, things are changing. Just last month, on May 13, the CDC issued new guidance under which fully vaccinated people can resume congregating and dining together without masks or social distancing.[6] In early June, the local Synagogue announced that it would be "returning to its pre-COVID scheduling," and that the congregation would "thrive once again as a community with … wonderful weekly services led by our dear Rabbi, as well as the numerous learning opportunities and programs held at the Shul." Epstein Decl. at ¶ 55, Ex. O. Not the Plaintiffs, though. The Board's draconian policies have denied them the freedom and flexibility to participate in that communal revitalization on the Sabbath and Jewish holidays. To take just a few examples: Helaine Kurlansky was unable to attend her Synagogue's social events on a Sabbath afternoon in early June, H. Kurlansky Decl. at ¶ 7; Martin Epstein was recently forced to turn down a Sabbath-meal invitation from friends at the Colony, Epstein Decl. at ¶ 38; and residents have not been able to visit the elderly ill, Susan Joffe Decl. at ¶ 16. For Plaintiffs, the vaccine is no cure against the Board's discriminatory elevator polices and the social isolation they breed. An injunction is needed.

---

[6] *Interim Public Health Recommendations for Fully Vaccinated People*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html

*Third*, the Board's ongoing efforts to intimidate Plaintiffs and incite the broader Colony community leaves residents feeling anxious and insecure in their own homes. Epstein Decl. at ¶ 35. Whether because of threatening notes or verbal assaults, Committee members now live with Board's vengeance hanging over the heads like "a 'Sword of Damocles.'" P. Kurlansky Decl. at ¶ 7; Epstein Decl. at ¶ 43, Ex. C. Unsurprisingly, Plaintiffs do not sleep well at night, fearful of what the Board will do next to target them. P. Kurlansky Decl. at ¶ 7.

\* \* \*

The Board's discriminatory tactics and conduct have essentially trapped Plaintiffs in their homes. After they relied in good faith on the promise that staff assistance would continue, and after the shareholders approved the Sabbath elevator, the Board turned around and deprived them of those vital services, effectively cutting them off from the Sabbath congregation. In theory, a younger person in Plaintiffs' position might simply move away (which, to be sure, is a needless and unfortunate outcome, and one that the FHA and NJLAD do not countenance). But even that dire option would not work for Plaintiffs. Relocating from the Colony is simply not a viable solution to the pressing discrimination they face—most are above 80 years old, with debilitating health challenges that prevent them from taking the stairs, let alone moving quickly to a new address. H. Ennis

Decl. at ¶ 4; J. Singer Decl. at ¶ 4; Appleton Decl. at ¶ 4. Only an injunction can offer the immediate freedoms, independence, and flexibility that Plaintiffs require.

## III.   THE BALANCE OF HARDSHIPS FAVORS PLAINTIFFS

Plaintiffs' injuries are severe and ongoing. The Board's discrimination stamps Plaintiffs with a badge of inferiority and blocks them from "attend[ing] religious services." *Roman Cath. Diocese*, 141 S. Ct. at 68. And the Board's intimidation campaign leaves them in a constant state of fear and insecurity. P. Kurlansky Decl. at ¶ 7.

These harms are tragic, but thankfully, the fix is easy. The Board need only *restore* its sixteen-year practice of neutral elevator assistance; *cease* retaliating against the Sabbath observers; and *resume* operation of the Sabbath elevator by the simple flick of a switch. Defendants can reinstate that status quo today. The three adjacent high-rises all operate Sabbath elevators without issue, and the Colony's elevators already have the default Sabbath setting preprogrammed. Epstein Decl. at ¶ 19. Restoring Plaintiffs' ability to live and worship with dignity entails nothing more than a simple flip of the switch.

