UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

PAUL KURLANSKY, HELAINE KURLANSKY, MARTIN EPSTEIN, HERBERT ENNIS, JUDITH ENNIS, MORDECAI APPLETON, HENRY KATZ, LILA KATZ, JOAN KATZ, GLENN KATZ, and JUDITH SINGER,

                                Plaintiffs,

      -against-

1530 OWNERS CORP.; MOE MARSHALL, ELLEN GERBER, KENNETH LIPKE, CAROL LICHTBRAUN, JUSTIN WIMPFHEIMER, PATRICIA DI CONSTANZO, and MARK O'NEILL, Individually and as Members of the Board of Directors of 1530 Owners Corp., and; FIRSTSERVICE RESIDENTIAL,

                                Defendants.

---

**DECLARATION OF MARTIN EPSTEIN PURSUANT TO 28 U.S.C. § 1746
IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Martin Epstein, hereby declare under penalty of perjury:

    1.    I am a plaintiff in the above-captioned proceeding and I am a resident of the Colony in Fort Lee, New Jersey, where I have been living with my wife, Gloria Epstein, for over sixteen years. My wife and I live in the Colony's North Tower in apartment 16F. I am a member of the Sabbath Elevator Committee, which advocated for the use of a Sabbath mode feature in the service elevators, so I am familiar with the Colony's now-terminated Sabbath elevator program. I am also familiar with the Colony's longstanding practice of assisting observant Jewish residents with the elevators on the Sabbath and other Jewish holidays. In short, I am familiar with the facts and circumstances set forth herein, and I submit this Declaration in support of Plaintiffs' Application for Preliminary Injunction.

2. As an observant Jew, my religious beliefs are informed by thousands of years of Jewish tradition. Part of my strongly-held religious beliefs is the primacy of *halakha*, or the Jewish legal system, which establishes a framework for my entire life. A second core element of my beliefs is *kehillah*, or community, and the importance of joining together with members of my community to pray, study, and worship, to mourn at sad times and to celebrate in times of joy.

3. A core part of my adherence to Jewish law is my observance of the Sabbath, the Jewish day of rest, which spans from Friday evening until Saturday night. On the Sabbath, and certain Jewish holidays, many observant Jews refrain from certain activities, including the use of electronic and certain mechanical devices. For example, many observant Jews, including myself, do not press elevator buttons or use telephones on the Sabbath and certain Jewish holidays. Doing so would violate my sincerely held religious beliefs.

4. When I moved to the Colony over sixteen years ago, I was concerned that the building did not have a Sabbath elevator. I spoke with an observant Jewish couple who lived at the Colony, and they told me that Colony employees always assisted observant Jewish residents with the elevators on the Sabbath and Jewish holidays by pressing elevator buttons for them.

5. The Colony, as a full-service apartment building, has staff that regularly assist residents with tasks such as carrying packages and groceries to their apartments, and pressing elevator buttons when residents' hands are full. For my first sixteen years at the Colony, the staff at the Colony regularly assisted me and my wife—as well as all other observant Jewish residents—on the Sabbath and certain Jewish holidays with the elevators. We relied on this assistance to attend services and other gatherings at the synagogue, and to host meals with friends and family on the Sabbath and certain Jewish holidays. We would provide a document in

advance to the staff with the times that we needed to be picked up to leave our apartment, and the staff would also assist us when we returned to the building. Ex. A (2014 Staff Assistance Schedule). My wife and I always tip the Colony's employees when they provide us with this or any other service, such as when they assist us in bringing in groceries or other packages from our car. Until September 2020, we never had any issues coordinating with the Colony staff for elevator assistance on the Sabbath and certain Jewish holidays.

6.  Although we certainly appreciated staff assistance with the elevators, we still faced substantial constraints on our freedom of movement and worship on the Sabbath and certain Jewish holidays. We could go up to our apartment when we wanted to do so, but we could leave only at times agreed upon in advance with the building's staff. This prevented us from going for walks without prior planning, as well as coordinating meals and gatherings with residents on other floors and friends outside the building during the Sabbath and certain other Jewish holidays. As early as 2007, I had begun advocating for the introduction of a Sabbath elevator at the building. A Sabbath elevator would offer increased freedom to Sabbath observant residents by allowing us to come and go as needed, and it would also offer higher property values for all residents.

