# EXHIBIT I



RCOLEMAN@DHILLONLAW.COM
ADMITTED IN NEW JERSEY AND NEW YORK

October 30, 2020

**BY FEDEX**

Moe Marshall, President
Colony Board of Directors
1530 Palisade Avenue
Fort Lee NJ 07024

        **Re:**  **Colony Cooperative Apartment**
           <u>**Cessation of Sabbath Elevator**</u>

Dear Mr. Marshall:

  This law firm represents a group of Colony residents concerning the decision of the Colony board to discontinue the Sabbath elevator service, as set forth in the Board's memorandum to the residents dated July 24, 2020 (the "Elevator Memo" or the "Memo").  The Elevator Memo raises several troubling issues in the process of announcing the cancellation – without consideration of the whole membership of the cooperative – a valuable amenity of critical importance to numerous coop members that was approved by a majority of voting shareholders after years of discussion. Furthermore, the Memo justifies this action in a manner that is internally illogical and does not appear to have been made in good faith. Subsequent conduct by management in instructing staff that they will be dismissed if they assist religiously-observant members with the elevators on the Sabbath only highlights the [1]discriminatory and even potentially illegal nature of the Colony board's recent action.  We write now in an effort to forestall legal action.

  The first reason set forth in the Elevator Memo beggars credibility and sets the tone for what can only be seen as a series of additional rationalizations for an otherwise unjustifiable decision. The Memo acknowledges that when the Board undertook a major elevator renovation project three years ago, it was informed that the elevator doors were only in "fair" condition and had, at best, a "potential life span of ten years."  The cost of replacement of these doors was projected to exceed $1 million, and the Board chose to defer this component of the renovation.  Seven years into the

---

[1] We have also filed a complaint concerning this matter with the New Jersey Attorney General.

**DHILLON LAW GROUP INC.**
A CALIFORNIA PROFESSIONAL CORPORATION

**8 HILLSIDE AVENUE, SUITE 103  |  MONTCLAIR, NJ 07042| 973-298-1723**

Moe Marshall, President
Colony Board of Directors
October 30, 2020
Page 2 of 7

best-case lifespan of ten more years, however, the Board concludes that this considerable but inevitable expense – which, under all scenarios, was anticipated to become necessary in the next few years – should now be attributed to the use of the built-in Sabbath mode for less than a year for extremely limited hours (at the time it was cancelled, a total of four hours per week: one hour on Friday nights and three hours on Saturdays), in addition to a few holy days (many of which fall on the Sabbath). The subsequent ban on staff assisting members with Sabbath operation of the elevators, of course, bears no relation whatsoever to any Colony economics, other than by depriving staff of the tips they once earned for performing this modest, customary function of coop attendants.

The Board's decision to place the blame for the supposed degradation of the elevator doors in Sabbath mode for what amounts to less than one percent of elevator usage measured by hours, is patently indefensible. If, in fact, this dubious claim was true, it would raise serious questions about the due diligence conducted by the Board when it agreed to install and pay for controllers that permitted programming for Sabbath mode, and the Board's decision to employ that option when, based on the claim in the Elevator Memo, such use could be expected to result in a shorter lifespan of the equipment. Our clients are aware of no warning from the engineers that the built-in Sabbath mode they furnished to the Colony, if used, could accelerate the degradation of the Colony's decades-old elevator doors because of "extra stress." This equipment was specified, purchased and installed based on their recommendation and under their supervision. If such a recommendation had been received, the Board should have shared it with shareholders at the time. If it was not, the Board should be contemplating action against the engineers who failed to advise the cooperative about this significant risk – not blaming its shareholders for using a feature the Colony bought and paid for.

