Peter Seiden, Esq.
MILBER MAKRIS PLOUSADIS & SEIDEN, LLP
2016 John F. Kennedy Boulevard
Jersey City, New Jersey 07305
(201) 433-0778

Patrick F. Palladino, Esq. (*pro hac vice* admission pending)
MILBER MAKRIS PLOUSADIS & SEIDEN, LLP
1000 Woodbury Road, Suite 402
Woodbury, New York 11797
(516) 712-4000

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL KURLANSKY, HELAINE KURLANSKY MARTIN EPSTEIN, HERBERT ENNIS, JUDITH ENNIS, MORDECAI APPLETON, HENRY KATZ, LILA KATZ, JOAN KATZ, GLENN KATZ, and JUDITH SINGER, | Civil Action No.: 2:21-cv-12770 |
| Plaintiffs, | |
| vs. | Motion Return Date: August 2, 2021 |
| 1530 OWNERS CORP.; MOE MARSHALL, ELLEN GERBER, KENNETH LIPKE, CAROL LICHTBRAUN, JUSTIN WIMPFHEIMER, PATRICIA DI CONSTANZO, and MARK O'NEILL, Individually and as Members of the Board of Directors of 1530 Owners Corp., and; FIRST SERVICE RESIDENTIAL, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

RELEVANT BACKGROUD FACTS ................................................................... 1

ARGUMENT ........................................................................................................ 6

POINT I ............................................................................................................... 6

       PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION MUST BE
       DENIED DUE TO THE LACK OF IRREPARABLE HARM

POINT II ........................................................................................................... 10

       THE PUBLIC INTEREST DOES NOT FAVOR AN INJUNCTION

POINT III ........................................................................................................... 11

       THE BALANCING OF THE HARDSHIPS FAVORS DEFENDANTS

POINT IV ........................................................................................................... 13

       PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

CONCLUSION .................................................................................................. 19

### TABLE OF AUTHORITIES

<u>**Cases**</u>

*Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*,
996 F.Supp. 409, 439 (D.N.J. 1998) ............................................................6

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520, 546 (1993)................................................................15

*Continental Group, Inc. v. Amoco Chemicals Corp.*,
614 F.2d 351, 358 (3d Cir. 1980)...........................................................10

*Flagg Bros., Inc. v. Brooks*,
436 U.S. 149 (1978)......................................................................8

*Frank's GMC Truck Center, Inc. v. General Motors Corp.*,
847 F.2d 100 (3d Cir. 1988)...............................................................7

*Heckler v. Matthews*,
465 U.S. 728, 739-740 (1984). ...........................................................8

*In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation*,
493 F.3d 393, 402-403 (3d Cir. 2007)..............................................13, 14

*In re Tower Air, Inc.*,
416 F.3d 229, 238 (3d Cir. 2005)..........................................................13

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
882 F.2d 797, 801 (3d Cir. 1989)...........................................................7

*Jakubowski v. Christ Hosp., Inc.*,
627 F.3d 195 (6th Cir. 2010) .............................................................17

*Kolawole O.T. v. Ahrendt*,
466 F.Supp.3d 457, 465-466 (D.N.J. 2020).................................................6

*Lefkowitz v. Westlake Master Ass'n*,
2019 WL 669806 (D.N.J. Feb. 19, 2019)..................................................17

*Maldonado v. Houstoun*,
157 F.3d 179, 184 (3d Cir. 1998).........................................................6

*Maul v. Kirkman*,
637 A.2d 928 (App. Div. 1994). ..........................................................13

*Midlake on Big Boulder Lake, Condominium Ass'n v. Cappuccio,*
673 A.2d 340 (Pa. Superior Ct. 1996)..................................................................... 8

*Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly,*
658 F.3d 375, 382 (2011)............................................................................... 15, 16

*Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharmaceuticals Co.,*
290 F.3d 578, 596 (3d Cir. 2002). .......................................................................11

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.,*
176 F.3d 151, 153 (3d Cir. 1999)...................................................................... 6, 7

*Oburn v. Shapp,*
521 F.2d 142 (3d Cir. 1975)............................................................................... 7

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
309 F.3d 144, 178 (3d Cir. 2002)................................................................. 17, 18

