UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL KURLANSKY, HELAINE KURLANSKY MARTIN EPSTEIN, HERBERT ENNIS, JUDITH ENNIS, MORDECAI APPLETON, HENRY KATZ, LILA KATZ, JOAN KATZ, GLENN KATZ, and JUDITH SINGER,<br><br>Plaintiffs,<br><br>vs.<br><br>1530 OWNERS CORP.; MOE MARSHALL, ELLEN GERBER, KENNETH LIPKE, CAROL LICHTBRAUN, JUSTIN WIMPFHEIMER, PATRICIA DI CONSTANZO, and MARK O'NEILL, Individually and as Members of the Board of Directors of 1530 Owners Corp., and FIRST SERVICE RESIDENTIAL,<br><br>Defendants. | Civil Action No.: 2:21-cv-12770<br><br>**DECLARATION OF MOE MARSHALL IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION** |

I, Moe Marshall, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I am a defendant in the above-captioned action. I also am a resident of the Colony in Fort Lee, New Jersey and a member of the Board of Directors of the Colony. I am familiar with all of the facts and circumstances surrounding this action, as well as the facts and circumstances set forth below. This Declaration is respectfully submitted in opposition to the plaintiffs' application for a preliminary injunction.

2.  Defendant 1530 Owners Corp. is also known as The Colony ("Colony") and is a 484 residential apartment and 11 commercial/storage unit, 32-story cooperative apartment complex located in Fort Lee, New Jersey ("Building"). I am an individual defendant in the above-

captioned action, and along with defendants Ellen Gerber, Kenneth Lipke, Carol Lichtbraun, Justin Wimpfheimer, Patricia Di Constanzo, and Mark O'Neill, I serve on the Board of Managers of Colony ("Board").

3. The Building was constructed in 1972, and was converted to a cooperative in 1985. The Building consists of north and south towers, with each tower containing a single service elevator, and two smaller passenger elevators.

4. According to Colony policy, residents are required to move in and out of their respective apartments on weekdays between 8:30 a.m. and 4:30 p.m. As most residents are home on the weekends, Saturday is a particularly busy day for deliveries and for residents doing laundry, and all residents transporting laundry, as well as delivery persons or messengers, are required to utilize the service elevators. Due to their size, large deliveries such as trunks, cartons, furniture, etc., and the removal of same, are required to be performed through the use of the service elevators, and as most deliveries arrive on Saturdays, the service elevators generally remain busy and occupied on that day. In addition, bicycles, children's three-wheeled toys, scooters, food, laundry carts, luggage and other similar items are all required to be transported through the service elevators. Tradesmen/tradeswomen, mechanics, construction workers and repair people are all required to use the service elevators. Due to the size of stretchers and other emergency medical equipment, emergency medical workers utilize the service elevators to tend to residents in need. Typically, ambulances and other emergency medical workers appear at the Building several times a week.

5. In or about 2019, the Colony's Board determined that the elevators in the Building, which did not have a built-in Sabbath elevator program, were old and required replacement for safety reasons. As such, the elevators were replaced at great cost to Colony (approximately

$2,600,000), and the new elevators purchased came with a Sabbath elevator program mode already installed. At the time of the replacement project, the Board was informed by the elevator contractors that the elevator doors had at least five to ten years of life remaining, and that they did not need to be replaced. The Board was informed that new elevator doors would cost Colony approximately $1,000,000. As such, Colony held off on the replacement of the elevator doors due to the excessive cost of the elevator replacement project.

6. Subsequent to the installation of the new elevators, in an effort to best accommodate all residents of Colony, the Board explored whether the residents would appreciate the enactment of a Sabbath elevator program. As such, a non-binding exploratory vote was held to decipher the potential interest in such a program. The vote was deemed non-binding because the Board did not know how the program would affect the Colony's daily operations. The vote resulted in an approval by a less than 1% margin. As such, the Board authorized the commencement of a trial period for the Sabbath elevator program.

7. After the program was enacted, multiple residents complained to the Board about significant delays and hardships the program was causing. In an effort to resolve the complaints while still maintaining the program, the Board reduced and altered the amount of hours and the times the elevators operated in Sabbath mode. However, the issues were not resolved, and the complaints continued to be lodged by the residents. Furthermore, reports of elevator doors repeatedly coming off their tracks or requiring repair significantly increased during this trial period. As a result of the above, in addition to concerns over potential delays in emergency medical workers reaching residents, the Board was forced to terminate the program.

8. Subsequent to the termination, Colony employees began complaining to the Board that the number of residents requiring personal escorts from their respective apartments to the

lobby was significantly increasing, with the employees noting that they could not complete their normal job functions. When the Board inquired into the specifics of the allegations, the employees explained that years back, one or two residents began requesting that the employees retrieve the residents from their apartments at various times, and that to be polite and to not cause trouble, the employees complied with the requests. The employees explained that those residents began posting personal schedules and demanding that the employees abandon their respective posts to appear at their apartments, all in order to escort the residents to the elevators and down to the lobby. The employees explained that upon arrival at the apartments, if the residents were not ready, the employees were ordered to hold the elevator and wait. The employees explained that in the event they were unable to escort the residents, they were harassed, scolded and threatened with termination by those residents. On several occasions, the police were called due to the employees fearing for their safety from the wrath of the unhappy residents.

9. The employees went on to note that initially it was only one or two residents that requested such escorts, and as such, did not cause much of a hardship. However, as time passed, and particularly when the Sabbath elevator program was terminated, the list of individuals to be escorted grew exponentially to the point where the employees were unable to accomplish their job functions. Specifically, Colony porters are required on Saturdays to: (i) inspect and clean the tower floors; (ii) utilize the service elevators to conduct four garbage removals at about an hour per removal; (iii) utilize the service elevators to distribute packages and deliveries; (iv) utilize the service elevators to wash and clean the compactor rooms and the equipment therein; (v) clean the elevators; and (vi) clean the laundry rooms. On Friday evenings, the porters are required to: (i) vacuum the floors from floor 16 to the penthouse; (ii) utilize the service elevators for two garbage removals; (iii) mop the compactor rooms from floor 15 to the penthouse; (iv) clean the chutes from

floor 15 to the penthouse; (v) wash the garbage buckets from floor 15 to the penthouse; (vi) utilize the service elevators to distribute packages and for deliveries; (vii) clean the main compactor room and machine; and (viii) clean the laundry room.

10. As no policy was ever enacted by Colony authorizing these escorts or the employees abandoning their respective posts in such a manner, and as a result of the employees' inability to complete their job functions, the Board directed the employees to no longer accept personal schedules for escorts. As a result, several residents, including several of the plaintiffs, retained the services of an individual identified as Jorge Perez to escort them and assist them in operating the elevators. The Colony is aware of the existence of this individual and his purpose, and to accommodate the residents of the Building, the Colony has not objected to or interfered with him in his performance of his paid for services.

11. Plaintiffs have also alleged that various defendants have made inflammatory and prejudicial statements. However, at no time have I made any discriminatory or inflammatory comments, and I am not aware of any such comments by any other defendants. The defendants have discussed the alleged comments, and the defendants are outraged by these allegations and adamantly deny such blatantly false statements. The allegations asserted by plaintiffs do not accurately reflect the history and background surrounding this matter, and absolutely no wrongful, inappropriate, illegal and/or discriminatory conduct has occurred.

12. The defendants respectfully request that This Honorable Court deny plaintiffs' application for a preliminary injunction in its entirety.

13. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2021.

*[Signature]*

MOE MARSHALL