The Board's Termination Memo alleged otherwise, but none of its pretextual assertions withstands even a modicum of scrutiny. First, the Board claimed the Sabbath elevators were causing "mechanical issues," and that the extra stress on the elevator doors would require replacing the doors at *all six elevators*. But a

Colony staff member told Plaintiffs these supposed mechanical issues were "bullshit," Samuel Joffe Decl. at ¶ 6; the Colony did not report any increased service calls since Sabbath elevator services had commenced, Samuel Joffe Decl. at ¶ 5; it refused to disclose the reports that supposedly support its concerns about "wear and tear" and replacement costs, Epstein Decl. at ¶ 21; and it rebuffed the Committee's offer *to sponsor an independent study* of the situation, Epstein Decl. at ¶ 21. In fact, the Colony's 2019 audited financial statements show that the building spent less than a quarter of its allocated budget for elevator repairs, even though the Sabbath elevator was running for nearly one-third of the year. Susan Joffe Decl. at ¶ 23, Ex. E. The reality is simple: The Sabbath elevator operated in just two service elevators (which generally open in the trash room, not in the hallway), and for only five hours per week, reflecting "less than one percent of elevator usage measured by hours." Epstein Decl. at ¶ 49, Ex. I at 2.  Pretext is afoot.

Next, the Board complained of "an impact on building food and package deliveries," and that "cleaning schedules and garbage removal have been delayed." Epstein Decl. at ¶¶ 25, 46, Ex. F. But these vague statements of "delay" and "impact" are hardly credible. And even if they were, neither comes close to defeating Plaintiffs' countervailing interests in "attending religious services." *Roman Cath. Diocese*, 141 S. Ct. at 68. Accommodation "can and often will

37

involve some costs" to the defendant, but that neither justifies discriminatory procedures, nor absolves the Board of its duty to accommodate. *Shapiro*, 51 F.3d at 334–35.  If the right to "attend religious services" defeats even the risk of Covid spread during the pandemic, *Roman Cath. Diocese*, 141 S. Ct. at 68, then surely it trumps the Board's hollow and pretextual claims of cost and convenience.

## IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION

A preliminary injunction is in the public interest, but the Court need not take Plaintiffs' word for it. Every public servant that has been involved in this matter has reacted in precisely the same way: The local Rabbi, the Mayor of Fort Lee, and Congressman Bill Pascrell all insisted that Marshall and the Board end their discrimination campaign and furnish the necessary accommodations. When their pleas fell on deaf Defendant ears, the ADL confronted the Board over its "discriminatory" and unlawful policies. Epstein Decl. at ¶ 50, Ex. J.  In response, the Board professed not to see the "*big issue* about how staff working at the Colony have been told not to assist those residents needing help with operating the elevators on Shabbat." Epstein Decl. at ¶ 51, Ex. K. Thankfully, it is not up to Defendants to determine what is a "big issue" for purposes of the public interest. Fort Lee, its religious leaders, and elected officials have already weighed in to the contrary and an immediate injunction should issue.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction directing the Defendants to (1) reverse their facially discriminatory policy of forbidding staff from pressing elevator buttons for Sabbath observant Jews on the Sabbath and Jewish holidays; (2) restore the Sabbath elevator services ratified by the Colony's shareholders; and (3) cease and desist from their ongoing efforts to retaliate against and interfere with Plaintiffs in the exercise of their statutory rights under federal and state fair housing law.

Dated:    June 21, 2021                    */s/  Diane P. Sullivan*
                                            Diane P. Sullivan
                                            WEIL, GOTSHAL & MANGES LLP
                                            17 Hulfish Street, Suite 201
                                            Princeton, NJ 08542
                                            (609) 986-1120
                                            diane.sullivan@weil.com

Josh Halpern (*pro hac vice* pending)       Yehudah Buchweitz (*pro hac vice* pending)
josh.halpern@weil.com                       yehudah.buchweitz@weil.com
WEIL, GOTSHAL & MANGES LLP                  David Yolkut (*pro hac vice* pending)
2001 M Street NW, Suite 600                 david.yolkut@weil.com
Washington DC 20036                         Matthew R. Friedenberg
(202) 682-7000                              matthew.friedenberg@weil.com
                                            Yonatan Shefa (*pro hac vice* pending)
                                            yonatan.shefa@weil.com
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, NY 10153
                                            (212) 310-8000

                                            *Attorneys for Plaintiffs*

39