7.  The Board originally told me that the building's then-existing elevators could not be programmed for Sabbath mode. However, beginning in October 2017, the Colony started upgrading to high-speed electronic elevators. That process was completed in 2019. Moe Marshall informed me in 2016 that the Sabbath mode would become a reality when the new elevators were installed. Based on this assurance, I, along with Judith Ennis, Joan Katz, and other building residents, formed the Sabbath Elevator Committee to help advocate for the introduction of the Sabbath mode.

8.     As a Committee, we took several steps to ensure that the new elevators would support our needs.  We contacted a representative from Liberty Elevator Corporation—the elevator company performing the renovations—to confirm that the new elevators were properly equipped for Sabbath mode.  The representative explained that it was easy to program the elevators for Sabbath mode, and sent the Committee materials outlining the programming options.  We also invited Mr. Marshall to Committee meetings to discuss the benefits of having a Sabbath elevator, and Mr. Marshall claimed to support the idea.

9.     The Board responded to our efforts by putting the question of whether the building would introduce a Sabbath elevator to a shareholder vote at the 2019 annual meeting.  As discussed further below, this was an unprecedented measure for a subject like a Sabbath elevator.  We ensured that the Board could not simply dismiss our proposal by coming forward with a proposal that both offered substantial benefits to elderly and handicapped residents of the building and also made significant compromises to preempt potential costs.

10.    Leading up to this vote, the Board took several steps to sabotage our Sabbath elevator proposal.  For example, Mr. Marshall attended one of the Committee's meetings and spoke for forty minutes at the beginning of the meeting, making many inaccurate claims about the Sabbath elevator program.  Later, on April 27, 2019—a few weeks before the annual shareholder meeting—the building management distributed an absentee ballot to shareholders that described the vote on the Sabbath elevator as "non-binding."  Ex. B (April 27, 2019 Ballot).

11.    In my sixteen years at the building, I cannot recall any other example of the Colony holding a non-binding vote, nor can I recall any instance in which shareholders were asked to vote on a subject like the Sabbath elevator that does not require a change to the Colony's bylaws or leases.  I was deeply troubled by these unprecedented procedures, and it

became clear to me that the Board was utilizing them to pursue a "heads we win, tails you lose" strategy: If the unprecedented vote for the Sabbath elevator failed, the Board could simply frame it as an issue of public opinion. And if the proposal passed, the Board could later set the result aside as "non-binding" and invent a post hoc rationale to justify that decision.

12. The text of the resolution, as it was described on the ballot, was also misleading. Ex. B. The text drafted by the Board described the Sabbath mode as running "from sunset each Friday to sunset each Saturday." *Id.* But the Committee had already agreed and informed the Board that Sabbath mode would operate only during specified Sabbath hours, such as before and after synagogue. The ballot also failed to mention that only the service elevators would be used for Sabbath mode—another substantial concession from the Committee. *Id.* Although the Committee brought these issues to the Board's attention, I later learned that the Board refused to make any changes to the ballot.

13. Despite these obstacles, the Sabbath elevator proposal won a majority of the voting shares at the May 15, 2019 annual meeting. Although the elevator upgrade was completed in July 2019, the Sabbath elevator did not begin operating until September 2019 after the Committee asked the Board to implement the Sabbath mode before the High Holidays.

14. The Sabbath elevator program meaningfully improved my quality of life at the Colony. It allowed me to attend services without relying on another person, to come and go as needed for walks when the weather was conducive to doing so, and to more seamlessly engage with my congregation and religious community.

15. To help ensure that the Sabbath elevator program ran smoothly, I served as the Committee's liaison with the Board and FirstService Residential, the building's management company. I solicited comments from observant Jewish residents about the new Sabbath elevator

program, and always sought to minimize the program's impact on all shareholders.  To address residents' comments, I coordinated directly with Mr. Marshall and Jude Odenthal to set the hours of operation for the Sabbath elevator and the floors on which the elevator would stop.

16. I also responded directly to comments from other shareholders about the Sabbath elevator and notified observant Jewish residents of any such comments.  During the Sabbath elevator program's first few months of operation, there were only a few comments from shareholders, and most of those comments came when one of the non-service elevators was out-of-order on one particular Sabbath (December 7, 2019).

17. About three months after the Sabbath elevator program began, Mr. Marshall told me that the Sabbath elevator program was "in trouble," and that the Board wanted to end the program.  The Committee asked for a written explanation for why the Board wanted to end the program, but never received one.