In fact, the Elevator Memo itself does not even claim that anything is different now with respect to the need to replace the doors and related hardware than it was before the Sabbath mode was employed. The Memo acknowledges that "[d]ue to the high cost of the project it did not include the replacement of the (4) Passenger and (2) Service car outer elevator doors and associated closing hardware which were evaluated to be in fair condition with a potential life span of ten years" in 2017, and then it goes on to state that, as of the date of the memo, the supposed "extra stress from opening and closing the elevator doors during the Shabbos mode . . . has led to mechanical issues and increased service calls for the 198 front hallway doors, and 66 double doors in compactors rooms which will cost over one million dollars to replace." No date is given for this contemplated repair. In other words, the same number of doors need replacement is the same as in 2017, only now – three years later – they need them more. This is exactly what was anticipated with or without "extra stress from opening and closing," which is precisely what elevators doors are designed to do.

The Board's other purported reasons for this cancellation appear to be nothing more than rationalizations for actions taken for less benevolent reasons than a sober assessment of shareholders' interests. The Elevator Memo claims that "there has been an impact on building

Moe Marshall, President
Colony Board of Directors
October 30, 2020
Page 3 of 7

food and package deliveries," yet such impact is neither described nor specified, and is hard to credit much considering the relatively low likelihood of package deliveries on Friday nights and Saturdays, much less during the few hours in question. The same is true of the vague assertion that "[c]leaning schedules and garbage removal have been delayed." The fourth reason given is merely a reprise of the previous two with the words "residents have complained" about those supposed problem. The Board's mere claim of the existence of complaints, without any sense of either the number of such complaints or their validity, is meaningless. The assertion that Sabbath-mode use of the elevators impacts cleaning and garbage removal is, of course, specious. The Colony's other elevator banks are not operated in Sabbath mode, and even without Sabbath mode, the elevator would be used by residents normally, not taken out of service. The Board is well aware that the activities that produce the greatest wear and tear on the elevators – use by contractors, service providers, deliveries, residents, guests, etc. – have in no way been curtailed to limit wear and tear. Instead, the Board has chosen to scapegoat those shareholders requesting very limited Sabbath-mode use for a handful of hours a week.

The list of pretexts set out in the Elevator Memo for cancelling the Sabbath elevator service is one of three things. One possibility is that the memo is meant to whitewash the real reason for the Board's decision (or its incompetence in failed due diligence before implementing Sabbath mode). Another possibility is that the Board has simply decided to acquiesce to the complaints of some indeterminate number of unknown residents about minor inconveniences and to disregard the benefits of the service for a known number of residents for whom the Sabbath elevator service is of critical importance. Yet a third potential reason for the memo is that it covers up a discriminatory animus on the part of whichever Board members are the catalysts for this manufactured controversy. It is impossible to take the memo at face value given its illogic and double-speak.

Based on reports from our clients, the Board's hostility towards the Sabbath elevator stems, not from a rational cost-benefit analysis, but rather bias against observant Jews – many of whom have been shareholders for many years – as members of the Colony community. Besides anecdotal reports of comments and overheard conversations supporting this impression, the Board's bias can be corroborated by several empirical facts. One is that the Board appears impervious to the suggestion, well supported by both data and common sense, that Sabbath elevators are a selling point that boosts the value of apartments in this area. Indeed, some shareholders who used the Sabbath elevator inquired about whether a Sabbath elevator could be instituted before they committed to move to the Colony. In response, Mr. Marshall acknowledged the point about how such an amenity increases the value of residential units in this area and told these potential buyers that Mr. Marshall supported the idea for this reason. Shareholders relied on those representations in purchasing their units, making the Board's decision now even more problematic for Colony.

The Board has also unreasonably dismissed as irrelevant the fact that three of the comparable adjoining buildings have been providing Sabbath elevator service for many years and running them each week for a period much longer than 4 or 5 hours per week, apparently

Moe Marshall, President
Colony Board of Directors
October 30, 2020
Page 4 of 7

without issues or problems. This fact is, however, very relevant, if only because the conduct of similarly-situated buildings casts so much doubt on the pretextual reasons given in the Elevator Memo for discontinuing the service.

All of these actions suggest bias. So does the fact that the Elevator Memo was issued on a Friday night – the Jewish Sabbath – and without the courtesy of giving advance notice to any member of the Sabbath elevator committee. Moreover, nothing good can be inferred from the fact that when the committee asked to see impact reports, or to allow an independent consultant to evaluate the impact of Sabbath mode on the wear and tear of the elevators, these requests were summarily denied.