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982)........................................................................................ 10

*Yeshiva Chofetz Chaim Radin v. Village of New Hempstead,*
98 F.Supp.2d 347, 354-355 (S.D.N.Y. 2000)........................................................ 16

## **Statutes**

42 U.S.C. § 3604(f)(3)(B)................................................................................ 16

## PRELIMINARY STATEMENT

Defendants 1530 Owners Corp., Moe Marshall, Ellen Gerber, Kenneth Lipke, Carol Lichtbraun, Justin Wimpfheimer, Patricia Di Constanzo, and Mark O'Neill, individually and as members of the Board of Directors of 1530 Owners Corp., and First Service Residential (hereinafter "Defendants") respectfully submit this memorandum of law in opposition to plaintiffs' motion for a preliminary injunction. For the reasons set forth below, plaintiffs' motion should be denied in its entirety.

As a threshold matter, plaintiffs' admission at page "32" of their memorandum of law that they "have hired an individual from outside the Colony to assist them with the elevator" is fatal to their application, thus requiring its denial, as it makes clear that plaintiffs have sustained monetary damages, and a preliminary injunction is not available in such circumstances. In addition, at several locations, plaintiffs argue that Defendants have purportedly violated their constitutional rights, including the First Amendment; however, as there is no state action, and all parties are private individuals or private corporations, plaintiffs' arguments are misplaced and inapplicable. Plaintiffs' application must also be denied for the reasons set forth below.

## RELEVANT BACKGROUND FACTS

This action arises out of damages allegedly sustained by plaintiffs as a result of Defendants' inability to permit the service elevator of their residential cooperative building to be specifically allocated as an automatically operating and continuously running Sabbath elevator, and for plaintiffs' demand to have the building staff act as their personal escorts to and from their apartments for the entire Sabbath and additional holidays.

1530 Owners Corp., also known as The Colony ("Colony"), is a 484 residential apartment and 11 commercial/storage unit, 32-story cooperative apartment complex located in Fort Lee, New

Jersey ("Building").[1] Moe Marshall, Ellen Gerber, Kenneth Lipke, Carol Lichtbraun, Justin Wimpfheimer, Patricia Di Constanzo, and Mark O'Neill are individual members of the Board of Managers of Colony ("Board").[2] The Building was constructed in 1972, was converted to a cooperative in 1985 and consists of north and south towers, with each tower containing a single service elevator, and two smaller passenger elevators.[3]

According to Colony policy, residents are required to move in and out of their respective apartments on weekdays between 8:30 a.m. and 4:30 p.m., and, as most residents are home on the weekends, Saturday is a particularly busy day for deliveries and for residents doing laundry.[4] All residents transporting laundry, as well as messengers and delivery personnel, are required to utilize the service elevators.[5] Due to their large size, deliveries such as trunks, cartons, furniture, etc., and the removal of same, are required to be performed through the use of the service elevators, and as most deliveries arrive on Saturdays, the service elevators generally remain busy and occupied on that day.[6] In addition, bicycles, children's three-wheeled toys, scooters, food, laundry carts, luggage and other similar items are all required to be transported through the service elevators.[7] Tradespeople, mechanics, construction workers and repair people are all required to use the service elevators.[8] Due to the size of stretchers and other emergency medical equipment, emergency medical workers utilize the service elevators to tend to residents in need, and, such ambulances and other emergency medical workers appear at the Building several times per week.[9]

---

[1] *See* Declaration of Moe Marshall dated July 19, 2021 ("Marshall Dec.") at ¶ 2.
[2] *See* Marshall Dec. at ¶ 2.
[3] *See* Marshall Dec. at ¶ 3.
[4] *See* Marshall Dec. at ¶ 4.
[5] *See* Marshall Dec. at ¶ 4.
[6] *See* Marshall Dec. at ¶ 4.
[7] *See* Marshall Dec. at ¶ 4.
[8] *See* Marshall Dec. at ¶ 4.
[9] *See* Marshall Dec. at ¶ 4.