18. Throughout December 2019, I tried to speak with Mr. Marshall regarding any issues with the Sabbath elevator.  On December 3, 2019, I asked to schedule a meeting with Mr. Marshall to discuss any issues, and he asked me to first meet with Mr. Odenthal, which I did on December 12, 2019.  I then sent Mr. Marshall a text message, again asking him to speak with me, but I did not hear back from him.  Two days later, I sent Mr. Marshall an email, again requesting to meet. Ex. C (December 16, 2019 Email).  By December 15, 2019, I still had not heard from Mr. Marshall.

19. I then sent Mr. Marshall a letter explaining why the Sabbath elevator did not burden the Colony, and that I and other observant Jewish residents were committed to working with the Board and building management to make the Sabbath elevator a success for everyone at the Colony. Ex. D (Attachment to December 16, 2019 Email).  I also noted to Mr. Marshall that

several individuals who recently purchased apartments at the Colony had done so specifically because they were informed there would be a Sabbath elevator, and I observed that neighboring buildings had been operating Sabbath elevators for several years without issue. *Id.* Some of these neighboring buildings have Sabbath elevators that stop on every (or every other) floor and operate for the entire 25-hour Sabbath.

20. Later on, I attended a meeting in January 2020 with Mr. Marshall and Mr. Odenthal, where they claimed that the Sabbath elevator program—which only utilized the service elevators—was causing undue "wear and tear" to all of the elevators which would necessitate the replacement of all elevator doors sooner than anticipated. The Committee knew that this explanation was pretextual: only the service elevators are placed in Sabbath mode, they stop only certain floors, and they operate for limited hours on Fridays and Saturdays.

21. We needed the Sabbath elevator, so our Committee did all that we could to address supposed concerns with its operation. On January 31, 2020, we sent an email agreeing to reduce the number of stops, to remove stops when residents were temporarily away, and to have the elevator run express to the top of the building and stop only on certain programmed floors where needed. Ex. E (January 31, 2020 Email). We further agreed to shorten the hours of operation for the Sabbath elevator from nine total to seven hours. *Id.* Separate from this letter, our Committee offered to pay for a report from the elevator company to determine whether the Sabbath elevator was causing the damage, as well as to determine how the Sabbath mode could operate most effectively. The Board refused our offer to pay for a report, and refused to provide documentation for the "wear and tear."

22. The Board ultimately told us that either we could agree to a reduction from nine total hours to five hours, or the Sabbath elevator program would be terminated. Seeing no other

option, our Committee agreed, although this meant we would have to stay in our apartments for the majority of the Sabbath.

23. The Sabbath elevator then operated for the next several months with the reduced hours. During the COVID-19 pandemic, houses of worship were closed and building rules restricted elevator occupancy to two people per elevator. The Board temporarily suspended the Sabbath elevator program.

24. When COVID-19 cases began to decline around June 2020, houses of worship re-opened, albeit with reduced hours and at more limited capacities. The Sabbath elevator also resumed on a limited basis. From that point on, I heard no complaints about operation of the Sabbath elevator from the building or from management.

25. I was shocked when the building's management company posted a memo from the Board on July 24, 2020 regarding the "Termination of Sabbath Elevator Service." Ex. F (July 24, 2020 Memo). Although I worked closely with Mr. Marshall and Mr. Odenthal to ensure that the Sabbath elevator program ran as smoothly as possible, I received no advance notice that the program was to be terminated. *Id.*

26. The July 24, 2020 memo provided several reasons for termination of the Sabbath service, including that the five hours of use of the service elevators per week would necessitate one million dollars in repairs, which would be assessed against all shareholders. *Id.* The memo also stated that the Sabbath elevator impacted deliveries and cleaning services. *Id.* Despite our Committee's requests, we never saw supporting documentation for these claims.

27. Separately, this memo also threatened that an "unjustified lawsuit" objecting to termination of the Sabbath elevator program "would lead to legal fees that would be assessed against all shareholders." *Id.* I am aware of no prior occasion when the Colony assessed fees

8

against shareholders as a result of legal issues or litigation.  This language appeared to be designed to turn the other residents against observant Jews like myself who would advocate to preserve this essential service.

28.     After termination of the Sabbath elevator program, I and other residents relied once again on the building's continued practice of providing staff assistance with the elevators on the Sabbath and certain Jewish holidays.  However, on September 16, 2020—shortly before the Jewish high holiday of Rosh Hashanah—we learned from a sympathetic staff member that the entire staff had been instructed not to assist Sabbath observant residents with the elevators on the Sabbath and other Jewish holidays.  A staff member, on the brink of tears, explained that if they offered such assistance to Sabbath observant residents, they would be fired.