The history of the Sabbath elevator at the Colony reinforces the growing body of evidence of discriminatory bias covered up by the Elevator Memo and the Board. As mentioned above, Mr. Marshall and Board's original reaction when approached with the suggestion was encouraging and positive, and you acknowledged that the membership would likely benefit from such an amenity by virtue of increased value of their units. Although Sabbath elevator service could have been implemented by the Board vote, however – as other buildings have done – the Board insisted on an extremely rare vote by the shareholders. It is now clear that this was done essentially to avoid Board accountability. Even then, after informing the elevator committee that the question would be put to a vote at the annual 2019 shareholder meeting, when the ballots were distributed, the question was labelled a novel "nonbinding resolution" (the first of its kind that our clients are aware of) subject to a "trial period" – meaning that the Board reserved to itself the authority and power it always had to decide the issue, but intended to use it only to deny the request. In other words, the Board forced an unnecessary vote and its result was a sham, reversible at will by the Board.

Once the Sabbath elevator went into operation in September 2019, the committee agreed to continuing adjustments, meaning reduction of hours from the originally-agreed schedule, to minimize any disruption. Despite such compromises, in December 2019 the Board threatened the committee that it would terminate the Sabbath elevator unless hours were further reduced, stops were reduced, and service was suspended for the winter on floors when users were away. These new requirements were coupled by the Board's petty and insulting insistence that, for the "privilege" of accepting them, Sabbath mode users must pay for reprogramming of the controller themselves!

In retrospect, it is obvious, if it were not at the time, that these demands by the Board were designed to induce the committee to push back and refuse them, which would then be framed as a justification for cessation of the service – the Board's apparent desired outcome from the beginning. The elevator committee, however, agreed to every concession requested, no matter how petty and baseless, and as of January 2020, operation of the Sabbath elevator was reduced to only about seven or eight floors on each tower, and only five hours per week.

Moe Marshall, President
Colony Board of Directors
October 30, 2020
Page 5 of 7

Notwithstanding the consistent willingness of the Sabbath elevator users to accept diminutions in service and, indeed, one slight after another, on July 24, 2020 the Elevator Memo announcing the end of Sabbath elevator service was nonetheless handed down as a diktat from the Board with neither a second vote, "advisory" or otherwise, nor any consultation with members of the committee. No less significantly, the letter cast the decision in a manner that not only failed to acknowledge the series of compromises accepted by the users, but actually blamed the users not only for the end of service, but for expensive repairs that had to be made anyway. Indeed, by assigning blame for a long-deferred million-dollar construction project to Orthodox Jews at the Colony, it is hard not to view the Elevator Memo itself as being calculated to poison the well in the event a second membership vote were to take place – itself an act of unconscionable bias against this community.

Mr. Marshall, the foregoing would be a damning enough indictment of the Board's recent actions concerning this matter, but if there were ever any question concerning the Board's implementation of policies designed to harm and discriminate against Orthodox Jewish residents, it is the sudden removal of a service that had been provided continually to them for more than sixteen years and on which they have come to rely – namely permitting building personnel to assist Sabbath observers use the regular elevator. In the absence of a Sabbath elevator, this minimal staff support the only option for residents in the 32-story Colony tower – on the Sabbath and other holy days.

History, basic decency, and the consideration due to residents in the Colony should require that building staff be permitted to continue assisting residents who need help with the elevator because of old age or infirmity, because they are carrying packages, or for any other reason. **That Mr. Marshall and the Board have now barred staff from extending this courtesy to observant Jews on the Sabbath and festivals is, to put it mildly, astonishing and constitutes clear evidence of religious discrimination.** This new prohibition is surgically targeted at religious observance, leaving observant Jews, especially the many elderly residents of the Colony, unable to attend religious services and making them virtual prisoners in their apartments on the Sabbath if they are unwilling to violate religious law by engaging the elevator.