In or about 2019, the Colony's Board determined that the elevators in the Building, which did not have a built-in Sabbath elevator program, were old and required replacement for safety reasons.[10] As such, the elevators were replaced at great cost to Colony (approximately $2,600,000), and the new elevators purchased came with a Sabbath elevator program mode already installed.[11] At the time of the replacement, the Board was informed by the elevator contractors that the elevator doors had at least five to ten years of life remaining, and that they did not need to be replaced.[12] The Board was informed that new elevator doors would cost Colony approximately $1,000,000, and, as such, Colony held off on the elevator door replacement due to the excessive cost.[13]

Subsequent to the installation of the new elevators, in an effort to best accommodate all Colony residents, the Board explored whether the residents would appreciate the enactment of a Sabbath elevator program.[14] As such, a non-binding exploratory vote was held to determine the potential interest in such a program, and the vote was deemed non-binding because the Board did not know how the program would affect the Colony's daily operations.[15] The vote resulted in an approval by a less than 1% margin; therefore, the Board authorized the commencement of a trial period for the Sabbath elevator program.[16]

After the program was enacted, multiple residents complained to the Board about significant delays and hardships caused by the program.[17] In an effort to resolve the complaints while still maintaining the program, the Board reduced and altered the amount of hours and the times that the elevators operated in Sabbath mode.[18] However, the issues were not resolved, and

---

[10] See Marshall Dec. at ¶ 5.
[11] See Marshall Dec. at ¶ 5.
[12] See Marshall Dec. at ¶ 5.
[13] See Marshall Dec. at ¶ 5.
[14] See Marshall Dec. at ¶ 6.
[15] See Marshall Dec. at ¶ 6.
[16] See Marshall Dec. at ¶ 6.
[17] See Marshall Dec. at ¶ 7.
[18] See Marshall Dec. at ¶ 7.

the complaints continued to be lodged by the residents.[19] Furthermore, reports of elevator doors repeatedly coming off their tracks or requiring repair significantly increased during this trial period.[20] As a result of the above, in addition to concerns over potential delays in emergency medical workers reaching residents, the Board was forced to terminate the program.[21]

Subsequent to the termination, Colony employees began complaining to the Board that the number of residents requiring personal escorts from their respective apartments to the lobby was significantly increasing, with the employees noting that they could not complete their normal job functions.[22] When the Board inquired into the specifics of the allegations, the employees explained that, years back, one or two residents began requesting that the employees retrieve the residents from their apartments at various times, and that, to be polite and to not cause trouble, the employees complied with the requests.[23] The employees explained that those residents began posting personal schedules and demanding that the employees abandon their respective posts to appear at their apartments, all in order to escort the residents to the elevators and down to the lobby.[24] The employees explained that, upon their arrival at the apartments, if the residents were not ready, the employees were ordered to hold the elevators and to wait.[25] The employees explained that, in the event they were unable to escort the residents, they were harassed, scolded and threatened with termination by those residents.[26] On several occasions, the police were called due to the employees fearing for their safety from the wrath of the unhappy residents.[27]

---

[19] *See* Marshall Dec. at ¶ 7.
[20] *See* Marshall Dec. at ¶ 7.
[21] *See* Marshall Dec. at ¶ 7.
[22] *See* Marshall Dec. at ¶ 8.
[23] *See* Marshall Dec. at ¶ 8.
[24] *See* Marshall Dec. at ¶ 8.
[25] *See* Marshall Dec. at ¶ 8.
[26] *See* Marshall Dec. at ¶ 8.
[27] *See* Marshall Dec. at ¶ 8.

The employees went on to note that, initially, it was only one or two residents that requested such escorts, and, as such, it did not cause much of a hardship.[28] However, as time passed, and particularly when the Sabbath elevator program was terminated, the list of individuals to be escorted grew exponentially to the point where the employees were unable to accomplish their job functions.[29]

As no policy was ever enacted by Colony authorizing these escorts or the employees abandoning their respective posts in such a manner, and as a result of the employees' inability to complete their job functions, the Board directed the employees to no longer accept personal schedules for escorts.[30] As a result, several residents, including several of the plaintiffs, retained the services of an individual identified as Jorge Perez to escort them and assist them in operating the elevators.[31] The Colony is aware of the existence of this individual and his purpose, and, to accommodate the residents of the Building, the Colony has not objected to or interfered with him in his performance of his paid-for services.[32]