29.     We received no notice from the Board of this decision to terminate the longstanding practice of staff assistance.  Had Colony staff members not notified us of the decision, we would have returned to the building from services with no means of returning to our apartments without violating our sincerely held religious beliefs.

30.     I sent two emails to Mr. Marshall on September 17, 2020 to remind him that Sabbath observant residents of the Colony cannot press elevator buttons on the Sabbath and certain Jewish holidays without violating their sincerely held religious beliefs.  Ex. G (September 17, 2020 2:58pm Email); Ex. H (September 17, 2020 5:17pm Email).  I noted, among other things, that Sabbath observant residents were facing different treatment than other residents of the Colony, and that my wife and I had never had any issue in coordinating with the building staff for assistance on the Sabbath and during certain Jewish holidays in our over sixteen years of living there.  Ex. G.  When I met with Mr. Marshall about this issue, he told me to "go pay a Shabbos *goy* to push a button."

9

31. Our local rabbi was unable to persuade the Board to change course. The Fort Lee mayor, Mark Sokolich, in coordination with the office of our Congressman. Bill Pascrell, intervened to request that the Colony reconsider the new policy. Even then, Mr. Marshall refused to budge. Finally, he agreed to suspend implementation of the new policy for Rosh Hashanah and Yom Kippur; but the no-button-pressing-for-the-Observant policy would still go into effect for the Sabbath in between Rosh Hashanah and Yom Kippur, and for every Sabbath after then.

32. By terminating the Sabbath elevator program, and then the practice of staff assistance, the Colony has blocked the two most viable paths for me and other Sabbath observant residents to observe our faith with dignity. I have been forced to hire an outside aide to provide limited elevator assistance for myself and other Sabbath observant residents. This individual is not an employee of the Colony; the process is cumbersome; and it affords little flexibility. The individual comes for limited specified times, making it difficult to cater to the diverse needs of the observant Jewish residents, some of whom are disabled and are unable to leave their apartments the moment the hired individual arrives. There have also been occasions when this individual has been unable to arrive at the Colony on the Sabbath. When that happens, we have no way of contacting him or securing back-up assistance because, as observant Jews, we do not utilize phones or other electronic devices on the Sabbath.

33. Over the past several months, I and other observant Jewish residents have taken steps to seek reinstatement of the Sabbath elevator program and the practice of staff assistance. An attorney for the Sabbath observant residents sent a letter to the Board on October 30, 2020 demanding that the Board reverse its actions, Ex. I (October 30, 2020 Letter), and the Anti-Defamation League also sent a letter to the Board and the management company condemning the

Board's actions. Ex. J (November 23, 2020 Letter). In its response to the ADL, the Colony admitted that it barred its staff from assisting Sabbath observant Jews with the elevators on the Sabbath and certain Jewish holidays. Ex. K (December 18, 2020 Letter). In November 2020, Paul Kurlansky, Helaine Kurlansky, and I tried without success to negotiate a resolution with the Colony. Ultimately, in December 2020, two residents at the Colony who are also Sabbath observant Jews—Samuel and Susan Joffe—filed complaints with New Jersey's Division on Civil Rights and the U.S. Department of Housing and Urban Development challenging the building's actions.

34. Mr. Marshall responded by publicly criticizing our efforts at Zoom Board meetings that were open to all shareholders. On February 24, 2021, Mr. Marshall announced that our efforts were costing shareholders $10,000 because the Colony had to hire lawyers to respond to us. Mr. Marshall told shareholders that he was reporting this information to let them know where their "money is going," and described the dispute as a "waste of money." Ex. L (February 24, 2021 Meeting Recording). Mr. Marshall further accused me at this same meeting of creating my own "back door" program, denying the existence of any prior practice of staff assistance with the elevators. *Id.* At another Board meeting on April 7, 2021, Mr. Marshall announced that the dispute was costing shareholders almost $20,000, and that the cost of the "battle" could grow as high as $300,000, which would result in an assessment against all shareholders. Ex. M (April 7, 2021 Meeting Recording).