Underscoring the illegitimacy of this latest petty diktat, the staff prohibition was instituted surreptitiously, with no formal notice to any shareholders or residents. If a concerned staff member had not confided to an observant shareholder that the staff had been warned to stop assisting Sabbath observers with the elevator on penalty of termination, residents would have returned from religious services to find they had no way to get back to their apartments – a humiliating and potentially health-impacting state of affairs.

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
8 HILLSIDE AVENUE, SUITE 103  |  MONTCLAIR, NJ 07042 | 973-298-1723

Moe Marshall, President
Colony Board of Directors
October 30, 2020
Page 6 of 7

We write to advise Mr. Marshall, as the Board's president, that by every indication, based on the foregoing, the Board's decision to obstruct, reduce, frustrate and eventually eliminate the Sabbath elevator was (a) not a result of the pretexts listed in the Elevator Memo but was (b) unlawful discrimination against the Orthodox Jewish community at the Colony, which is prohibited by the Fair Housing Act, Civil Rights Act of 1964, and New Jersey Law against Discrimination, and other statutes and that (c) this can be proven at trial. The evidence will show that the Board's conduct constitutes invidious discrimination based on refusals to make reasonable accommodations and outright harassment of the Colony's Orthodox residents based on their religious faith and practices. Additionally, the Board's abuse of power described above also constitutes bad faith, a breach of the Board's fiduciary duty to its shareholders and a breach of the "No Discrimination" clause in the Proprietary Lease (¶ 48), all of which may give rise to separate grounds for civil liability.

Our clients have authorized us to prepare a complaint seeking legal relief for these violations of their rights. **If filed, this action will subject the Colony, its Board, and its members individually – including, quite likely, without indemnification, because of the extensive evidence of bad faith and intentional misconduct here – to significant statutory, contractual and other penalties, as well as attorneys' fees and injunctive relief.**

Our clients have no wish to put their own cooperative to the expense and risk of litigation, much less to subject themselves and their fellow tenants to the process of discovery, pretrial motion practice and a public trial where this sorry tale of discrimination will be on full display and could affect property values at the Colony. What they seek by this letter is the avoidance of such an outcome – the possibility of which they had, despite their entitlement to relief, all but ruled out until the Board's most recent assault on their dignity and rights, i.e., the instruction forbidding building staff from assisting them with elevator operation on the Sabbath.

The relief our clients demand in order to avoid litigation is as follows:

- Immediate and permanent lifting of restrictions on staff concerning assistance for shareholders based on religious practice;

- Immediate delivery of any professional analysis and written report by an independent expert on the impact of Sabbath elevator usage on the elevator doors, as well as documentation of the extent of the impact, relied on by the Board in its determination to cancel the service;

- Absent the Board's providing such contemporaneous proof, the Sabbath elevator service shall be restored immediately to a level consistent with that of other buildings in the local community;

Moe Marshall, President
Colony Board of Directors
October 30, 2020
Page 7 of 7

- A binding agreement that no retaliatory action will be taken to interfere with services normally provided for shareholders of the Colony in connection with all the foregoing; and

- A binding agreement to refrain from communicating negative and/or misleading information concerning the observant Jewish shareholders.

Because the Board's recent actions have caused life at the Colony for our clients to be rendered almost intolerable, and because they have already forborne from taking action for months in the interest of communal harmony at the cooperative, the timeframe for an affirmative response must be short. This office must receive an affirmative response to the demands set forth above and an indication of willingness to negotiate the specific terms of an agreement regarding these matters no later than ten days from your receipt of this correspondence. Absent the same, we are authorized to proceed with litigation to vindicate our clients' rights. We will take any effort to pressure, harass, intimidate, bully, or punish any Sabbath-observant shareholder of the Colony as retaliation for this demand as a grave matter that will accelerate our need to take formal action.

Very truly yours,

Ronald D. Coleman

cc:  Ellen Gerber
     Kenneth Lipke
     Carol Lichtbraun
     Justin Wimpfheimer
     Patricia DiCostanzo
     Mark O'Neill
     Eric Frizzell, Esq.