Plaintiffs have since commenced this action and have moved for a preliminary injunction for the reinstatement of the Sabbath elevator program, as well as for Colony employees to return to escort them from their apartments, apparently without regard for the complaints or hardships faced by the Building residents, the expenses associated with the elevator repairs and maintenance or the potential delays in allowing emergency medical personnel to reach those residents in need. Plaintiffs have also alleged that various Defendants have made inflammatory and prejudicial

---

[28] *See* Marshall Dec. at ¶ 9.
[29] *See* Marshall Dec. at ¶ 9.
[30] *See* Marshall Dec. at ¶ 10.
[31] *See* Marshall Dec. at ¶ 10.
[32] *See* Marshall Dec. at ¶ 10.

statements; however, Defendants are outraged by these allegations and adamantly deny such false hearsay.[33]

## ARGUMENT

## POINT I

## PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION MUST BE DENIED DUE TO THE LACK OF IRREPARABLE HARM

Plaintiffs' application for a preliminary injunction must be denied as a matter of law due to the complete lack of irreparable harm. The two factors that must be demonstrated prior to further analysis in order to obtain a preliminary injunction are irreparable harm and likelihood of success on the merits. *Kolawole O.T. v. Ahrendt*, 466 F.Supp.3d 457, 465-466 (D.N.J. 2020).

Plaintiffs falsely argue at page "30" of their memorandum of law that they are not required to prove irreparable harm due to their purported "strong likelihood of success on the merits", apparently creating "a presumption of irreparable harm." In this regard, plaintiffs' deceivingly cite *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*, 996 F.Supp. 409, 439 (D.N.J. 1998), as authority for their contention, but fail to cite the very next sentence in that case, which clarifies that, while the above contention is sometimes followed by the 11th Circuit, "[i]n this Circuit . . . courts have declined to apply such a presumption." *Id.*

"A preliminary injunction is an extraordinary remedy that should be granted only if '(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'" *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999), *quoting, Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction

---

[33] *See* Marshall Dec. at ¶ 11.

inappropriate." *NutraSweet, supra.* "In the absence of irreparable injury, no preliminary injunction would lie, even if the other three elements, noted above, were found." *Id.*

Herein, plaintiffs allege that they are irreparably harmed due to their inability to utilize the elevators on the Sabbath and select holidays without the Sabbath elevator program or the assistance of a Colony employee. First, as noted above, and as admitted by plaintiffs at page "32" of their memorandum of law, plaintiffs "have hired an individual from outside the Colony to assist them with the elevator." As confirmed by Defendants, plaintiffs have retained the services of an individual named Jorge Perez to act as their escort and to push elevator buttons for them on the Sabbath and holidays, and, Colony has not objected to or interfered with his performing such tasks.[34]

Money damages do not constitute irreparable harm, and "we have never upheld an injunction where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law . . . [t]he availability of adequate monetary damages belies a claim of irreparable injury." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989), *citing, Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100 (3d Cir. 1988). Plaintiffs' admission that some individuals are actively utilizing the staircases also eliminates the potential for irreparable harm, as "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Oburn v. Shapp*, 521 F.2d 142 (3d Cir. 1975).

---

[34] *See* Marshall Dec. at ¶ 10.

Plaintiffs also attempt to argue, citing *Heckler v. Matthews*, 465 U.S. 728, 739-740 (1984), that because plaintiffs were purportedly subject to discrimination, they have suffered significant damages. However, such an argument is more appropriately addressed as to plaintiffs' potential likelihood of success on the merits, rather than to whether plaintiffs suffered irreparable harm. Plaintiffs cite an instance when a staff member allegedly passed by plaintiffs without pressing an elevator button for them. However, as noted above, plaintiffs have hired an individual to operate the elevators for them, and as such, have not been irreparably harmed. Plaintiffs' statement at page "32" of their memorandum of law that without an injunction "they will invariably continue to miss out on communal prayer, lifecycle events in their Synagogue, and other foundational parts of the Sabbath" is outright false, since, as noted above, plaintiffs have retained an individual to operate the elevators for them and to escort them from their apartments to the lobby.