35. Other shareholders have been similarly hostile, seemingly taking cues from Mr. Marshall. On April 7, 2021, another shareholder verbally accosted me as I entered the building lobby after visiting my ill wife in the hospital, accusing me of "costing shareholders more than $10,000," and demanding to know why observant Jewish residents are "entitled" to a Sabbath

11

elevator.  On April 19, 2021, I again returned from the hospital and found an anonymous letter from a "disgruntled shareholder" in my mailbox calling me "an embarrassment and disgrace to Jews," and criticizing me for focusing on "petty things like having people push elevator buttons" during the pandemic.  Ex. N (April 19, 2021 Letter).  These events have left me feeling anxious and insecure in my own home.

36. Yet, the Board has persisted in its efforts to target the Committee.  On June 2, 2021, Mr. Marshall announced at another shareholder meeting that Sabbath observant residents had cost the Colony $20,000.  He claimed that costs would continue to rise and that the Colony had already paid a lawyer to participate in two mediation sessions.

37. The Board's elevator policies have significantly impaired my ability to engage with my religious community and Synagogue congregation on a weekly basis.  My wife, Gloria Epstein, is ill and is staying in a nearby hospital.  I visit her daily, but I am otherwise generally alone in our apartment at the Colony.  I look forward to the Sabbath each week as an opportunity to gather with my friends and neighbors, through festive meals, religious services, and other Judaic lectures and classes.

38. The Board's elevator policies have impaired all of these religious activities.  For instance, on Passover, I was unable to celebrate the Seder with my friends and neighbors because I would have had no means to return to my apartment without violating my sincerely held religious beliefs.  I therefore spent much of the holiday alone in my apartment.  Just a few weeks ago, I was forced to decline an invitation for lunch during the Sabbath because I could not coordinate with the individual that I hire to assist observant Jewish residents with the elevators.  I am 80 years old, and could not climb the necessary eight flights of stairs to visit my friends' apartment without endangering my health and safety.

39. The Colony's policies are especially oppressive in light of our community's re-opening and the increasing number of people who have been vaccinated against COVID-19. Our synagogue has begun hosting more events, just as it had done before the pandemic, and these events do not fit neatly within the timeframe that the individual I hire can come to assist Sabbath observant residents. Ex. O (Synagogue Event Flyer). Impromptu religious and social gatherings are resuming, but not for me. The Board's policies make it impossible for observant residents like myself to fully emerge from the social isolation of COVID-19 on the Sabbath. We have a vaccine, but the Board's elevator policies continue to confine us.

40. I, therefore, respectfully request that this Court grant Plaintiffs' Plaintiffs' Application for Preliminary Injunction.

41. A true and correct copy of the 2014 staff assistance schedule is attached hereto as Exhibit A.

42. A true and correct copy of the April 27, 2019 ballot is attached hereto as Exhibit B.

43. A true and correct copy of my December 16, 2019 email is attached hereto as Exhibit C.

44. A true and correct copy of the letter I provided to Mr. Marshall on December 15, 2019, which was also attached to Exhibit B, is attached hereto as Exhibit D.

45. A true and correct copy of the January 31, 2020 email the Sabbath Elevator Committee sent to the Board is attached hereto as Exhibit E.

46. A true and correct copy of the July 24, 2020 termination memo announcing the end of the Sabbath elevator program is attached hereto as Exhibit F.

47. A true and correct copy of my September 17, 2020 2:58pm email to Mr. Marshall is attached hereto as Exhibit G.

48. A true and correct copy of my September 17, 2020 5:17pm email to Mr. Marshall is attached hereto as Exhibit H.

49. A true and correct copy of the October 30, 2020 letter to the Board from the prior attorney is attached hereto as Exhibit I.

50. A true and correct copy of the November 23, 2020 letter to the Board from the Anti-Defamation League is attached hereto as Exhibit J.

51. A true and correct copy of the Board's December 18, 2020 response to the Anti-Defamation League letter is attached hereto as Exhibit K.

52. A true and correct recording of the February 24, 2021 Zoom Board of Directors meeting is attached hereto as Exhibit L.

53. A true and correct recording of the April 7, 2021 Zoom Board of Directors meeting is attached hereto as Exhibit M.

54. A true and correct copy of the anonymous letter I received on April 19, 2020 is attached hereto as Exhibit N.

55. A true and correct copy of the synagogue event flyer for June 4 to 5, 2021 is attached hereto as Exhibit O.

56. I declare under penalty of perjury that the foregoing is true and correct. Executed on June 18, 2021.

*/s/ Martin Epstein*
MARTIN EPSTEIN