Plaintiffs' argument regarding an apparent violation of their First Amendment rights by Colony is completely misplaced, since, as explained by the Supreme Court of the United States, a "state action" is required in order for such a violation to occur. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978). Private residential associations are not considered state actors, and, as such, First Amendment violation claims against them are without merit. *Midlake on Big Boulder Lake, Condominium Ass'n v. Cappuccio*, 673 A.2d 340 (Pa. Superior Ct. 1996)(First Amendment violation claims against condominium association may not be maintained). Herein, plaintiffs have asserted claims against private individuals and a privately owned residential association and managing agent, and, as no state action has occurred, or is even alleged, no First Amendment violation can be alleged, or occurred, or can be claimed.

Plaintiffs also argue that the Board has purportedly retaliated against them, leaving them anxious and insecure due to other residents being aggravated with them. Even if true, it is irrelevant

8

as to the within demand for an injunction, as the reinstatement of such programs would have no effect on plaintiffs' activities, as they have specifically retained an individual to escort them and to operate the elevators for them.

Moreover, the record is devoid of any statute or law requiring the installation or maintenance of Sabbath elevators or mandatory employee elevator assistance to any residents, let alone Sabbath observers, within private residential associations. In this regard, herein, plaintiffs allege that employees had assisted them for approximately sixteen years. However, prior thereto, no Sabbath elevator program was in place, and no employee assistance occurred or was alleged. Yet, no apparent irreparable harm occurred from the time of the construction of the Building in 1972, through its cooperative conversion in 1985, to approximately 2005 when plaintiffs alleged employees purportedly began assisting one or two of them with the elevators. A holding that plaintiffs are suffering irreparable harm would, in essence, mandate, as a matter of law, the installation and maintenance of Sabbath elevators, or require employee assistance to Sabbath observers, within all private residential accommodations in this jurisdiction spanning more than a couple of stories.

As a result of the above, plaintiffs' application for a preliminary injunction must be denied in its entirety as a matter of law.

## POINT II

## THE PUBLIC INTEREST DOES NOT FAVOR AN INJUNCTION

Herein, plaintiffs inappropriately argue that a preliminary injunction is in the public interest, as an alleged rabbi, a mayor and a congressman purportedly had discussions with the Colony Board. Noteworthy, plaintiffs did not cite to the content of any such conversations, the specific points made, whether those individuals supported the Colony's decision, or any directives issued by any individual or governmental entity requiring Colony to act in any specific manner. Plaintiffs have also failed to cite any adverse decision by any agency with respect to Colony's decisions, including ceasing the Sabbath elevator program.

Generally, "[t]he public interest was in specific action rather than in the vindication of an abstract principle, and was considered within the confines of disputes involving governmental agencies or programs rather than in the adjudication of private controversies." *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 358 (3d Cir. 1980). The inadequate staffing of a police force is an example of a dispute centered on the public interest. *Oburn, supra.* An adverse effect on the public interest may cause an injunction to be withheld even "though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982). As noted above, the Sabbath elevator program subjects the Colony residents to delays in emergency medical workers reaching the residents, causes accelerated wear and tear and damage to the elevators, and results in significant disruption to the entire Building.[35]

Moreover, as argued above, the record is devoid of any statute or law requiring the installation or maintenance of Sabbath elevators or mandatory employee elevator assistance to any resident, let alone Sabbath observers, within private residential associations. As such, granting an

---

[35] *See* Marshall Dec. at ¶ 7.

injunction herein would essentially mandate, in the entire jurisdiction, the installation and maintenance of Sabbath elevators, or the requirement for employee assistance to residents within all private residential accommodations spanning more than a few floors. Such a massive public impact at least requires the adjudication of this action without the confines of an injunction prior to restricting the general public in this jurisdiction to such restrictive requirements. Notwithstanding, it would appear that such a severe mandate would actually require formal legislation rather than a single private civil action dictating such expansive, expensive and life altering policy.

As a result of the above, plaintiffs' motion for a preliminary injunction must be denied in its entirety as a matter of law.

## POINT III

## THE BALANCING OF THE HARDSHIPS FAVORS DEFENDANTS

"Before granting an injunction, a district court must balance the relative harm of the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

Herein, plaintiffs cannot demonstrate any hardship. In this regard, plaintiffs admit in their moving papers that they have retained the services of an individual to escort them and to operate the elevators for them. Thus, at most, plaintiffs will sustain a minimal amount of monetary damages. Additionally, plaintiffs admit that some of the plaintiffs have taken the staircase rather than the elevator. Again, those plaintiffs have suffered minimal to no hardship in doing so.

On the contrary, as noted above, numerous residents have issued complaints to the Board regarding elevator delays, package and delivery delays, and elevator breakdowns.[36] As noted above, the elevators doors wear out more rapidly with the operation of the Sabbath elevator program, and the Board has been informed that the cost of replacement of those elevator doors will be in the $1,000,000 range.[37] Moreover, a delay in allowing emergency medical responders to reach residents due to the elevator being run on the Sabbath program could prove deadly.[38] In allowing the Sabbath elevator program to continue, the Board is opening Colony to lawsuits from residents of the Building that do not utilize the Sabbath elevator, and who are adversely impacted because of the program.

Moreover, as noted above, there is no doubt that a balancing of the equities is not in favor of plaintiffs, as granting an injunction herein establishes a precedent in the entire jurisdiction that the installation and maintenance of Sabbath elevators, or the requirement for employee assistance to residents that demand same within all private residential accommodations spanning more than a few floors, is required. Such a massive policy change imposed on the general public requires the denial of plaintiffs' application for an injunction, as the facts and circumstances surrounding any such mandate and precedent must be fully litigated, and, in theory, initiated by legislation, prior to requiring such massively extensive and expensive mandates to the general public's living accommodations. Plaintiffs' demand to conduct their own expert study relating to elevator wear and tear and repairs is direct evidence of an admission by plaintiffs that this matter must be reviewed, litigated and decided prior to any such harsh restrictions on public policy or jurisdictional precedent.

---

[36] *See* Marshall Dec. at ¶ 7.
[37] *See* Marshall Dec. at ¶ 5.
[38] *See* Marshall Dec. at ¶ 7.

As a result, plaintiffs' application for a preliminary injunction must be denied in its entirety as a matter of law.

## POINT IV

### PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Plaintiffs' application for a preliminary injunction must be denied, as plaintiffs are not likely to succeed on the merits in this action.

"The business judgment rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct." *Maul v. Kirkman*, 637 A.2d 928 (App. Div. 1994). "The rule exists to promote and protect the full and free exercise of the power of management given to the directors." *Id.* "[B]ad judgment, without bad faith, does not ordinarily make officers individually liable." *Id.* With regard to directors, the business judgment rule provides a "powerful presumption . . . that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation*, 493 F.3d 393, 402-403 (3d Cir. 2007).

Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task. *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). To overcome the business judgment rule, a plaintiff must establish "that a decision was so egregious as to constitute corporate waste. . . that no reasonable business person could possibly authorize the action in good faith." *Id.* "Put positively, the decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Id.*

Plaintiffs' argument that Defendants discriminated against them does not have any merit whatsoever. Specifically, as noted above, multiple complaints by the residents relating to

significant delays and hardships, the breakdown of the elevators and the costs to repair same, and concerns over delays for emergency medical workers resulted in the Board making the legitimate business decision to terminate the elevator program.[39] Moreover, Colony employees becoming unable to perform their job duties and tasks resulted in the Board directing the employees to not deviate from their assigned responsibilities.[40] The presumption, as a matter of law, is that the Board acted in good faith for the benefit and betterment of the corporation. *In re Merck, supra.* As such, before the facts are even examined, the presumption is that Defendants acted properly, thus eliminating plaintiffs' purported likelihood of success on the merits.

Moreover, there is no rule as to who may or may not use the passenger elevators; rather, the elevator rules relate to oversized special deliveries being assigned to the service elevators due to size and weight restrictions.[41] Clearly, Defendants' actions represent legitimate business purposes in furtherance of the corporation, with no self-dealing, bad faith or discrimination. Importantly, if Defendants sought to discriminate against plaintiffs, why would they have initiated the Sabbath elevator program in the first place? Clearly, this action constitutes a group of plaintiffs not pleased with the legitimate business decisions of Defendants, and, as a result of the business judgment rule, plaintiffs are barred from contesting Defendants' decision.

Plaintiffs incorrectly allege there is direct evidence of discrimination against Sabbath observants based upon the staff being permitted to deliver packages, luggage and groceries for residents. That argument is misplaced, as the staff is also permitted to deliver packages, luggage and groceries for Sabbath observant residents, and there is not a single allegation that the staff refused to assist plaintiffs with their groceries, packages, etc. There is no express policy of

---

[39] *See* Marshall Dec. at ¶ 7.
[40] *See* Marshall Dec. at ¶ 10.
[41] *See* Marshall Dec. at ¶ 4.

imposing any burdens in the Building based upon religious beliefs. Rather, Defendants have instructed the employees to fulfill and complete their required responsibilities, and to not deviate from their responsibilities at the whims of the residents.[42] Plaintiffs attempt to dismantle the business judgment rule by alleging that boards do not have the authority to hold non-binding exploratory votes among their residents or to make decisions contrary to such non-binding exploratory votes. However, plaintiffs fail to cite a single authority as precedent for such a contention. Rather, plaintiffs again mistake this matter as one against a governmental entity by citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), which discusses a governmental "law burdening religious practice" rather than private actions between non-governmental entities. *Id.*

Plaintiffs' allegations of indirect evidence of discrimination is based upon the Board's apparent failure to share documentary evidence with plaintiffs related to the basis of its decisions. Again, the business judgment rule protects the Board's decisions, and mandates the presumption of good faith; thus, plaintiffs will be required to conduct discovery in this matter to reveal the basis for the decisions of the Board without first obtaining an injunction. Again, as noted above, plaintiffs concoct fabricated prejudicial quotes to portray Defendants in a negative light. Defendants are outraged by these false quotations and object to the submission of such hearsay.[43]

Plaintiffs' argument of disparate impact upon plaintiffs is also without merit, since, once again, plaintiffs improperly intermingle the laws relating to state action with those relating to actions of private individuals and private entities. In this regard, plaintiffs' citations of *Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly*, 658 F.3d 375, 382 (2011) and *Yeshiva Chofetz Chaim Radin v. Village of New Hempstead*, 98 F.Supp.2d 347, 354-355 (S.D.N.Y.

---

[42] *See* Marshall Dec. at ¶ 4.
[43] *See* Marshall Dec. at ¶ 11.

2000) are entirely misplaced as they relate to the potential disparate impact of governmental laws and regulations on the public and how to address such laws and regulations. Those cases, and the principles they discuss, are completely irrelevant to private actions by private individuals or entities. Notwithstanding, and not surprisingly, the establishment that a judgment based upon the lack of an alternative is a viable defense thereto. *Mt. Holly, supra.* As noted above, the Board, after considering all options, and fielding various complaints and concerns from plaintiffs and other residents, made legitimate business decisions in good faith which are protected by the business judgment rule. So even if the Colony was a state actor, which it is not, it would not face liability under plaintiffs' disparate impact theory.

Plaintiffs then oddly and incorrectly argue that, under state and federal laws, Defendants discriminated against some of the plaintiffs as they are disabled, and Defendants allegedly failed to offer a reasonable accommodation for them. Specifically, plaintiffs state that Defendants have discriminated against plaintiffs due to "a refusal to make reasonable accommodations in rules, policies, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

Plaintiffs then argue that, as some of them are purportedly disabled, they cannot traverse the staircases. First, it is undisputed that Defendants have provided plaintiffs with three elevators per Building tower for any and all disabled plaintiffs to utilize, and all residents have the same equal opportunity to use and enjoy the dwelling through the use of those elevators. While plaintiffs, at times, refuse to utilize those elevators for their own reasons, such is their own choice, and, thus, forms the basis for their argument/assertion of religious discrimination.

However, plaintiffs have failed to cite one precedent source to establish that plaintiffs may opt out of a reasonable accommodation and demand another mode of reasonable accommodation.

In fact, if a reasonable accommodation is offered, an individual cannot reject the accommodation and demand a different accommodation. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195 (6ᵗʰ Cir. 2010). Additionally, the record is completely devoid of any documents or evidence that any of plaintiffs demanded a reasonable accommodation from Defendants based upon their alleged disabilities, and that Defendants did not accommodate plaintiffs related to those disabilities. Nonetheless, as noted above, use of the Sabbath elevator program will require the replacement of the elevator doors at an approximate cost of $1,000,000.[44] Such costs do not constitute a reasonable amount, and risking the lives of residents through the delay in emergency medical workers reaching their destinations is not reasonable. As also noted above, the accommodations are not "necessary," as plaintiffs have retained an individual to operate the elevators and to escort them from their apartments to the lobby.

Plaintiffs' citation of *Lefkowitz v. Westlake Master Ass'n*, 2019 WL 669806 (D.N.J. Feb. 19, 2019) is inapplicable herein, as that case involved offering to a Sabbath observer an extra key to a gate, when the gate is virtually not utilized and no damage or significant work to the gate would be required. *Id.* Herein, as noted above, the employment of the Sabbath elevator program has caused significant delays, wear and tear, and damage to the elevators and risks the lives of those who need emergency medical assistance.[45] Additionally, directing the employees of the Colony association to escort plaintiffs, as explained by the employees, prevents them from completing their job duties.[46]

Analogous to the above First Amendment argument, plaintiffs inappropriately cite *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) to argue that "plaintiffs'

---

[44] *See* Marshall Dec. at ¶ 5.
[45] *See* Marshall Dec. at ¶ 7.
[46] *See* Marshall Dec. at ¶ 10.

free exercise of religion will be impaired," and, as such, the "balance easily tips in the plaintiffs' favor." *Id.* As above, such arguments are only applicable where state action interferes with First Amendment rights. *Id.* The *Tenafly* case dealt with the Borough of Tenafly taking action impairing the plaintiffs' religious rights. *Id.* Herein, there is no state action, and plaintiffs have commenced suit against private individuals and private companies; thus, they may not argue First Amendment violations.

Finally, plaintiffs incorrectly argue that Defendants retaliated against and harassed them. First, plaintiffs allege the retaliation was in the form of Defendants not reversing their purportedly discriminatory decisions. As discussed above, the decisions of Defendants were made in good faith for a legitimate business purpose, and, as such, are protected under the business judgment rule. Next, plaintiffs argue that Defendants retaliated by purportedly addressing them at a building-wide meeting to discuss the issue. Plaintiffs' attempt to trap the Board by bringing up and inquiring of the elevator issue at a building-wide meeting, and then, when the Board responds to plaintiffs' inquiries, claiming discrimination, is inappropriate and improper. Plaintiffs' allegations that the Board "lied repeatedly-to the ADL, the New Jersey Division on Civil Rights, and the shareholders" is completely unfounded, and there has been no formal determination by any agency or other group of any such perjury, false statements or similar conduct. Plaintiffs incorrectly allege that "the Board has launched a campaign to intimidate Plaintiffs into dropping their DCR complaints and abandoning their efforts to secure Sabbath accommodations." Plaintiffs' purported evidence of this alleged campaign is the Board's decision to terminate the Sabbath elevator program, which, as noted above, falls under the protection of the business judgment rule.

As a result of the above, plaintiffs' application for a preliminary injunction must be denied in its entirety as a matter of law.

## <u>CONCLUSION</u>

In light of the foregoing and the settled case law and statutory authority cited above, plaintiffs' application for a preliminary injunction must be denied in its entirety as a matter of law.

Dated: July 19, 2021

**MILBER MAKRIS PLOUSADIS
& SEIDEN, LLP**

By: _____

Peter Seiden, Esq.
Attorneys for Defendants
*1530 Owners Corp., Moe Marshall, Ellen Gerber,
Kenneth Lipke, Carol Lichtbraun, Justin
Wimpfheimer, Patricia Di Constanzo, and Mark
O'Neill, individually and as members of the Board
of Directors of 1530 Owners Corp., and First
Service Residential*
2016 John F. Kennedy Boulevard
Jersey City, NJ 07305
(201) 433-0778
pseiden@milbermakris.com

Patrick F. Palladino, Esq. (*pro hac vice* pending)
Milber Makris Plousadis & Seiden, LLP
1000 Woodbury Road, Suite 402
Woodbury, New York 11797
(516) 712-4000
ppalladino@milbermakris.com
